# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

FRIENDS OF ANIMALS,                            )
                                               )
                        Plaintiff,             )
                                               )
        v.                                     )
                                               )
DIRK KEMPTHORNE, Secretary of the Interior,    )
                                               )    Civ. No. 04-1660 (HHK-DAR)
                                               )    Civ. No. 06-2120
                        Defendant,             )    (Consolidated Cases)
                                               )
        and                                    )
                                               )
SAFARI CLUB INTERNATIONAL, et al.,             )
                                               )
                        Defendant-Intervenors. )
_____)
REBECCA ANN CARY, et al.,                      )
                                               )
                        Plaintiffs,            )
                                               )
        v.                                     )
                                               )
DALE HALL, Director, Fish and Wildlife Service,)
et al.,                                        )
                                               )
                        Defendants,            )
                                               )
        and                                    )
                                               )
SAFARI CLUB INTERNATIONAL, et al.,             )
                                               )
                        Defendant-Intervenors. )
_____)


## PLAINTIFF FRIENDS OF ANIMALS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………………………ii

TABLE OF AUTHORITIES……………………………………………………………..iv

INTRODUCTION…………………………………………………………………...1

LEGAL BACKGROUND—THE ENDANGERED SPECIES ACT…………………………..2

STANDARD OF REVIEW……………………………………………………………4

ARGUMENT………………………………………………………………………...5

I.    FOA HAS STANDING TO CHALLENGE THE CANNED HUNTING RULE………...6

    A.    FOA has Standing to Challenge the Canned Hunting Rule on Behalf of Priscilla Feral……………………………………………………………………6

        1.    Ms. Feral has standing to challenge the canned hunting rule based on injury to wild antelope……………………………………………………6

            a.    Ms. Feral has an aesthetic interest in wild antelope………………6

            b.    The canned hunting rule causes the injury to wild antelope…........8

            c.    This Court can redress Ms. Feral's injuries……………………...13

        2.    Ms. Feral has standing to challenge the canned hunting rule based on injury to antelope in captivity………………………………………........14

    B.    FOA has Standing as an Organization………………………………………...16

        1.    FOA has standing to challenge the regulation because the canned hunting rule drains its resources………………………………………16

        2.    FOA has standing to challenge the canned hunting rule based on informational injury………………………………………………...18

II.   THE CANNED HUNTING RULE VIOLATES SECTION 10 OF THE ENDANGERED SPECIES ACT………………………………………………...21

    A.    FWS Cannot Authorize Sport-Hunting or Trade in Sport-Hunted Trophies Under  Section 10(a)(1)(A)…………………………………………………21

        1.    Section 10(a)(1)(A) does not authorize lethal take for "sport."…………22

       2.      FWS cannot allow canned hunting ranches to sustain antelope
for no other purpose than to kill them…………………………………29

   B.     FWS Cannot Eliminate the Individual Permitting Requirement of Section 10(c)
and (d)……………………………………………………………………32

III.    FWS VIOLATED ESA SECTION 4 BY FAILING TO RELY ON THE BEST
SCIENTIFIC INFORMATION AVAILABLE…………………………………………35

IV.    FWS VIOLATED THE ESA BY FAILING TO CONDUCT A SECTION 7
CONSULTATION ON THE CANNED HUNTING RULE……………………………37

V.    FWS VIOLATED NEPA BY FAILING TO TAKE A HARD LOOK AT THE
IMPACTS OF THE CANNED HUNTING RULE………………………………...39

   A.     FWS violated NEPA by using the EA to Rationalize a Predetermined Outcome
and Failing to Consider a Reasonable Range of Alternatives……………………40

   B.     FWS Ignored Relevant Environmental Concerns and Failed to Rely on High
Quality Information……………………………………………………………...43

CONCLUSION………………………………………………………………………………44

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,
469 F.3d 129 (D.C. Cir.2006)……………………………………………………………6, 16

AFL-CIO v. Fed. Election Comm'n, 333 F.3d 168 (D.C. Cir. 1999)……………………………..5

Am. Farm Bureau v. EPA, 121 F. Supp. 2d 84 (D.D.C. 2000)…………………………………19

Am. Iron & Steel Inst. v. EPA, 115 F.3d 979 (D.C. Cir. 1997)…………………………………38

Am. Wildlands v. Norton, 193 F. Supp.2d 244 (D.D.C. 2002)…………………………………35

Animal Legal Defense Fund v. Espy, 23 F.3d 496 (D.C. Cir. 1994)……………………………19

Animal Legal Defense Fund v. Glickman, 154 F.3d 426 (D.C. Cir. 1998)…………………...6, 15

Animal Welfare Inst. v. Kreps, 561 F.2d 1002 (D.C. Cir. 1977)………………………………...9, 12

Baltimore Gas & Electric v. NRDC, 462 U.S. 87 (1983)…………………………………………4, 43

Building Indus. Ass'n of Superior Cal. v. Babbitt, 979 F. Supp. 893(D.D.C. 1997)…………4, 8

Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,
449 F.2d 1109 (D.C. Cir. 1971)……………………………………………………………...40, 41

Carlton v. Babbitt, 900 F. Supp. 526 (D.D.C. 1995)……………………………………………36

Cary v. Hall, No. 05-4363 (N.D. Ca. Sept. 30, 2006)...……………………………………passim

Cayman Turtle Farm, Ltd. v. Andrus, 478 F. Supp. 125 (D.D.C. 1979)……………………passim

Chevron U.S.A., Inc. v. Nat. Resources Defense Council ("NRDC"), 467 U.S. 837 (1984)……..4

Citizens Against Burlington v. Busey, 938 F.2d 190 (D.C. Cir. 1991)…………………………40

City of Las Vegas v. Lujan, 891 F.2d 927 (D.C. Cir. 1989)……………………………………4

City of New York v. U.S. Dept. of Transp., 715 F.2d 732 (2d Cir. 1983)………………..……..41

Common Cause v. Fed. Election Comm'n, 692 F. Supp. 1391 (D.D.C. 1987)…………………...5

Competitive Enter. Inst., 901 F.2d 107 (D.C. Cir. 1990)…………………………………8, 10, 19

Covington v. Jefferson County, 358 F.3d 626 (9th Cir. 2004)………………………………………9

Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002)……………………………………………..41

Defenders of Wildlife v. Babbitt, 958 F. Supp. 670 (D.D.C. 1997)………………………………..35

Defenders of Wildlife v. Norton, Civ. No. 05-1573 (D.D.C.))…………………………………..24

Envtl. Protection Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073 (9th Cir. 2001)……………38

Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.,
28 F.3d 1268 (D.C. Cir. 1994)…………………………………………………………………...16

FEC v. Akins, 524 U.S. 11 (1998)……………………………………………………………………18

Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996)…………………………………14

Florida Key Deer v. Stickney, 864 F. Supp. 1222 (S.D. Fla. 1994)……………………………………9

Fund for Animals v. Norton, 295 F. Supp. 2d 1 (D.D.C. 2003)………………………………………13

Fund for Animals v. Norton, 322 F.3d 728 (D.C. Cir. 2003)……………………………………18

Fund for Animals v. Turner, Civ. No. 91-2201 (Sept. 27, 1991), 1991 WL 206232………..24, 25

Gerber v. Norton, 294 F.3d 173 (D.C. Cir. 2002)………………………………………………19, 33

Gifford Pinchot Task Force v. FWS, 378 F.3d 1059 (9th Cir. 2004)……………………………29

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982)……………………………………..16, 19

Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv., 281 F. Supp.2d 1 (D.D.C. 2003)……38

Humane Soc'y of the U.S. v. Kempthorne, Civ. No. 06-1279 (D.D.C. Aug. 9, 2006)……passim

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977)……………………………….6

Intl. Ladies' Garment Union v. Donovan, 722 F.2d 795 (D.C. Cir. 1983)………………………..9

Lujan v. Defenders of Wildlife, 504 U.S. 55 (1992)…………………………………………6, 8, 14

Marsh v. Or. Natural Res. Council, 490 U.S. 360 (1989)……………………………………..39

Metcalf v. Daley, 214 F.3d 1135 (9th Cir. 2000)…………………………………………………..41

Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220 (10th Cir. 2002)……………30

Motor Vehicles Mfrs. Ass'n. v. State Farm, 463 U.S. 29 (1983)……………………………4, 43

Nat'l Ass'n of Home Builders v. Norton, 298 F. Supp. 2d 68 (D.D.C. 2003)………………..30

Nat'l Treasury Employees Union v. U.S., 101 F.3d 1423 (D.C. Cir. 1996)……………………..16

Nat. Wildlife Fed'n v. Norton, 332 F. Supp.2d 170 (D.D.C. 2004)…………………………35, 39

Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117 (1991)…………………...5

NRDC v. Browner, 57 F.3d 1122 (D.C. Cir. 1995)…………………………………………………….5

NRDC v. Houston, 146 F.3d 1118 (9th Cir. 1998)…………………………………………………38

NRDC v. Morton, 458 F.2d 827 (D.C. Cir. 1972)…………………………………………………43

Oceana, Inc. v. Evans, 384 F. Supp.2d 203 (D.D.C. 2005)……………………………………...39

Orloski v. Fed. Election Comm'n, 795 F.2d 156 (D.C. Cir. 1986)………………………………..5

Pub. Citizen v. Dep't of Justice, 491 U.S. 440 (1989)……………………………………………...18

Qi-Zhuo v. Messner, 70 F.3d 136 (D.C. Cir. 1995)………………………………………………..5

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989)………………………39, 40

Sierra Club v. Clark, 755 F.2d 608 (8th Cir. 1985)…………………………………………24, 25

Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987)…………………………………………38

Sierra Club v. Watkins, 808 F. Supp. 852 (1991)……………………………………40, 41, 43

Sw. Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58 (D.C. Cir. 2000)……………………..35

Taxpayers of Mich. Against Casinos v. Norton, 433 F.3d 852 (D.C. Cir. 2006)……………39, 43

TVA v. Hill, 437 U.S. 153 (1978)……………………………………………………...2, 21, 38

Warth v. Seldin, 422 U.S. 490 (1975)………………………………………………………16

**FEDERAL STATUTES**

5 U.S.C. § 552……………………………………………………………………20, 34

5 U.S.C. § 706(2)(A)………………………………………………………………………4

7 U.S.C. § 1901……………………………………………………………………………..15

7 U.S.C. § 1902……………………………………………………………………………..15

16 U.S.C. § 1531(b)………………………………………………………………………...2, 22

16 U.S.C. § 1532(3)…………………………………………………………2, 18, 22, 25, 30

16 U.S.C. § 1532(6)…………………………………………………………………………2

16 U.S.C. § 1532(19)………………………………………………………………………3, 21

16 U.S.C. § 1532(20)………………………………………………………………………...2

16 U.S.C. § 1533……………………………………………………………………………2, 35

16 U.S.C. § 1533(d)………………………………………………………………………...24

16 U.S.C. § 1533(f)…………………………………………………………………………30, 32

16 U.S.C. § 1536(a)(2)……………………………………………………………………3, 38, 39

16 U.S.C. § 1536(b)(3)(A)…………………………………………………………………38

16 U.S.C. § 1538……………………………………………………………………passim

16 U.S.C. § 1539(a)(1)(A)………………………………………………………………..passim

16 U.S.C. § 1539(c)…………………………………………………………………………19, 33

16 U.S.C. § 1539(d)…………………………………………………………………19, 22, 30, 33

16 U.S.C. § 1540(g)…………………………………………………………………………4

42 U.S.C. § 4332……………………………………………………………………………39, 40

42 U.S.C. § 4342……………………………………………………………………………40

42 U.S.C. § 4344……………………………………………………………………………40

## FEDERAL REGULATIONS

40 C.F.R. §§ 1500.1…………………………………………………………………………43

40 C.F.R. § 1501.4……………………………………………………………………………40

40 C.F.R. § 1502.1…………………………………………………………………………..40, 43

40 C.F.R. § 1502.5…………………………………………………………………………….41

40 C.F.R. § 1502.13………………………………………………………………………....41

40 C.F.R. § 1502.14…………………………………………………………………………40, 43

40 C.F.R. § 1508.9…………………………………………………………………………..40, 43

50 C.F.R. § 10.12…………………………………………………………………………….3

50 C.F.R. § 17.3……………………………………………………………………………19

50 C.F.R. § 17.21(g)………………………………………………………………………19, 31

50 C.F.R. § 17.21(h)………………………………………………………………………...passim

50 C.F.R. § 17.22(a)………………………………………………………………………19, 33

50 C.F.R. § 17.22(e)………………………………………………………………………...33

50 C.F.R. § 402.02…………………………………………………………………………38

 50 C.F.R. § 402.14…………………………………………………………………………..3, 38, 39

## ADMINISTRATIVE DECISIONS

43 Fed. Reg. 16144 (Apr. 14, 1978)…………………………………………………………31

44 Fed. Reg. 30044, 30047 (May 23, 1979)………………………………………………….31

44 Fed. Reg. 37124, 37124 (Jun. 25, 1979)………………………………………………....11

45 Fed. Reg. 47352, 47353 (Jul. 14, 1980)…………………………………………………11

51 Fed. Reg. 19,926, 19,949 (Jun. 3, 1986)…………………………………………………38

54 Fed. Reg. 36905, 36908 (Sept. 5, 1989)………………………………………………...11

58 Fed. Reg. 32632 (Jun. 11, 1993)………………………………………………………...10

58 Fed. Reg. 68323, 68324 (Dec. 27, 1993)………………………………………………...31

68 Fed. Reg. 1826 (Jan. 14, 2003)…………………………………………………………...4

68 Fed. Reg. 49512 (Aug. 18, 2003)……………………………………………………..17

68 Fed. Reg. 53327 (Sept. 10, 2003)……………………………………………………..17

70 Fed. Reg. 52310-52319 (Sept. 2, 2005)……………………………………………passim

70 Fed. Reg. 52319-24 (Sept. 2, 2005)…………………………………………………………1

70 Fed. Reg. 71554 (Nov. 29, 2005)…………………………………………………3, 30

71 Fed. Reg. 34153 (Jun. 13, 2006)……………………………………………………30

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 93-412 (1973)……………………………………………………passim

H.R. Conf. Rep. No. 93-740, at 2 (1973)…………………………………………23, 26

House Consideration and Passage of H.R. 37 (1973)……………………………………..9

## INTRODUCTION

The scimitar-horned oryx, addax, and dama gazelle (collectively "North African antelope" or "antelope") once thrived in the deserts of northern Africa.  Today, the scimitar-horned oryx is extinct in the wild, and only very small numbers of addax and dama gazelle remain in their native ranges.  Poaching, civil wars, and habitat destruction have led to the demise of the antelope.  The countries where these species live have few if any effective methods to protect the antelope from these threats.

Meanwhile, private ranches in the United States, mainly in Texas, breed the North African antelope solely to sell "hunts" of these rare species within fenced areas.  For a hefty price, ranging from $1,800 to $4,000, these canned hunting operations guarantee success and a mounted trophy.

Although Defendant U.S. Fish and Wildlife Service ("FWS") recognized the North African antelope needed protection under the Endangered Species Act ("ESA") in 1991, the agency failed to provide this protection for 14 years, until plaintiff Friends of Animals ("FOA") sued.  From the outset, FWS refused to consider protecting the antelope without an exemption from the ESA's prohibitions on "take"—or killing—for canned hunting ranches.  Debate within FWS about how to exempt these operations paralyzed the agency.  As a result of this lawsuit, FWS finally listed the antelope in September 2005.  70 Fed. Reg. 52319 (Sept. 2, 2005).  On the same day FWS listed the antelope, however, the agency issued a rule exempting canned hunting ranches from the listing.   70 Fed. Reg. 52310 (Sept. 2, 2005) (codified at 50 C.F.R. § 17.21(h)) (hereinafter "canned hunting rule").

The canned hunting rule allows any person to kill an unlimited number of endangered antelope and transport or sell their body parts or trophies in interstate or foreign commerce as

long as the animal was bred on a canned hunting ranch that is "sustaining" a population of the species. FWS based the rule on Section 10(a)(1)(A) of the ESA, which allows FWS to permit ESA prohibited activities for "scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). FWS concludes that allowing canned-hunting operations to profit from killing North African antelope is actually good for these species. 70 Fed. Reg. 52310. FOA challenges FWS's absurd "kill endangered species to save them" theory because it is unsupported by evidence in the administrative record and violates the fundamental principles of the ESA.

## LEGAL BACKGROUND—THE ENDANGERED SPECIES ACT

The Endangered Species Act ("ESA") is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." TVA v. Hill, 437 U.S. 153, 180 (1978). Through the ESA, Congress sought to "reverse the trend toward extinction, whatever the cost." Id. at 184. The ESA accomplishes this goal by providing protections necessary to both prevent extinction and recover imperiled species. 16 U.S.C. §§ 1531(b), 1532(3).

Under ESA Section 4, FWS must list all species that are either "threatened" or "endangered." Id. § 1533. An endangered species is one that is "in danger of extinction throughout all or a significant portion of its range." Id. § 1532(6). A threatened species is "likely to become an endangered species within the foreseeable future." Id. § 1532(20). FWS must determine whether a species is threatened or endangered "solely on the basis of the best scientific and commercial data available." Id. § 1533(b)(1)(A). Once FWS lists a species as endangered or threatened, the ESA provides substantial protections.

Section 7 protects species from the actions of federal agencies. Under Section 7, every federal agency must "consult" with FWS to "insure that any action authorized, funded, or carried

2

out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]."  16 U.S.C. § 1536(a)(2).  Section 7 consultation is required for any action that "may affect listed species."  50 C.F.R. § 402.14.

Section 9 prohibits any person from "taking" an endangered species.  Id. § 1538(a)(1)(b).  "Take" is defined broadly to include "harass, harm, pursue, hunt, shoot, would, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  Id. § 1532(19).  Section 9 also makes it illegal for any person to "import," "export," or "possess, sell, deliver, carry, transport or ship in interstate or foreign commerce . . . in the course of a commercial activity" any endangered species.  Id. § 1538(a)(1).  Section 9 protections apply equally to captive or wild endangered animals.  50 C.F.R. § 10.12;  H.R. Rep. No. 93-412, at 10 (1973); Cayman Turtle Farm, Ltd. v. Andrus, 478 F. Supp. 125, 129-30 (D.D.C. 1979).

Section 10 provides FWS with flexibility to grant limited exceptions to Section 9's prohibitions, even for endangered species.  For example, Congress recognized it would be necessary to take actions that would otherwise violate Section 9 in order to aid in the recovery of species.  Accordingly, Section 10(a)(1)(A) allows FWS to permit "any act otherwise prohibited by [Section 9] for scientific purposes or to enhance the propagation or survival of the affected species."  16 U.S.C. § 1539(a)(1)(A).  FWS uses Section 10(a)(1)(A) to authorize captive breeding and reintroduction programs.  For example, FWS has a permit allowing it to handle endangered Mexican wolves as part of an effort to reintroduce the species in the southwestern U.S.  70 Fed. Reg. 71554 (Nov. 29, 2005).  Similarly, the National Marine Fisheries Service, FWS's counterpart for marine species, issues permits for hatchery operations involving endangered salmon.  68 Fed. Reg. 1826 (Jan. 14, 2003).

## STANDARD OF REVIEW

FOA is challenging the canned hunting rule under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), as well as the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-06. This Court reviews FWS's actions under the ESA under the standards of the APA. City of Las Vegas v. Lujan, 891 F.2d 927, 932 (D.C. Cir. 1989); Building Indus. Ass'n of Superior Cal. v. Babbitt, 979 F. Supp. 893, 898 (D.D.C. 1997).

Under the APA, this Court must set aside the canned hunting rule and the associated Environmental Assessment ("EA") if FWS acted arbitrarily or contrary to law. 5 U.S.C. § 706(2)(A). To meet this standard FWS must "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choice made." Baltimore Gas & Electric v. NRDC, 462 U.S. 87, 105 (1983). This Court should reverse FWS's decision if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicles Mfrs. Ass'n. v. State Farm, 463 U.S. 29, 43 (1983).

To determine whether FWS exceeded its statutory authority, the Court must apply the Supreme Court's two-step process as articulated in Chevron U.S.A., Inc. v. Nat. Resources Defense Council ("NRDC"), 467 U.S. 837 (1984). Under the first step, the Court must consider whether Congress has "directly spoken to the precise question at issue." Id. at 842-43. Where Congress has addressed the issue, the Court must "give effect to the unambiguously expressed intent of Congress." Id.; Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 128 (1991); Qi-Zhuo v. Messner, 70 F.3d 136, 140 (D.C. Cir. 1995) ("Where . . . the plain

4

language of the statute is clear, the court generally will not inquire further into its meaning."). The statute's framework and legislative history may shed light on the plain meaning of the statute.  AFL-CIO v. Fed. Election Comm'n, 333 F.3d 168, 172 (D.C. Cir. 1999); NRDC v. Browner, 57 F.3d 1122, 1127 (D.C. Cir. 1995).  Under Chevron step-one, the Court "giv[es] no deference to the agency's interpretation."  AFL-CIO, 33 F.3d at 173.

If the Court finds the statute is "silent or ambiguous" with respect to the issue, it moves on to step two of Chevron and considers whether the agency's interpretation is "based on a permissible construction of the statute."  467 U.S. at 843.  If the agency's interpretation is inconsistent with the purposes of the statute, it cannot stand.  Id. at 845; Orloski v. Fed. Election Comm'n, 795 F.2d 156, 164 (D.C. Cir. 1986); Common Cause v. Fed. Election Comm'n, 692 F. Supp. 1391, 1396 (D.D.C. 1987).

## ARGUMENT

The canned hunting rule violates the bedrock principles of the ESA by allowing individuals to kill endangered species—species that Congress has afforded the highest level of protection provided under the law—for sport.  Indeed, when Congress authorized "take" of endangered species to "enhance the propagation or survival of [endangered] species," it did not intend to give the green light to sport-hunters to kill them in captivity and mount them on their walls.  Furthermore, the record shows the primary concern of FWS throughout this process was not the well-being of the antelope, but the convenience of the canned hunting industry.  FWS's bias led to a flawed decision that violates ESA Sections 10, 4, and 7 of the ESA as well as the National Environmental Policy Act ("NEPA").

## I.     FOA HAS STANDING TO CHALLENGE THE CANNED HUNTING RULE.

FOA meets the three constitutional requirements for standing under Article III:  (1) injury, (2) causation, and (3) redressibility.  Lujan v. Defenders of Wildlife, 504 U.S. 55, 560-61 (1992).

### A.     FOA has Standing to Challenge the Canned Hunting Rule on Behalf of Priscilla Feral.

An organization may sue on behalf of its members if (1) its individual members have standing, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) the claims do not require the participation of individual members in the lawsuit.  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 133-34 (D.C. Cir. 2006).  As discussed below, FOA member Priscilla Feral has standing in this case.  In addition, protecting North African antelope and stopping canned hunting are highly germane to FOA's mission to "free animals from cruelty and institutionalized exploitation around the world."  Exhibit 1 ¶ 3 (Declaration of Priscilla Feral).  Finally, there is no need for Ms. Feral's individual participation in the lawsuit.

### 1.     Ms. Feral has standing to challenge the canned hunting rule based on injury to wild antelope.

#### a.     Ms. Feral has an aesthetic interest in wild antelope.

The desire to observe animals, even for purely aesthetic purposes, is a sufficient interest for standing purposes.  Lujan, 504 U.S. at 560-61; Animal Legal Defense Fund v. Glickman, 154 F.3d 426, 437 (D.C. Cir. 1998) (en banc).  In order to establish standing based on the desire to observe animals, FOA must show that its members have an on-going interest in the animals.  Lujan, 504 U.S. at 562-64.

FOA is leading reintroduction and habitat restoration efforts for the antelope in North Africa.  Since 1999, FOA has worked with the *Direction des Parcs Nationaux* ("DPN") (Senegal's National Park Agency) to restore the scimitar-horned oryx and dama gazelle to two reserves managed by DPN, the Guembuel Fauna Reserve in northwestern Senegal and a second reserve within the Ferlo National Park in northeastern Senegal.  Exhibit 1 ¶ 5.  FOA has funded and assisted in deliveries of oryx to the Guembuel Fauna Reserve, a transfer of oryx and dama gazelles from the Guembel to the Ferlo recovery area, and habitat restoration efforts within the Ferlo.  Id.  FOA is helping to restore habitat so the antelope can eventually be released from the fenced area within the Ferlo.  Id. ¶¶ 5, 6.  As a result of FOA's efforts, there are approximately 50 scimitar-horned oryx and 34 dama gazelles in semi-captivity within the two reserves.  Id. ¶ 5.

FOA staff members travel to Africa regularly to see the species and their historic habitat.  Id. ¶ 7.  In December 2005, Priscilla Feral visited Senegal.  Id. ¶ 9.  Ms. Feral observed the oryx and dama gazelles in the Guembeul Fauna Reserve and explored their damaged historical habitat.  Id. ¶ 10.  She would like to see a wild oryx or dama gazelle.  Id.  FOA intends to send an employee to Senegal regularly to monitor the recovery efforts; in fact, Ms. Feral is planning a trip for December 2007.  Id. ¶ 11.  As President of FOA, she will also continue to monitor the status of the antelope from the United States and provide money for the recovery efforts.  Id. ¶ 9.

The canned hunting rule harms Ms. Feral's interest in the North African antelope by increasing the incentive for poachers to kill them in the wild.  As a result, there will be even fewer animals left in the wild, which will further reduce Ms. Feral's chances of seeing one when she visits their habitat in North Africa.  Cary v. Hall, No. 05-4363, at 9 (N.D. Ca. Sept. 30, 2006) (order granting in part and denying in part government's Motion to Dismiss) ("Dr. Clark alleges that the challenged exemption will adversely affect wild populations of the three antelope species

in North Africa where he works with and observes them.  Nothing more is required.").[1]

Furthermore, the poaching risk harms Ms. Feral's and FOA's interest in recovery by reducing the

chance the DPN can release the antelope safely from the fenced area within the Ferlo.

b.    The canned hunting rule causes the injury to wild antelope.

Increased poaching in the wild is "fairly traceable" to the challenged regulation.  Lujan,

504 U.S. at 560-61.  FOA "need not prove a cause-and-effect relationship with absolute

certainty; substantial likelihood of the alleged causality meets the test . . . even in cases where the

injury hinges on the reactions of third parties . . . to the agency's conduct."  Competitive Enter.

Inst. v. Nat'l Highway Safety Admin., 901 F.2d 107, 113 (D.C. Cir. 1990) (citations omitted);

see also Building Indus. of Superior Cal., 979 F. Supp. at 899 ("[P]laintiffs can meet their burden

by demonstrating the [government's action] had a 'determinative or coercive effect on the action

of someone else' who, in turn, caused plaintiffs injury." (quoting Bennett v. Spear, 520 U.S. 154,

168 (1997))).

If FWS had listed the North African antelope, but not passed the canned hunting rule, all

commerce in antelope trophies would be illegal in the U.S.  16 U.S.C. § 1538.  However, the rule

allows sport-hunters to buy and sell captive-bred trophies and animal parts in interstate or foreign

commerce.  50 C.F.R. § 17.21(h).  By creating a legal market, FWS has made it easier for

poachers to sell their illegal products in the legal market, thereby increasing the incentive to

poach animals in the wild.  In fact, the listing of the antelope will only increase their value in this

market.

---

[1] The Cary plaintiffs, which included FOA's former employee Bill Clark as well the Humane
Society of the United States and Defenders of Wildlife, challenged the canned hunting rule in the
Northern District of California.  The court dismissed all of plaintiffs' claims for lack of standing
except for their challenge to FWS's elimination of the individual permitting requirement under
ESA Section 10(c) and (d).  Cary, No. 05-4363, at 28-29.  The court then transferred the Cary
case to D.C., and this Court consolidated it with FOA's challenge.

In this case, causation is established as a matter of law by the ESA.  Under similar circumstances, this Circuit held the Marine Mammal Protection Act "established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices" because the statute "reflects a congressional decision that denial of import privileges is an effective method of protecting marine mammals."  Animal Welfare Inst. v. Kreps, 561 F.2d 1002, 1010 (D.C. Cir. 1977).  According to the court, this "congressional determination" made it impossible to conclude that the causal relationship was "purely speculative."  Id.; see also Intl. Ladies' Garment Union v. Donovan, 722 F.2d 795, 821 (D.C. Cir. 1983) ("[A]s Congress passed the Act partly to provide redress to employers from unfair competition, the suggestion that effective enforcement of the Act will not have this effect directly contravenes the congressional judgment underlying the Act."); Covington v. Jefferson County, 358 F.3d 626, 650 (9th Cir. 2004) (Gould, J., concurring); Florida Key Deer v. Stickney, 864 F. Supp. 1222, 1237 (S.D. Fla. 1994).

The same principle applies here—Congress has determined as a matter of law that eliminating trade in endangered species leads to their protection in the wild.  For example, Congress identified the threat to animals in the wild from the "pressures of trade" and the fact that "the scarcer an animal may be, the more people may be willing to pay to acquire it."  H.R. Rept. No. 93-412, at 2, 5.  Congress also recognized the U.S. is an "important market" for endangered species, and eliminating trade within the U.S. sets an important precedent.  Id. at 6. As Representative Sullivan stated during House consideration of the ESA, "[a]nother hazard to endangered species arises from those who would capture or kill them for pleasure of profit. There is no way that the Congress can make it less pleasurable for a person to take an animal, but we can certainly make it less profitable for them to do so."  House Consideration and Passage of

H.R. 37, with Amendments, at 192 (1973).[2]  Congress did so by "eliminat[ing] the financial incentives to trading in endangered species."  H.R. Rept. No. 93-412, at 2.  The ESA makes it illegal to "sell or offer for sale" or "deliver, receive, carry, transport or ship in interstate commerce or foreign commerce, by any means whatsoever and in the course of a commercial activity" any endangered species.  16 U.S.C. § 1538(a).  Where Congress has determined there is a causal connection, this Court should not second-guess that determination in the context of standing.

Furthermore, FWS concedes the causal link.  Competitive Enter. Inst., 901 F.2d at 114-115 (relying on agency's findings to support causation).  FWS admits that poachers continue to threaten remaining wild dama gazelle and addax.  70 Fed. Reg. 52319, 52321 (Sept. 2, 2005); see also Exhibit 2 (Declaration of Tarig Osman), Exhibit 3 (Declaration of Limia Ibrahim) (both documenting illegal poaching by foreigners for trophies in North Africa).  In addition, FWS has repeatedly found that a legal market in the parts of an endangered species increases the incentive to kill species in the wild.  FWS specifically prohibited the interstate or foreign commerce in "dead wildlife or its products (including sport-hunted trophies)" from canned hunting ranches prior to the canned hunting rule because such commerce "might present a risk to the survival of both wild and captive populations by encouraging the propagation of endangered and threatened wildlife for consumptive markets rather than for direct benefit to the species in the wild."  Friends of Animals' Statement of Material Facts ("SOF") ¶¶ 34, 48; see also 58 Fed. Reg. 32632 ("[C]are needs to be taken, however, to avoid stimulation of trade.").

---

[2] This consideration is reprinted in S. Comm. on Environment and Public Works, A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980 (Comm. Print 1982), *microformed on* CIS No. 82-S322-4 (Cong. Info. Serv.).

Indeed, FWS has frequently taken the position that it must protect species, including foreign species, under the ESA because a market in their parts leads to increased poaching. For example, in <u>Cayman Turtle Farm, Ltd. v. Andrus</u>, 478 F. Supp. 125, (D.D.C. 1979), FWS took the exact opposite position from that taken in this case. FWS listed sea turtles <u>without</u> providing a requested exemption from the ban on trade for captive breeding facilities. <u>Id.</u> at 128-29. FWS refused to provide the exemption because the "marketing of sea turtle products would increase consumer demand for these products . . . provid[ing] a strong economic incentive for the illegal marketing of wild sea turtles." <u>Id.</u> at 132-33. FWS's conclusion was bolstered by the fact that it would be impossible to distinguish wild animals from captive bred animals. <u>Id.</u> FWS has come to the same conclusion for many other endangered species. <u>See, e.g.</u>, 54 Fed. Reg. 36905, 36908 (Sept. 5, 1989) ("It is very doubtful that legal trade of ivory stocks could be accomplished without providing cover for illegal trade"); 45 Fed. Reg. 47352, 47353 (Jul. 14, 1980) (listing the African black rhinoceros because the value of its parts "stimulated illegal poaching"); 44 Fed. Reg. 37124, 37124 (Jun. 25, 1979) ("[The South China sitka] deer has been decimated primarily as a result of killing for its antlers for which extremely high prices are paid.").

If that were not enough, the administrative record provides ample support for causation. As stated by 358 professional scientists, including E.O. Wilson and Jane Goodall, a "growing body of evidence, accumulated across many countries and taxa, indicates that legal harvest and trade can lead to increased poaching and illegal trade." SOF ¶ 59. Other scientists have also made this point. <u>See id.</u> ¶ 59 ("Generally putting a price on dead wildlife almost invariably leads to over-exploitation and increases the 'extinction potential' of target species."); ("Ironically, market forces can exacerbate the threats from illegal trade, for as species become rarer their value on the market increases to reflect this scarcity, increasing the incentive for further

poaching."); ("'[L]egal ivory' in trade . . . is inevitably used as a cover for illegal sources of ivory to make their way into the market.").

North African antelope trophies and parts have value and people will buy and sell them through websites and other means. Exhibit 4. In these forums, it is impossible to tell whether a sport-hunted trophy was legally obtained from a canned hunting ranch or illegally obtained from the wild. Moreover, even if the import of antelope to the United States from North African is illegal under the Convention on International Trade in Endangered Species ("CITES"), illegal wildlife trade is rampant throughout the world. SOF ¶ 60. Therefore, by providing a legal market where poachers can disguise their illegally hunted trophies as legally hunted, the canned hunting rule provides an incentive to poachers to kill wild antelope.

When the <u>Cary</u> plaintiffs challenged the regulation in the Northern District of California, Judge Walker rejected their showing of a causal connection between the rule and poaching in the wild. <u>Cary</u>, No. 05-4363, at 18. However, that case is distinguishable. First, plaintiffs did not argue and the court did not consider whether Congress had already established causation. <u>Kreps</u>, 561 F.2d at 1010. Second, according to the court, plaintiffs' theory was that allowing sport-hunting in the U.S. will "send a signal" that hunting is acceptable in the range countries and lead to more hunting. <u>Cary</u>, No. 05-4363, at 12. In contrast, FOA's claims are based on the idea that a legal market increases the incentive for poaching.

However, Judge Walker went on to examine some of the evidence, also presented by FOA in this case, that shows that a legal market leads to increased poaching in the wild, and found that it consisted only of "speculative opinions unsubstantiated by data," and that evidence pertaining to other species is not relevant with respect to the antelope. <u>Id.</u> at 13-14. FOA disagrees. Congressional findings, the opinions of 358 leading scientists, and FWS's own

12

findings are not speculative.  Furthermore, the evidence is consistent across different species and countries.  SOF ¶ 59.  Indeed, this concept applies in all cases where an endangered species has value, there is a legal market in which to take advantage of that value, and poaching is a problem in the wild.  FOA has demonstrated these conditions exist for the antelope.

c.    <u>This Court can redress Ms. Feral's injuries</u>.

Finally, FOA's injuries will "likely" be redressed by a favorable decision in this case.  <u>Lujan</u>, 504 U.S. at 560-61.  FOA alleges that FWS cannot authorize canned hunting of North African antelope or the trade of their parts under Section 10 of the ESA.  First Amended Complaint ("Complaint") ¶¶ 100-103 (First Claim for Relief).  If this Court agrees, trade in the parts of the North African antelope will be illegal and there will be no increased incentive for illegal poaching.

Although the <u>Cary</u> court relied heavily on <u>Fund for Animals v. Norton</u>, 295 F. Supp. 2d 1 (D.D.C. 2003), to reject the <u>Cary</u> plaintiffs' similar claim, that case represents an extreme interpretation of the redressibility requirement and is distinguishable.  <u>Cary</u>, No. 05-4363, at 14-16.  In <u>Fund for Animals</u>, the Court found that while plaintiffs had presented no evidence to show that relief sought would actually decrease poaching of argali sheep in the wild, intervenors presented specific evidence that the relief would actually increase poaching.  295 F. Supp. 2d at 8.  In contrast, FOA has presented significant information in support of causation.  Furthermore, there is no evidence that allowing a market in parts will actually decrease poaching in the wild.[3]

---

[3] Although FWS does argue that allowing sport-hunting may reduce pressure on wild populations by providing "an alternative to legal and illegal hunting of wild specimens," 70 Fed. Reg. 52315, the record does not support this claim.  In fact, FWS's Chief of the Office of Scientific Authority stated:  "One might speculate that the existence of these stocks removes some pressure on wild populations, but this cannot be substantiated to the point of making a finding that the harvest and export of these specimens enhances the survival of the species."  SOF ¶ 62.

FOA also meets the redressiblity requirement for FWS's procedural violations under Section 7 and 4 of the ESA and NEPA. Complaint ¶¶ 104-07 (Section 7),[4] 108-11 (Section 4), 116-20 (NEPA). The causation and redressibility requirements are relaxed for procedural injuries. Lujan, 504 U.S. at 572 n.7; Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 664 (D.C. Cir. 1996). Had FWS complied with the procedural requirements of these statutes, which are designed to ensure FWS makes environmentally conscious decisions that do not harm endangered species, the agency likely would have determined that the canned hunting rule was illegal and illogical.

## 2. Ms. Feral has standing to challenge the canned hunting rule based on injury to antelope in captivity.

In addition to promoting the recovery of the North African antelope in the wild, Ms. Feral works to prevent canned hunting of the antelope by exposing canned hunting practices to the public and seeking to influence administrative policy and legislation. Exhibit 1 ¶¶ 13, 15, 17-19. FOA regularly comments on FWS issued permits allowing sport-hunting and imports of sport-hunted trophies, and worked to oppose the Sportsmanship in Hunting Act of 2005, which would have allowed canned hunting of the antelope on ranches over 1,000 acres. Id. ¶ 19. FOA has published numerous articles in its magazine objecting to the practice of canned hunting, including the fact that the animals are raised as domesticated animals and then hunted. Id. ¶¶ 17-18 ("Many of the prey are so tame a hunter can pet his target before killing it.").

As part of her job, Ms. Feral has visited three canned hunting ranches to investigate and expose their practices. Ms. Feral observed scimitar-horned oryx at two of the ranches and other captive animals at the third. Id. ¶¶ 16, 21-28. Ms. Feral was offended by the tame nature of

---

[4] Although Judge Walker dismissed the Cary plaintiffs Section 7 claim due to their failure to provide notice 60-days prior to suing, Cary, No. 05-4363, at 25-27, FOA provided notice prior to challenging the rule.

these animals, particularly on the ranches where the animals were later hunted down and killed, with no real chance of escape. Id. ¶¶ 16, 26-27. At one ranch, Ms. Feral saw men drive up in a pick-up truck and ring a bell to indicate it was feeding time. Id. ¶ 16. At the Y.O. Ranch, which allows canned hunting of scimitar-horned oryx, Ms. Feral also viewed numerous pictures of hunters posing with dead scimitar-horned oryx, dama gazelle, and addax. Id. ¶ 25. Ms. Feral intends to continue monitoring canned hunting ranches and visiting the antelope on these ranches as part of her efforts to investigate and expose the practice to the public, administrative agencies, and legislatures. Id. ¶ 28.

Ms. Feral has suffered aesthetic injury as a result of viewing tame animals in captivity on canned hunting ranches. The D.C. Circuit recognizes that plaintiffs can suffer aesthetic injury based on the "quality" of an animal's life in captivity. ALDF, 154 F.3d at 433 n.5. In ALDF, the plaintiff's injury stemmed from observation of captive primates living under inhumane conditions. Id. at 429-30, 31-33. The court recognized the plaintiff suffered injury based on the nature and the quality of the environment. Id. at 432, 433 n.5.

Ms. Feral has suffered the same injury as a result of her visits to canned hunting ranches by viewing tame animals that are later hunted in captivity. This process is akin to raising a pet dog, and then letting it go in the back yard and shooting it. Indeed, canned hunting does not meet the objective "humane" standard of the Humane Slaughter Act ("HSA"), 7 U.S.C. § 1901. Although the HAS applies only to "livestock," the canned hunting ranchers concede the antelope are raised as exotic livestock. SOF ¶ 16. The HSA requires animals to be "rendered insensible to pain by a single blow or gunshot . . . that is rapid and effective." 7 U.S.C. § 1902. With respect to livestock, this would typically mean a single gunshot to the head; however, this practice is not suitable for sport-hunters interested in trophies. Accordingly, sport-hunters will

kill antelope by shooting them in the body, which does not ensure a rapid death. Indeed, ranches make known in their advertising that "wounded animals are considered a kill." SOF ¶ 17. As a result of the canned hunting rule, Ms. Feral is harmed by viewing antelope that are raised as tame livestock and later slaughtered inhumanely.

**B.      FOA has Standing as an Organization.**

FOA has standing as an organization based on harm to its limited resources and informational injury. Warth v. Seldin, 422 U.S. 490, 511 (1975) ("There is no question that an association may have standing in its own right.").

**1.      FOA has standing to challenge the regulation because the canned hunting rule drains its resources.**

An organization can establish standing by showing that the challenged action results in a "drain on [its] resources." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982); Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach, 469 F.3d 129, 132-33 (D.C. Cir. 2006). The organization must demonstrate both that the government's action is at "loggerheads with its stated mission" and that it makes its "activities more difficult." Nat'l Treasury Employees Union v. U.S., 101 F.3d 1423, 1429-30 (D.C. Cir. 1996); Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994) (finding where defendant's actions have "perceptibly impaired" the organizations programs, "there can be no question that the organization has suffered an injury in fact" (quoting Havens, 455 U.S. at 379)). Furthermore, the organization must show that any drain on its resources was caused by the need to "counteract" defendant's illegal practices. Havens, 455 U.S. at 379; Fair Employment, 28 F.3d at 410.

There is no question that the canned hunting rule is at loggerheads with FOA's mission of "cultivat[ing] a respectful view of nonhuman animals, free-living and domestic" and "free[ing]

animals from cruelty and institutionalized exploitation around the world."  Exhibit 1 ¶ 3. Additionally, the rule requires FOA to expend its limited resources to counteract FWS's illegal activities.  FOA has worked to educate the public about canned hunting of the endangered antelope and influence legislation and administrative practice.  Id. ¶¶ 14-15, 17-19.  The canned hunting rule requires FOA to spend more of its time and resources on these activities.  Without the rule, canned hunting of the antelope would be illegal, and there would be no need to expend these resources.  Id. ¶ 18.

Furthermore, the canned hunting rule sets a dangerous precedent.  Indeed, canned hunting proponents have stated already that they intend to push FWS to expand the illegal policy to other endangered species.  Id. ¶ 20.  FWS employees also expressed about the "precedent this could set for native captive-bred endangered species."  SOF ¶ 44.  Moreover, even prior to the canned hunting rule, FWS indicated its intent to use the "kill endangered species to save them" logic in other contexts.  See, e.g., 68 Fed. Reg. 53327 (Sept. 10, 2003) (proposing to expand survival and enhancement exemptions under Section 10(a)(1)(A) regulations; 68 Fed. Reg. 49512 (Aug. 18, 2003) (proposing to expand authorization of import permits for trophies obtained from foreign canned hunting facilities).  If this Court upholds the rule, there will be no barrier to efforts by the canned hunting industry to expand this illegal policy.  FOA will need to expend additional resources to fight these efforts.  Exhibit 1 ¶ 20.

By deviating from FWS's past practice of requiring a connection between ranches and recovery in the wild, the canned hunting rule places an additional drain on FOA's resources. FOA's primary arguments in this case are that FWS cannot allow canned hunting or commercial trade in sport-hunted trophies under Section 10(a)(1)(A), and canned hunting ranches do not and cannot contribute to recovery of the species in the wild.  However, if this Court rejects these

arguments, at a minimum, FWS must require all facilities covered under the rule to contribute to antelope recovery in the wild.  16 U.S.C. §§ 1532(3), 1539; see infra Part II.A.2.

If this Court enforces the recovery requirement, there will be considerably more resources available.  There are at least 63 ranches that house endangered antelope.  SOF ¶ 15.  In the past, FWS required these facilities to donate 10% of their profits toward conservation.  Id. ¶ 50.  If only a portion of these ranches made donations, it would increase substantially the resources available.  This Circuit has recognized the loss of conservation funds that would otherwise be available, absent the challenged action, constitutes injury to those involved in recovery efforts.  Fund for Animals v. Norton, 322 F.3d 728, 733 (D.C. Cir. 2003).

This recovery requirement would alleviate the drain on FoA's financial resources.[5]  There are only a few recovery programs in the native range of the antelope.  70 Fed. Reg. 52310; 70 Fed. Reg. 52322.  Furthermore, it is clear that resources are a limiting factor in these efforts.  SOF ¶¶ 20, 26.  Currently, FOA is shouldering a large portion of the burden for recovery efforts in North Africa.  With greater funds going towards recovery, FOA could either use its resources for other animal protection issues or to provide even greater recovery of the antelope.  Exhibit 1 ¶ 12.  Accordingly, FWS's failure to require recovery efforts harms FOA; and that harm would be redressed by a ruling in FOA's favor.

> ### 2.    FOA has standing to challenge the canned hunting rule based on informational injury.

The Supreme Court recognizes "the inability to obtain information" as injury in fact.  FEC v. Akins, 524 U.S. 11, 20 (1998); see also Pub. Citizen v. Dep't of Justice, 491 U.S. 440,

---

[5] Even if this Court does alleviate some of FOA's financial burden, it does not remedy the rule's impact on wild populations.  Furthermore, FOA believes the U.S. government should never condone the take of endangered wildlife purely for pleasure, and by doing so, is hypocritically telling those with less means in North Africa not to kill these animals, while at the same time allowing wealthy people within our own country to kill them at will.  Exhibit 1 ¶ 12.

449 (1989); <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 373-74 (1982).  To suffer

informational injury, a plaintiff must have a statutory right to the information.  <u>Animal Legal

Defense Fund v. Espy</u>, 23 F.3d 496, 502 (D.C. Cir. 1994); <u>Am. Farm Bureau v. EPA,</u> 121 F.

Supp. 2d 84, 97-98 (D.D.C. 2000); <u>Cary</u>, No. 05-4363, at 18.  Furthermore, an organizational

plaintiff must show "concrete ways in which their programmatic activities have been harmed."

<u>Competitive Enter. Inst.</u>, 901 F.2d at 123.  FOA meets each of these requirements.

 FOA has a statutory right to information about individual canned-hunting ranches under

Section 10(c) and (d).  Section 10(c) requires FWS to publish in the Federal Register "<u>each</u>

application for an exemption or permit."  16 U.S.C. § 1539(c) (emphasis added).  In addition,

FWS must ask for public comments and make available to the public all information received as

part of each application.  <u>Id.</u>  Under Section 10(d), FWS must publish a finding in the Federal

Register that the application:  (1) was applied for in good faith, (2) will not operate to the

disadvantage of the endangered species, and (3) is consistent with the purposes and policies of

the ESA.  <u>Id.</u> § 1539(d).  These public participation requirements are mandatory.  <u>Gerber v.

Norton</u>, 294 F.3d 173, 185-86 (D.C. Cir. 2002); <u>see also</u> <u>Cary</u>, No. 05-4363, at 20 (relying on

<u>Gerber</u> to find Section 10(c) creates a right to information sufficient to support standing).

 Contrary to FWS's past practice,[6] the canned hunting rule eliminates these procedural

requirements for individual canned hunting facilities.  There is no application process or even a

requirement to notify FWS if a facility is operating under the rule.  50 C.F.R. § 17.21(h).  Rather,

---

[6] FWS issued regulations implementing Section 10(a)(1)(A) that require individual permitting, and has authorized canned hunting and trade of trophies of other endangered species under these regulations.  50 C.F.R. § 17.22(a); SOF ¶ 49.  FWS also allows canned hunting under its captive bred wildlife ("CBW") regulations by finding that "culling" is a "normal practice of animal husbandry" authorized by the regulations.  50 C.F.R. §§ 17.3, 17.21(g); 50 C.F.R. § 17.22(a); SOF ¶ 46.  Because the CBW regulations prohibit commercial activity in dead animal parts, 50 C.F.R. § 17.21(g)(1)(iii), FWS requires individual Section 10(a)(1)(A) permits for transport or trade of trophies.  SOF ¶ 48-49.

canned hunting facilities can continue with business as usual, and it is up to FWS to inspect facilities and determine if they are not meeting the limited requirements of the rule.  Id. § (h)(7).  As a result, the rule shuts the public out of the process completely.

Not only does the rule eliminate the public process under Section 10(c), it also eliminates the public's ability to get this information through other means.  Although the rule requires canned hunting facilities to maintain records, they are kept at the ranches and never submitted to FWS.  As a result, the public cannot even obtain the records under the Freedom of Information Act ("FOIA") because the Act applies only to records held by an agency.  5 U.S.C. § 552(a)(3)(A), (f).

FOA's mission suffers because of its inability to get this information.  FOA can no longer attempt to persuade FWS not to allow canned hunting of endangered species through the permitting process.  Exhibit 1 ¶ 19.  FOA is also unable to publicize this material to its members and the public through its magazine, on-line action alerts, and other media to encourage them to oppose canned hunting.  Id. ¶¶ 13-15, 18.  Nor can FOA use the information to try and influence legislation and administrative policy.  Id. ¶ 18.  Finally, FOA can no longer use this information to challenge individual permitting decisions in the courts.

Accordingly, FOA has suffered informational injury as a result of the challenged regulation.  Cary, No. 05-4363, at 23  ("By alleging that the challenged regulation effectively denies Defenders information required to be made publicly available under § 10(c) so that Defenders can meaningfully participate in the § 10 permit process, Defenders has alleged a concrete injury that comes within the zone of interests protected by § 10(c).").  This injury would be redressed by this Court requiring FWS to reinstate the individual permitting process.

20

**II.    THE CANNED HUNTING RULE VIOLATES SECTION 10 OF THE ENDANGERED SPECIES ACT.**

The ESA strictly forbids killing endangered species and commercial activity in their parts.  16 U.S.C. § 1538.  Although Section 10(a)(1)(A) provides a limited exception to these prohibitions, FWS seeks to expand this exception beyond the limits of the law.  First, FWS cannot authorize sport-hunting or trade in sport-hunted trophies under Section 10(a)(1)(A).  Indeed, there is no support for FWS's "kill them to save them" logic.  Second, FWS violated Section 10(c) and (d) by eliminating the individualized permitting process.  For these reasons, this Court should reject FWS's attempt to appease canned hunters at the expense of the North African antelope.

**A.    FWS Cannot Authorize Sport-Hunting or Trade in Sport-Hunted Trophies Under Section 10(a)(1)(A).**

Section 9 of the ESA affords the highest level of protection to endangered species.  <u>TVA v. Hill</u>, 437 U.S. 153, 174 (1978).  This section prohibits all "take" of endangered species, which is defined broadly to include "harass, harm, pursue, hunt, shoot, would, kill, trap, capture, or collect."  <u>Id.</u> §§ 1538(a)(1), 1532(19).  Section 9 also makes it illegal for any person to "import," "export," or "possess, sell, deliver, carry, transport or ship in interstate or foreign commerce . . . in the course of a commercial activity" any endangered species.  <u>Id.</u> § 1538(a)(1).  Through these expansive provisions, Congress recognized the need to provide the utmost protection to species on the brink of extinction.

Section 10(a)(1)(A) provides only a "narrow" exemption to Section 9.  <u>Humane Soc'y of the U.S. v. Kempthorne</u>, Civ. No. 06-1279, at 23 (D.D.C. Aug. 9, 2006) ("<u>HSUS</u>") (Memorandum Opinion granting Plaintiffs' Motion for Preliminary Injunction) (attached as Exhibit 5).  Congress intended to "<u>limit substantially</u> the number of exemptions that may be

granted." H.R. Rept. 93-412, at 17 (emphasis added).  FWS may grant these exemptions only

"for scientific purposes or to enhance the propagation or survival of the affected species."  16

U.S.C. § 1539(a)(1)(A).  In this case, FWS does not claim the canned hunting rule is necessary

for scientific purposes, only that it will enhance the propagation and survival of the antelope.  70

Fed. Reg. 52310.

FWS must find a Section 10(a)(1)(A) permit is "consistent with the purposes and policy .

. . of the ESA."  Id. § 1539(d).  Section 2 spells out these purposes, which are "to provide a

means whereby the ecosystems upon which endangered species and threatened species depend

may be conserved, [and] to provide a program for the conservation of such endangered and

threatened species."  Id. § 1531(b) (emphasis added).  The canned hunting rule is inconsistent

with this overarching conservation goal of the ESA for two reasons.  First, conservation does not

include lethal take solely for recreation.  Second, conservation means recovery of the species in

the wild, and canned hunting has nothing to do with recovery of the antelope in the wild.

### 1.    Section 10(a)(1)(A) does not authorize lethal take for "sport."

Congress authorized lethal take of endangered species under Section 10(a)(1)(A) only in

extreme circumstances.  Conservation is defined as:

> [T]he use of all methods and procedures which are necessary to bring any
> endangered species or threatened species to the point at which the measures
> provided [by the ESA] are no longer needed.  Such methods and procedures
> include, but are not limited to, all activities associated with scientific resources
> management such as research, census, law enforcement, habitat acquisition and
> maintenance, propagation, live trapping, and transplantation, and, in the
> extraordinary case where population pressure within a given ecosystem cannot be
> otherwise relieved, may include regulated taking.

Id. § 1532(3) (emphasis added).  Although Congress indicated conservation "might include

authority for carefully controlled taking of surplus members of the species," it authorized lethal

take "only in extreme circumstances, as where a given species exceeds the carrying capacity of

22

its particular ecosystem and where this pressure can be relieved in <u>no other feasible way</u>."  H.R. Conf. Rep. No. 93-740, at 2 (1973) (emphasis added).  Furthermore, "[t]o say that [the possibility of lethal take] exists, however, in no way is intended to suggest that this extreme situation is likely to occur—it is just to say that the authority exists in the unlikely event that it ever becomes needed."  <u>Id.</u>

Congress reiterated this limitation with respect to Section 10(a)(1)(A), stating: "[A]ctivities to encourage propagation or survival . . . might even, <u>in extraordinary circumstances</u>, include the power to cull excess members of a species where the carrying capacity of its environment is in danger of being overwhelmed."  H.R. Rep. No. 93-412, at 17 (emphasis added).  Furthermore, Section 10(a)(1)(A) permits must "provide the most practicable and realistic opportunity to encourage the development of the species concerned."  <u>Id.</u>  Congress could not have been more clear—FWS may consider lethal take under Section 10(a)(1)(A) only as a last resort.[7]

This Court recently struck down a similar attempt by FWS to authorize lethal take under Section 10(a)(1)(A).  <u>HSUS</u>, No. 06-1279, at 2.  In that case, FWS granted a permit to kill wolves that preyed on livestock to promote public support for wolf recovery.  <u>Id.</u> at 23.  Holding that Congress' intent is "remarkably clear and unambiguous," the Court rejected FWS's argument that the agency can freely authorize either lethal or non-lethal take under Section 10(a)(1)(A).  <u>Id.</u> at 28.

---

[7] FWS should not authorize commercial activity in captive animals or their parts lightly either. Although the ESA provides a specific exemption from the prohibition against take for endangered species held in captivity prior to the enactment of the ESA in 1973 (or the date the species is listed), even this exemption prohibits use of captive animals "in the course of commercial activity."  16 U.S.C. § 1538(b); <u>Cayman Turtle Farm</u>, 478 F. Supp. at 129-30. Therefore, FWS should consider trade in trophies only as a last resort as well.

> The language "propagation or survival of the affected species" is, on its face,
> antithetical to the killing of 43 members of an endangered species barring some
> direct and immediate danger imposed by the individual animals killed to other
> members of the species. . . . [I]t is counterintuitive to authorize the killing of
> endangered animals rather than to authorize some non-lethal method of "take" to
> enhance their propagation or survival.

Id. at 17. Considering the same permit in an earlier hearing on procedural issues, Judge Huvelle

also discredited FWS's logic: "I am baffled by the government's position here. . . . I have a hard

time understanding the notion you kill the wolves to save the wolves." Id. at 18 (quoting Judge

Huvelle at a preliminary injunction hearing in Defenders of Wildlife v. Norton, Civ. No. 05-1573

(D.D.C.)).

The HSUS Court's interpretation of Section 10(a)(1)(A) was also influenced by the

crucial distinction between threatened and endangered species. Id. at 20-24. The ESA affords

more protection to endangered species. While it is strictly illegal to take an endangered species,

FWS can authorize limited take of threatened species under Section 4(d) where it serves the

purposes of "conservation," as defined above. 16 U.S.C. §§ 1533(d); 1538(a)(1), (a)(1)(G).

However, this Court and the Eighth Circuit have rejected FWS's attempts to authorize

recreational take of threatened species under Section 4(d). This Court rejected FWS's attempt to

authorize sport-hunting of threatened grizzly bears in northwestern Montana. Fund for Animals

v. Turner, Civ. No. 91-2201 (Sept. 27, 1991), 1991 WL 206232. Similarly, the Eighth Circuit

rejected FWS's attempt to authorize sport-trapping of threatened grey wolves in Minnesota.

Sierra Club v. Clark, 755 F.2d 608, 615 (8th Cir. 1985). Because the ESA's definition of

"conservation" applies to threatened species, both courts found FWS could authorize lethal

control of threatened species only in the "extraordinary case where population pressure within a

given ecosystem cannot otherwise be relieved," and FWS had not made such a showing. <u>Fund for Animals</u>, Civ. No 91-2201 (Sept. 27, 1991); <u>Sierra Club</u>, 755 F.2d at 611, 612-13.[8]

These 4(d) cases emphasize that Congress intended lethal take to be a last resort for endangered species under Section 10(a)(1)(A). Because the ESA affords endangered species more protection than threatened species, allowing lethal take of endangered species where it is not allowed for threatened species would "effectively erase any meaningful distinctions between the management measures permitted for [these different classifications]" in violation of the ESA. <u>HSUS</u>, No. 06-1279, at 23. Accordingly, this Court cannot sanction sport-hunting of endangered antelope, where it has found the ESA does not allow sport-hunting of threatened grizzly bears.[9]

Under these standards, the canned hunting rule goes well beyond the narrow limits of Section 10(a)(1)(A). Not only did FWS fail to consider sport-hunting as a last resort, it was the first and only option FWS considered. While FWS recognized the antelope deserved ESA protection in 1991, it delayed taking action for 14 years, all the while trying to come up with some way to allow canned hunting to continue. During that time, FWS never questioned the species' dire status in the wild. Instead, the agency was concerned the effects of the listing on canned hunting ranches would "upset[] people" and "create infinitely more work." SOF ¶ 29.

Because of these concerns, FWS considered option after option for protecting canned hunting ranches from the effects of listing, including listing only the antelope found within their

---

[8] The Eighth Circuit explicitly recognized FWS's authority to issue Section 10(a)(1)(A) permits for either threatened or endangered species. <u>Sierra Club</u>, 755 F.2d at 614 n.8. However, the court found Section 10 "does not authorize establishment of a public sport season." <u>Id.</u>

[9] There is no question that the only circumstance Congress recognizes as warranting lethal take—where the ecosystem is in danger of being overwhelmed—are not present in this case. 16 U.S.C. § 1532(3). As discussed <u>infra</u> Part II.B, the "ecosystem" with which Congress was concerned was the one in the wild, not in captivity, and the antelope are either already extinct or in imminent danger of becoming extinct in the wild. 70 Fed. Reg. 52310.

native ranges; listing antelope within their native ranges as endangered, while listing those in captivity as threatened with a special 4(d) rule allowing canned hunting; and listing both captive and wild animals as endangered and preparing a separate policy that would allow sport-hunting and transport and trade in trophies in the U.S.  SOF ¶¶ 30-39.  In the end, FWS took its zoologist's suggestion to "drop the matter" until the agency was sued for illegally missing the ESA deadline to finalize the proposed rule.  Id. ¶ 31.

After FOA sued, FWS finally chose to grant an exemption for canned hunting ranches under Section 10(a)(1)(A) to "provide an economic incentive for private landowners to continue to breed these species and maintain them as a genetic reservoir for future reintroduction or research."  70 Fed. Reg. 52315.  However, there is no evidence that canned hunting is necessary for recovery or that there are no feasible non-lethal alternatives.  HSUS, No. 06-1279, at 17; H.R. Conf. Rep. No. 93-740, at 2 (1973); H.R. Rep. No. 93-412, at 17.  In fact, the record supports the opposite conclusion.

As discussed with respect to standing, the rule authorizes a legal market in parts that will increase the incentive for poaching in the wild.  See supra Part I.A.1.b.  In fact, FWS used to prohibit trade in parts for this very reason.  SOF ¶ 34, 48 (stating that trade in trophies would put wild populations at risk "by encouraging the propagation of endangered and threatened wildlife for consumptive markets rather than for direct benefit to the species in the wild").

Even disregarding the negative impact of the rule on wild populations, there is no evidence that canned hunting ranches are necessary for recovery.  The major causes of decline of the antelope are poaching and habitat destruction, not the lack of animals in captivity available for reintroduction efforts.  70 Fed. Reg. 52319-22.  As FWS concedes, large scale reintroduction efforts are not currently feasible because these threats are still prevalent in North Africa.  Id. at

52322.  Therefore, there is no need for massive numbers of antelope to be kept on canned

hunting ranches.

Furthermore, FWS cannot show that canned hunting ranches have or even could play a

role in recovery efforts.  There are currently several reintroduction programs within the

antelopes' native range.  As discussed above, FOA has been intimately involved with oryx and

dama gazelle recovery in Senegal.  There are also efforts to restore the oryx, addax, and dama

gazelle to the Souss-Massa National Park in Morocco and the Bou-Hedma and Sidi Toui

National Parks in Tunisia.  SOF ¶¶ 19-20.  However, zoos in Europe, the United States, and

North Africa, not canned hunting ranches, provided all of the founding antelope for these

projects.  Id.[10]

Additionally, there are numerous national and international organizations dedicated to

recovering the antelope, none of which utilize canned hunting ranches as part of their efforts.

The American Zoo and Aquarium Association ("AZA") is responsible for the Species Survival

Program ("SSP"), which seeks to ensure the survival of endangered species by planning for

genetically diverse breeding, habitat preservation, public education, and field conservation and

research.  70 Fed. Reg. 52314-15; SOF ¶ 21.  The AZA has established SSPs for each of the

three antelope.  SOF ¶ 22.  The AZA's 213 accredited institutional members do not include

canned hunting ranches.  Id. ¶ 21.  In fact, AZA policies prohibit members from supplying

antelope to these ranches.  Id. ¶ 23.  The scimitar-horned oryx SSP is the only SSP with a private

ranch participant, the Bamberger Ranch, which does not allow canned hunting of the oryx.  Id.;

---

[10] FWS also states that one "commenter" on the rule indicated he provided a number of all three
antelope to a private wildlife sanctuary in the United Arab Emirates that will eventually be used
for reintroduction efforts in the antelopes' native habitat.  70 Fed. Reg. 52312, 15; SOF ¶ 27.
However, there is no evidence to show these antelope were ever used for this purpose.
Moreover, even if they were, the fact that FWS can come up with only one example is telling.

Exhibit 1 ¶ 23.  In November 2004, FWS acknowledged that "[n]o other ranches are involved with the U.S. zoo community for these species at the present time and no future collaboration is under discussion."  SOF ¶ 23.

The Sahelo-Saharan Interest Group ("SSIG") is an international affiliation of individuals and organizations dedicated to protecting species in the Sahelo-Saharan area, including the antelope.  Id. ¶ 24.  The 75 members of the SSIG share information about genetics, captive breeding, reintroductions, and establishment of protected areas for endangered species.  Id.  FOA has participated in several SSIG conventions to discuss recovery efforts for the antelope.  Exhibit 1 ¶ 8.  No canned hunting ranches are members of the SSIG.

The CITES Secretariat is also planning to establish a world pool of the antelope taken from zoos to be used in reintroduction efforts throughout North Africa.  SOF ¶ 25.  In addition, the Antelope Specialist Group ("ASG") of the World Conservation Union Species Survival Commission ("IUCN/SSC") completed a "Global Survey and Regional Action Plan" for the antelope in 2001 that summarizes the current knowledge about the species and develops action plans for their conservation.  Id. ¶ 26.  Neither of these efforts envisions any role for canned hunting ranches.

Even if the antelope on ranches were needed, there is no evidence they are suitable for recovery efforts.  FWS has questioned the suitability of antelope on canned hunting ranches repeatedly because of their uncertain genetic history.  Id. ¶ 51 ("[T]he problem with the oryx, as I understand it, is that there are lots of them in captivity, but relatively few whose bloodlines are charted for optimum breeding."); ("[T]he survival of the [captive antelope populations] is tenuous and there is no assurance that they can be maintained in keeping with the evolutionary potential and the morphological and ecological characteristics of the natural species.  Only some

of the captives are currently part of programs with such an objective."). Similarly, for other endangered species bred on canned hunting ranches, FWS found the animals could not enhance the survival of the species because they were not needed for "organized breeding programs" and were of "unknown origin." Id. ¶ 50 (also finding animals from canned hunting ranches are not needed for "established captive breeding programs" because of a lack of information about "genetic history").[11]

In the end, FWS cannot show it is necessary to kill antelope to save them. While canned hunting facilities may be upset or inconvenienced as a result of the listing, FWS's primary concern under the ESA must be to protect endangered species from death and commercial exploitation, not to appease private industry.

> **2.     FWS cannot allow canned hunting ranches to sustain antelope for no other purpose than to kill them.**

FWS asks this Court to accept that it is enough for a canned hunting ranch to "enhance the propagation" of an endangered animal for no other purpose than to kill it. In doing so, FWS ignores Congress' intent that Section 10(a)(1)(A) was intended to further the primary purpose of the ESA—recovery of species in the wild.

The ESA is not designed to protect endangered species by placing them in cages or behind fences for the enjoyment of humans. Rather, the "primary purpose of the Act is the conservation and continued existence of wild populations of endangered and threatened species and the ecosystems on which they depend." SOF ¶ 34 (citing ESA Section 2); Gifford Pinchot Task Force v. FWS, 378 F.3d 1059, 1070 (9th Cir. 2004) ("[T]he ESA was enacted not merely to

---

[11] Although the final rule requires ranches to manage antelope to "prevent hybridization" and "maintain genetic diversity," there are no standards to define these terms. 50 C.F.R. § 17.21(h)(3), (4). Accordingly, canned hunting ranches can interpret them however they like, which may not be the same standards used by the AZA and SSIG as part of legitimate recovery efforts.

forestall the extinction of species . . . but to allow a species to recover to the point where it may be delisted."); Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1230 (10th Cir. 2002); 16 U.S.C. § 1533(f) (requiring FWS to develop recovery plans for all listed species).

Although the ESA's goal of recovery in the wild is evident throughout the statute, nowhere is it more evident than in Section 10(a)(1)(A). As discussed above, Section 10(a)(1)(A) permits must be consistent with the "conservation" purpose of the ESA, which is defined as "recovery." 16 U.S.C. §§ 1539(d), 1532(3). Accordingly, this Court has repeatedly referred to Section 10(a)(1)(A) permits as "recovery permits." HSUS, No. 06-1279, at 5; Nat'l Ass'n of Home Builders v. Norton, 298 F. Supp. 2d 68, 72 (D.D.C. 2003), aff'd, 415 F.3d 8 (D.C. Cir. 2005).

As an example of this recovery goal, Section 10(a)(1)(A) specifically authorizes "acts necessary for the establishment and maintenance of experimental populations [under Section 10(j)]." 16 U.S.C. § 1539(a)(1)(A); see also id. § 1532(3) (listing as examples of conservation "propagation, live trapping, and transplantation"). Where an endangered species has reached such dire levels that it cannot recover without FWS's intervention (e.g. those that are extinct in the wild), FWS can bolster recovery by reintroducing animals from captivity into the wild under Section 10(j). Indeed, the North African antelope are the perfect examples of species that need this flexibility. Because all three species are either completely or nearly extinct in the wild, captive-breeding will be a necessary component of their recovery.

That Congress paired recovery permits with scientific permits in Section 10(a)(1)(A) is also telling. Efforts to study species and their needs are necessary as part of attempts to recover species. See, e.g., 71 Fed. Reg. 34153 (Jun. 13, 2006) (surveys necessary for recovery efforts); 70 Fed. Reg. 71554 (Nov. 29, 2005) (genetic studies of wolves as part of reintroduction efforts).

FWS has long recognized that captive-breeding is important under the ESA only to the extent that it contributes to recovery of species in the wild. In enacting the captive bred wildlife ("CBW") regulations found at 50 C.F.R. § 17.21(g), FWS stated:

> The Service considers the purpose of the Act to be best served by conserving species in the wild along with their ecosystems. Populations of species in captivity are, in large degree, removed from their natural ecosystems and have a role in survival of the species only to the extent that they maintain genetic integrity and offer the potential of restocking natural ecosystems where the species has become depleted or no longer occurs.

43 Fed. Reg. 16144 (Apr. 14, 1978) (emphasis in original); see also 58 Fed. Reg. 68323, 68324 (Dec. 27, 1993) (stating the purpose of the captive breeding regulations was to ensure animals are "available for any legitimate and appropriate effort to re-establish or augment wild populations"); 44 Fed. Reg. 30044, 30047 (May 23, 1979) ("[Captive populations are important because] they can be used to bolster or restock wild populations, they provide an alternative to wild populations, as a source of animals for research or other uses, and they provide opportunities for research that can benefit wild populations.").[12]

Canned hunting ranches do not fit within this framework because they are not engaged in captive breeding for the purpose of recovery; they are engaged in captive breeding to profit from the killing of rare animals. As discussed above, not only does all the evidence in the record show that allowing trade in sport-hunted trophies will exacerbate the problem of poaching, FWS cannot demonstrate canned hunting ranches have or even could effectively contribute to recovery efforts.

---

[12] FWS later disregarded this original intent, allowing both canned hunting and trade in sport-hunted trophies, despite the agency's recognition that canned hunting ranches are not involved in legitimate captive breeding programs and the animals are not suitable for reintroductions because of their uncertain genetics. SOF ¶ 49. FWS got around this problem by requiring donations to conservation organizations working on recovery. Id. ¶ 50. The canned hunting rule removes even this requirement.

Furthermore, FWS's justification for the rule is premature because the agency has not even started to prepare a recovery plan for the species. The ESA requires FWS to develop recovery plans to outline the steps necessary for recovery, including necessary "site-specific management actions," "objective, measurable [recovery] criteria," and timeframes for recovery. 16 U.S.C. § 1533(f). In this case, FWS has put the cart before the antelope. Until the agency develops a plan for recovery of the antelope, it does not know what role canned hunting ranches can play, if any, in recovery of the species in the wild.

Even if FWS could show that canned hunting ranches are good for recovery, however, the canned hunting rule does not require them to participate. Under the rule, an operation need only show it is "increasing or sustaining" a population of North African antelope to qualify to kill an unlimited number of animals. 50 C.F.R. § 17.21(h). As FWS concedes, "we do not know when or to what degree any particular ranch will be called upon to provide specimens for reintroduction efforts or research necessary to facilitate such program." 70 Fed. Reg. 52315. Left unsaid is the fact that there will be canned hunting facilities that are never called upon to provide these conservation measures. Even if FWS requested that a canned hunting operation contribute animals for reintroduction efforts in the future, the facility could refuse. Sustaining a population of antelope for no purpose other than killing them serves no purpose of the ESA and cannot be squared with Congress' intent. To hold otherwise would blast a shotgun-sized hole in the narrow exemption Congress provided under Section 10(a)(1)(A).

### B. FWS Cannot Eliminate the Individual Permitting Requirement of Section 10(c) and (d).

By issuing a global regulation that includes all captive breeding facilities, FWS eliminated the fact-finding for each individual ranch required under Section 10(c) and (d) and shut the public out of the process. Under Section 10(a)(1)(A), FWS may "permit" specific "acts"

that enhance the propagation and survival of the species.  16 U.S.C. § 1539(a)(1)(A).  Under

Section 10(c), FWS "shall publish notice in the Federal Register of each application for an

exemption or permit which is made under [Section 10]."  Id. § 1539(c).  Notably, Congress used

the words "each application" and "exemption" or "permit," not regulation or rule.  Accordingly,

the plain language shows Congress intended FWS to engage in an individualized permitting

process.  Indeed, FWS interpreted Section 10(a)(1)(A) to require exactly that and enacted

regulations mandating an individual application process.  50 C.F.R. § 17.22(a)(1).

Furthermore, Congress required meaningful public participation under Section 10(c).

"Each notice shall invite the submission from interested parties . . . of written data, views, or

arguments with respect to the application . . . .  Information received by the Secretary as part of

any application shall be available to the public as a matter of public record at every stage of the

proceeding."  16 U.S.C. § 1539(c); 50 C.F.R. § 17.22(e).  As the D.C. Circuit held, these public

participation requirements are mandatory and an important part of the permitting process.

Gerber v. Norton, 294 F.3d 173, 179 (D.C. Cir. 2002).

Finally, under Section 10(d), Congress required specific findings for each application.

FWS must publish a finding in the Federal Register that the application:  (1) was applied for in

good faith, (2) will not operate to the disadvantage of the endangered species, and (3) is

consistent with the purposes and policies of the ESA.  Id. § 1539(d).  Recognizing it was dealing

with species "in danger of extinction," Congress required these findings to "limit substantially

the number of exemptions that may be granted under the act."  H.R. Rept. 93-412, at 17.

FWS has turned congressional intent on its head.  Rather than limiting the number of

permits, FWS has substantially increased the number by including any captive breeding facility

that is increasing or sustaining a population of antelope without requiring them to apply for a

permit.  50 C.F.R. § 17.21(h).  In fact, canned hunting ranches do not even have to notify FWS

that they are killing endangered species.  Accordingly, FWS will have no idea what ranches are

operating under the rule unless the agency, on its own initiative, decides to inspect a ranch's

records.  Id. § (h)(7).

By getting rid of the permitting process, FWS has eliminated the need for individual

applicants to show they are enhancing the survival of the species.  However, canned hunting

ranches cannot make this showing.  See supra Part I.A.1.  The individual permitting process was

designed to prevent exactly this problem.

The lack of a permitting process also effectively nullifies public participation in the

decision-making process.  FOA can no longer obtain the files of individual applicants and

provide comments to FWS.  Exhibit 1 ¶ 19.  In fact, because the rule requires the ranches to

maintain their records, rather than FWS, FOA cannot even obtain the information through FOIA,

which applies only to "records" maintained by "agencies."  5 U.S.C. § 552(a)(3)(A), (f).  By

shutting the public out of the process, FWS violated Section 10(c).

FWS's only justification for eliminating the individual permitting process is that canned

hunting ranches and other facilities complained it was too onerous.  70 Fed. Reg. 52320; 70 Fed.

Reg. 52313.  FWS even argues that permitting requirements will cause canned hunting facilities

to cease breeding North African antelope because it would "no longer [be] profitable."  SOF ¶

64.  Based on FWS's current illegal interpretation of the law, this is an absurd statement.  There

is simply no evidence that canned hunting ranches would cease breeding antelope if they had to

fill out a pre-printed, two-page application or renewal form on a yearly basis.  Id. ¶ 49.

Canned hunting ranches command a sizeable fee, ranging from $1,800 to $4,000, for

sport-hunts of endangered species.  Id. ¶ 16.  Moreover, FWS found that the average value of the

breeding stock and trophy sales of canned hunting ranches ranges from $48,600 to $83,300.  Id.
It is hard to imagine the ranches giving up that value because of the need to apply for a permit.
Indeed, there are numerous examples of canned hunting ranches that have obtained permits to
kill other endangered species for years.  Id. ¶ 49.

    Furthermore, FWS has bent over backwards to accommodate the ranches.  Indeed, FWS
has granted permits repeatedly in situations where it found that canned hunting ranches had not
met the necessary requirements of Section 10(a)(1)(A), either because they failed to donate to a
conservation organization or failed to demonstrate they would enhance the propagation and
survival of the species.  Id. ¶ 52.  In fact, when the World Wildlife Fund refused to accept funds
generated from sport-hunting, FWS advised hunting ranches to lie about the origin of the money.
Id. ¶ 53 ("Send only a simple note saying the donation is for species conservation. . . .  If you
indicate [the real reason for the donation] the contribution will not be accepted.").  Therefore,
FWS claim that ranches will cease breeding antelope is unfounded, and FWS has provided no
justification for eliminating the ESA's crucial check before allowing endangered species to be
killed.

**III.    FWS VIOLATED ESA SECTION 4 BY FAILING TO RELY ON THE BEST
         SCIENTIFIC INFORMATION AVAILABLE.**

    Section 4 of the ESA requires FWS to make listing decisions based on the "best scientific
and commercial data available."  16 U.S.C. § 1533.  Under this standard, FWS cannot ignore
available scientific information or the opinions of its experts.  Sw. Ctr. for Biological Diversity
v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000); Defenders of Wildlife v. Babbitt, 958 F. Supp. 670,
680-84 (D.D.C. 1997).  Similarly, FWS must articulate a rational basis for its decision that is
supported by evidence in the administrative record.  Am. Wildlands v. Norton, 193 F. Supp.2d
244, 251-52, 254-56 (D.D.C. 2002); Nat. Wildlife Fed'n v. Norton, 332 F. Supp.2d 170, 175,

177 (D.D.C. 2004) (holding agency must make a "rational connection between the facts found and the choice made"); Carlton v. Babbitt, 900 F. Supp. 526, 532-33 (D.D.C. 1995). FWS's decision was politically motivated in this case and not based on the best scientific evidence available. The agency repeatedly ignores evidence in the record, including evidence from its own experts, discrediting the agency's decision to allow canned hunting.

As discussed with respect to standing, there is overwhelming evidence in the record that by creating a market for dead antelope parts in the U.S., FWS has increased the incentive for individuals to poach animals in the wild. See supra Part I.A.1.b. Yet, without ever considering the evidence presented or discussing why it was not persuasive, FWS concluded there was "no evidence" to support this conclusion. 70 Fed. Reg. 52313. Instead, FWS argues sport-hunting may reduce pressure on wild populations by providing an alternative to illegal hunting. Id. at 52315. However, FWS does not provide a shred of evidence to support this conclusion. In fact, FWS's own scientist previously rejected that finding as speculation. SOF ¶ 62 ("One might speculate that the existence of these stocks removes some pressure on wild populations, but this cannot be substantiated to the point of making a finding that the harvest and export of these specimens enhances the survival of the species."). FWS's one-sided approach shows the agency based its decision on irrelevant political factors rather than the best scientific information.

Additionally, FWS repeatedly ignores evidence showing that canned hunting ranches do not serve the same purposes as zoos and other conservation organizations with respect to antelope recovery. For example, FWS claimed "[c]aptive breeding in the United States has enhanced the propagation and survival of the [North African antelope] worldwide by rescuing these species from near extinction and providing the founder stock necessary for reintroduction."

70 Fed. Reg. 52310.  However, not one canned hunting ranch provided any of the founder stock for reintroductions within the antelope's native range.  SOF ¶¶ 18-20.

FWS also ignores evidence that animals on canned hunting ranches are not suitable for reintroductions.  In the rule, FWS finds that zoos and private ranches "genetically manage[] their herds" and "maintain captive specimens as a demographically and genetically diverse megapopulation."  70 Fed. Reg. 52314.  What FWS fails to mention is that these "private ranches" do not include canned hunting facilities.  Prior to the canned hunting rule, FWS's own biologists found repeatedly that antelope and other endangered species on canned hunting ranches were not suitable for recovery because they were not part of breeding programs that actively track genetics, and their genetic history is uncertain.  SOF ¶¶ 50-51.  Although FWS concedes later in the rule that canned hunting ranches have not participated with the SSPs in tracking genetic diversity, the agency finds ranches "can" work with the SSPs to take surplus animals.  Id. at 52314.  The AZA specifically objected to this statement in the proposed rule and pointed out that their policies prohibited this activity, yet FWS continues to rely on it in the final rule.  SOF ¶ 23.  This is yet another example of FWS ignoring evidence contrary to its position.

Relying solely on the statements of canned hunting proponents, FWS also finds that some ranches have provided opportunities to study species.  70 Fed. Reg. 52315.  However, there is no evidence in the record that these studies involved the antelope or were part of conservation efforts.  Accordingly, FWS has not met its obligation to consider the best evidence available.

## IV.    FWS VIOLATED THE ESA BY FAILING TO CONDUCT A SECTION 7 CONSULTATION ON THE CANNED HUNTING RULE.

ESA Section 7 provides that every federal agency "shall in consultation with and with the assistance of [FWS], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species . . . or result in the

destruction or adverse modification of [critical habitat]."  16 U.S.C. § 1536(a)(2); <u>TVA v. Hill</u>, 437 U.S. 153, 173, (1978) ("One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 . . .  This language admits of no exception.").  Consultation is not a meaningless paper exercise.  <u>NRDC v. Houston</u>, 146 F.3d 1118, 1128-29 (9th Cir. 1998) ("[C]onsultation offers valuable protections against the risk of a substantive violation and ensures that environmental concerns will be properly factored into the decision-making process."); <u>Sierra Club v. Marsh</u>, 816 F.2d 1376, 1384 (9th Cir. 1987).

Typically there is an "action agency" that must consult with FWS.  However, when FWS is the action agency, as in this case, it must engage in internal consultation (i.e. one branch of the agency consults with another).  <u>Envtl. Protection Info. Ctr. v. Simpson Timber Co.</u>, 255 F.3d 1073, 1076 (9th Cir. 2001); <u>Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.</u>, 281 F. Supp.2d 1, 5 (D.D.C. 2003); FWS, Section 7 Consultation Handbook ("Handbook") 1-5 (1998), <u>available at</u> <u>http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm</u>.  Agency action is defined broadly and includes "promulgation of regulations" and "granting permits."  50 C.F.R. § 402.02; <u>Am. Iron & Steel Inst. v. EPA</u>, 115 F.3d 979, 1003 (D.C. Cir. 1997).

Formal consultation is required when an action "may affect" listed species.  50 C.F.R. § 402.14(a).  <u>Hawaii Longline</u>, 281 F. Supp.2d at 4.  The threshold for such a determination is low. 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement."); Handbook, at xvi (definition of "may affect").  Formal consultation results in a Biological Opinion ("BO") from FWS that evaluates the direct, indirect, and cumulative impacts of the agency action.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02(d), 402.14(g)(3), (g)(4).  If FWS determines jeopardy to a listed species is likely, the agency must develop "reasonable and

prudent alternatives" to avoid jeopardy. 50 C.F.R. § 402.14(g)(5). During consultation, FWS

must rely on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

FWS may only avoid formal consultation if the agency prepares a biological assessment

("BA") or engages in informal consultation and (1) determines the proposed action is "not likely

to adversely affect" any listed species, and (2) gets internal written concurrence for that finding.

50 C.F.R. § 402.14(b). Conversely, if the proposed action is "likely to adversely affect" a

protected species, formal consultation is required. Id. § 402.14(a); Oceana, Inc. v. Evans, 384 F.

Supp.2d 203, 211 (D.D.C. 2005); Nat'l Wildlife Fed., 332 F. Supp.2d at 175. FWS may not

determine that a listed species is "not likely to be adversely affected" if the proposed action

allows take. Handbook, at xv.

Accordingly, in the present case it is beyond dispute that FWS must engage in formal

consultation. The canned hunting rule will allow take of endangered antelope, and authorizes a

legal market in antelope body parts, which will increase poaching in the wild. FWS concedes it

did not consult on the rule. Complaint ¶ 88; Answer ¶ 88. As a result, FWS violated Section 7.

## V.    FWS VIOLATED NEPA BY FAILING TO TAKE A HARD LOOK AT THE IMPACTS OF THE CANNED HUNTING RULE.

NEPA requires all federal agencies to take a "hard look" at all the potential

environmental consequences of their actions. Marsh v. Or. Natural Res. Council, 490 U.S. 360,

374 (1989); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); Taxpayers

of Mich. Against Casinos v. Norton, 433 F.3d 852, 861 (D.C. Cir. 2006). Federal agencies must

engage in this analysis before they take action to ensure "the agency will not act on incomplete

information, only to regret its decision after it is too late to correct." Marsh, 490 U.S. at 371.

Federal agencies must prepare an environmental impact statement ("EIS") before taking

any "major . . . actions significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(2)(C).  The EIS must include a detailed statement of the environmental impacts of the

proposed action and any alternatives to the proposed action that would avoid or minimize those

impacts.  Id.; 40 C.F.R. § 1502.1.[13]  To determine whether an action is "significant" and requires

an EIS, an agency may prepare a less extensive environmental assessment ("EA").  40 C.F.R. §§

1501.4(b), 1508.9.  If the EA finds the action is not significant, the agency makes a finding of no

significant impact ("FONSI").  Id. § 1501.4(e).

A.    **FWS violated NEPA by using the EA to Rationalize a Predetermined Outcome and Failing to Consider a Reasonable Range of Alternatives.**

The "heart" of NEPA is the agency's obligation to consider a "reasonable range of

alternatives" to the proposed action.  42 U.S.C. § 4332(C)(iii); 40 C.F.R. §§ 1502.14, 1508.9.

An EA must include alternatives that cover the "full spectrum of possibilities."  Sierra Club v.

Watkins, 808 F. Supp. 852, 872 (1991).  This requirement ensures the agency considers "all

possible approaches to a particular project (including total abandonment of the project) which

would alter the environmental impact."  Calvert Cliffs' Coordinating Comm., Inc. v. U.S.

Atomic Energy Comm'n, 449 F.2d 1109, 1115 (D.C. Cir. 1971); Watkins, 808 F. Supp. at 875

("[NEPA] is designed to insure that an agency's single-minded approach to a proposed action is

tempered by the consideration of other feasible options that may have different (and fewer)

environmental effects.").

An agency begins its alternatives analysis by describing the "purpose and need" of the

proposed action, which defines the "universe of the action's reasonable alternatives."  Citizens

Against Burlington v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991), cert. denied, 502 U.S. 994

---

[13] NEPA created the Council on Environmental Quality, an agency within the Executive Office of the President charged with promulgating regulations under NEPA.  42 U.S.C. §§ 4342, 4344. These regulations, found in 40 C.F.R. Part 1500, are binding on all federal agencies.  Robertson, 490 U.S. at 354.

(1991); 40 C.F.R. § 1502.13.  However, the agency may not define purpose and need so

narrowly that only one alternative meets that need.  Id. at 196; see also Davis v. Mineta, 302 F.3d

1104, 1119 (10th Cir. 2002); City of New York v. U.S. Dept. of Transp., 715 F.2d 732, 742 (2d

Cir. 1983).  Similarly, an agency's consideration of alternatives must be more than a "pro forma

ritual."  Calvert Cliffs, 449 F.2d at 1112, 1128.  In other words, an EA cannot "be used to

rationalize or justify decisions already made."  40 C.F.R. § 1502.5; Watkins, 808 F. Supp. at 870

("[A]n EA is more than simply the agency's post hoc rationalizations of its decision."); see also

Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000).

The EA for the canned hunting rule was nothing more than a pro forma ritual.  As

discussed previously, FWS decided long before it prepared the EA that it would not list the

antelope without providing an exemption to allow canned hunting ranches to continue business

as usual.  Accordingly, FWS never intended to consider any other alternatives, much less a

reasonable range of alternatives.  Indeed, FWS stated its purpose as "amending the regulations

implementing the [ESA] by adding new regulations that would govern U.S. captive-bred

antelopes."  SOF ¶ 55.  With respect to the need for the action, FWS stated that the current

regulations prohibit interstate and foreign commerce of sport-hunted trophies, and the rule was

intended to authorize such commerce.  Id.  By defining the need for the action as passing a

regulation to authorize trade in antelope parts, the only option that would meet that need was a

regulation doing just that.

In fact, FWS did not consider even a single alternative that did not allow both canned

hunting and commerce in trophies.  The only difference between the alternatives was the level of

FWS and public involvement, and whether the canned hunting ranch had to contribute money

41

towards conservation.[14]  Alternative 1, the canned hunting rule, allows canned hunting and commerce in trophies, and has no permitting or registration requirements or any requirement that the ranches contribute money towards recovery.  SOF ¶ 56.  Alternative 2 would have allowed canned hunting with no registration, but would have required ranches to apply for an individual Section 10(a)(1)(A) permit to buy or sell trophies or other animal parts.  Id.  Alternative 3 was the no action alternative.  Even under the no action alternative, however, canned hunting ranches could authorize sport-hunting and engage in trade in trophies, they would just have to register with FWS for the former and apply for a permit for the latter.  Id.  Under both Alternatives 2 and 3, to obtain a Section 10(a)(1)(A) permit, the ranch would have to contribute funds towards conservation efforts in the wild.  Id.  The record shows that FWS freely granted these permits to canned hunting ranches for other endangered species.  Id. ¶¶ 46, 49, 52-53.

FWS cannot claim it considered a reasonable range of alternatives where the agency defined the purpose and need for the action so narrowly that only options allowing canned hunting and trade in trophies could meet that need, and the agency only considered alternatives that allowed both.  Furthermore, although FWS justified the rule on the basis that it would promote the recovery of the antelope, FWS never explored an alternative that would actually accomplish this goal, such as promoting reintroduction efforts or habitat restoration.  As such, the EA completely defeats NEPA's purpose of requiring the agency to consider a range of alternatives with a range of possible impacts.

---

[14] Although these were the only distinctions between the rules, FWS never analyzed the impacts of these differences.  For example, FWS never considered the fact that eliminating FWS and public involvement would make it more difficult to determine whether canned hunting ranches were actually meeting the minimal requirements of the rule, such as breeding to promote genetic diversity.  Similarly, FWS never discusses the potential benefits of requiring donations toward conservation.

Although FWS was already authorizing canned hunting and commerce in trophies illegally under the existing regulations at the time it prepared the EA, that does not alleviate the need to consider alternatives disallowing these activities. Indeed, NEPA requires agencies to consider even "reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. 1502.14; NRDC v. Morton, 458 F.2d 827, 836 (D.C. Cir. 1972); Watkins, 808 F. Supp. at 871. Here, FWS does not even have to go outside its own jurisdiction. FWS has the power to interpret its regulations to prohibit canned hunting and trade in trophies—indeed it is compelled to do so by law—or change the regulations. Therefore, FWS's failure to consider these alternatives violates NEPA.

**B.    FWS Ignored Relevant Environmental Concerns and Failed to Rely on High Quality Information.**

To satisfy the hard look requirement, an EA must include a "full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. The process is designed to ensure "no arguably significant consequences have been ignored." Taxpayers of Mich., 433 F.3d at 860 (citation omitted). FWS must support its EA with "evidence and analysis" that is of "high quality." 40 C.F.R. §§ 1500.1(b), 1508.9. "Accurate scientific analysis, expert agency comment, and public scrutiny are essential to implementing NEPA." Id. § 1500.1(b). Furthermore, under the APA, FWS must provide a rational basis for its decision. Baltimore Gas & Electric v. NRDC, 462 U.S. 87, 105 (1983); Motor Vehicles Mfrs. Ass'n. v. State Farm, 463 U.S. 29, 43 (1983).

The EA's analysis mimics that of the final rule. Accordingly, for the same reasons that FWS cannot demonstrate that it relied on the best available science under the ESA, FWS also cannot show that it considered all relevant environmental concerns or that the rule is supported by high quality information. See supra Part IV.

Consistent with the rule, the EA states "[t]here is no evidence that the availability of captive-bred animals to trophy hunters has contributed in any way to hunting pressure on these species in the wild." SOF ¶ 58. Although commenters on the EA provided hundreds of pages of scientific evidence to the contrary, FWS ignored it. Id. ¶¶ 59-62. While FWS ignored this truly scientific evidence, the EA cited repeatedly as scientific authority the comments of the Exotic Wildlife Association ("EWA"), a consortium of canned hunting interests. Id. ¶ 63 (listing EWA's comments as a "reference"). Because FWS's bias prevented the agency from considering significant environmental impacts, the EA does not meet the hard look requirement.

The EA also perpetuates two flawed arguments discussed above. First, that canned hunting ranches are actually needed for recovery efforts. Id. ¶ 58. Second, that canned hunting ranches would cease operations if they were required to either register or obtain an individual permit. Id. ¶ 64. The EA does not provide any additional analysis or support for these arguments. Accordingly, for the same reasons discussed previously, they do not provide a rational basis for upholding the EA. Canned hunting ranches do not promote recovery of the antelope. Furthermore, under FWS's current interpretation of the law, where it freely grants permits to kill endangered species, minimal permitting requirements will not be enough for ranches to give up the lucrative business of canned hunting.

## CONCLUSION

For the foregoing reasons, FOA requests that this Court strike down the canned hunting rule as violating ESA Sections 10, 4, and 7 as well as NEPA.

Dated:   February 21, 2007                    Respectfully submitted,


                                              /s/  Robin Cooley
                                              Robin Cooley
                                              D.C. Bar No. CO0040
                                              Environmental Law Clinic
                                              University of Denver Sturm College of Law
                                              2255 E. Evans Ave., Room 365G
                                              Denver, CO 80208
                                              Phone:  303-871-6039
                                              Fax:  303-871-6991

                                              Attorney for Plaintiff Friends of Animals

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| FRIENDS OF ANIMALS,              ) | |
|            ) | |
|       Plaintiff,     ) | |
|           ) | |
|   v.           ) | |
|           ) | |
| DIRK KEMPTHORNE, Secretary of the Interior,  ) | |
|           ) | Civ. No. 04-1660 (HHK-DAR) |
|           ) | Civ. No. 06-2120 |
|       Defendant,    ) | (Consolidated Cases) |

FRIENDS OF ANIMALS,                    )

                  Plaintiff,           )

    v.                                     )

DIRK KEMPTHORNE, Secretary of the Interior,  )
                                 )     Civ. No. 04-1660 (HHK-DAR)
                                 )     Civ. No. 06-2120
             Defendant,           )     (Consolidated Cases)

    and                                    )

SAFARI CLUB INTERNATIONAL, et al.,       )

             Defendant-Intervenors.   )

REBECCA ANN CARY, et al.,                )

                 Plaintiffs,          )

    v.                                     )

DALE HALL, Director, Fish and Wildlife Service,  )
et al.,                                  )

             Defendants,          )

    and                                    )

SAFARI CLUB INTERNATIONAL, et al.,       )

             Defendant-Intervenors.   )

---

# PLAINTIFF FRIENDS OF ANIMALS' STATEMENT OF MATERIAL FACTS

## I.     The Scimitar Horned Oryx, Dama Gazelle, and Addax

### A.     Existence in the Wild

1.     The scimitar-horned oryx (*Oryx dammah*), addax (*Addax nasomaculatus*), and dama gazelle (*Gazella dama*) (collectively "North African antelope" or "antelope") are species of antelope native to the Sahelo-Saharan regions of northern Africa.  Complaint ¶ 1; Answer ¶ 1. All three species are in danger of extinction throughout their ranges.  Complaint ¶ 2; Answer ¶ 2.

2.     The scimitar-horned oryx, pictured below, gets its name from its long arching horns. Complaint ¶ 48; Answer ¶ 48.  The ancient Egyptians used to bind the horns of oryx together to make them appear as a single horn.  Soon the horns would actually grow together. This practice is likely a source of the Unicorn legend.  See e.g. http://www.seaworld.org/animal-info/animal-bytes.



3.     The scimitar-horned oryx once lived throughout the semi-deserts north of the Sahara, from Morocco to Egypt.  The oryx was extirpated from Egypt over 100 years ago.  By the mid-1900's, the species had been eliminated from Morocco as well.  There were only a few hundred oryx left in the wild by the 1980's; most were living in Chad.  The World Conservancy Union ("IUCN") has declared the species extinct in the wild.  Complaint ¶ 49; Answer ¶ 49.

4.    The addax, pictured below, has grayish white with horns that spiral upwards. Complaint ¶ 50; Answer ¶ 50.



5.    The addax once lived throughout the Northern African deserts from the Atlantic Ocean to the Nile River.  It may also have occurred in the Arabian Peninsula and some adjacent parts of southwestern Asia until the 19th Century.  Complaint ¶ 51; Answer ¶ 51.  The addax was extirpated from Tunisia in the 1930's, and by the end of the 1970's it had been extirpated from Libya, Algeria, Egypt, and Morocco as well.  70 Fed. Reg. 52319, 52320 (Sept. 2, 2005). Currently, there are around 600 animals left in the wild.  These remnant populations occur in remote areas of Chad, Mali, and Niger.  Complaint ¶ 51; Answer ¶ 51.

6.    The dama gazelle, pictured below, is the largest of the gazelle species.  Its horns curve back and up, and reach a length of 17 inches.  Complaint ¶ 52; Answer ¶ 52.



7.      The dama gazelle once lived through deserts from southern Morocco and Senegal to central Sudan.  There are only approximately 700 dama gazelle remaining in the wild. Complaint ¶ 53; Answer ¶ 53.

8.      The primary threat to the survival of all three antelope species is unregulated killing.  Military and government officials have killed large numbers of these species.  Civil wars in Chad and Sudan have also contributed to hunting and harassing of the antelope.  Complaint ¶ 54; Answer ¶ 54.  In addition, illegal poaching remains a major problem for the antelope in the wild.  70 Fed. Reg. 52321; Administrative Record ("AR") 316-17 ("[T]hreats to their survival, most notably poaching pressure must be stopped or these species will certainly be extinct within a generation, or less."), 2388 (234-35); see also Friends of Animals' ("FOA") Motion for Summary Judgment ("MSJ"), Exhibits 2, 3 (documenting poaching threat by foreigners). Poachers have become extremely effective in killing the antelope by using off-road vehicles and automatic rifles.  70 Fed. Reg. 52321

9.      The other primary threat to the three antelope species is the destruction of their habitat.  Large herds of domestic livestock within the historic range of the antelope have led to

competition for forage, overgrazing, erosion, and desertification.  Military activity, expansion of human populations, and mining have also contributed to habitat loss.  Complaint ¶ 55; Answer ¶ 55.

11.    Finally, the countries the antelope inhabit have few effective methods for protecting the species from poaching and other harmful activities.  Complaint ¶ 56; Answer ¶ 56.

**B.    Antelope in Captivity**

12.    According to Defendant the U.S. Fish and Wildlife Service ("FWS"), 100% of the known scimitar-horned oryx, 71% of addax, and 48% of dama gazelles live in captivity.  70 Fed. Reg. 52314.  The Sahelo-Saharan Interest Group ("SSIG") of the United Nations Environment Program estimates there are 4,000-5,000 scimitar-horned oryx, 1,500 addax, and 750 dama gazelles in captivity worldwide.  AR 2237-38.

13.    These antelope live in a variety of environments.  Some live within semi-confined areas in the native range of the species and are part of efforts to reintroduce the antelope to the wild.  See infra ¶¶ 18-20.  Others live in zoos or on ranches dedicated to conservation.  For example, worldwide there are at least 1,250 scimitar horned oryx in zoos and other private facilities (not including canned hunting ranches in the U.S.), including at least 350 oryx in 23 different zoos in North America.  AR 2489, 2494.  Similarly there are over 1,000 addax living in zoos worldwide.  AR 2448, 2489.

14.    There are several ranches in Texas that raise the antelope for wildlife viewing that do not allow any sport-hunting.  The David Bamberger Ranch in Johnson City was created as part of a captive breeding program to maintain genetic diversity of the scimitar-horned oryx.  AR 1166-67.  The ranch maintains over thirty founder bloodlines of oryx and engages in scientific research.  AR 2452; 70 Fed. Reg. 3214.  The Fossil Rim Wildlife Center, which houses the

largest breeding herd of addax in the world as well as scimitar-horned oryx, is a member of the

American Zoo and Aquarium Association ("AZA") and is dedicated to conservation of the

species.  AR 890, 1241-45; 70; Fed. Reg. 52315.  The Wilds is also home to the oryx, and

engages in education, conservation, and scientific study.  AR 890, 1246-54; 70 Fed. Reg. 52315.

15.    However, the majority of the North African Antelope in the United States live on

canned hunting ranches.  In 2004, FWS found there were at least 63 ranches with scimitar-

horned oryx, 31 ranches with addax, and 14 with dama gazelles.  AR 2554.  FWS also estimates

there are 2,145 oryx and 2,000 addax on private ranches.  AR 2495.  AR 2554.  These ranches,

the majority of which are in Texas, breed the antelope for the sole purpose of giving private

individuals the opportunity to "hunt" these rare species.  AR 890-919, 1191-1225.

16.    These canned-hunting operations confine the antelope within fenced areas and

charge "hunters" anywhere from $1,800 to $4,000 to shoot the species and take home a trophy.

AR 890-919, 1191-1225.  Based on information provided by the Exotic Wildlife Association, a

consortium of canned hunting ranches, FWS found the average value of the breeding stock and

trophy sales ranges from $48,600 to $83,300.  AR 2236.  Many of these ranches allow canned

hunting of endangered species.  AR 890-919, 1191-1225.  Although the Animal Welfare Act

regulates the humane treatment of the antelope by exhibitors (such as zoos and circuses) and

dealers, it does not apply to canned-hunting ranches.  AR 2246.  The canned hunting ranchers

concede the antelope are raised as exotic livestock.  AR 65, 103, 295.

17.    Some canned hunting ranches guarantee kills to their customers, advertising "no

kill, no pay."  AR 1199, 1210.  However, ranches also make it clear that sport-hunters must pay

even if they only wound an animal.  AR 919 ("[W]ounded animals are considered a kill."), 1199

("[W]ounded game is charged at full trophy fee.").

C.     **Recovery Efforts**

18.     There are numerous efforts underway to restore the North African antelope to their native ranges.  FOA is actively involved in efforts to restore the scimitar-horned oryx and dama gazelle in Senegal, and has donated animals and money for restoration of habitat.  FOA's MSJ, Exhibit 1 ¶¶ 5-11.  As a result of these efforts, there are now approximately 50 oryx and 34 dama gazelles in semi-captivity in two reserves, and Senegal's National Park Agency has had funding to start restoring habitat outside of one of the reserves in the hopes the animals can eventually be released back into the wild.  Id. ¶ 5.

19.     The Souss-Massa National Park in Morocco houses all three North African antelope, with the hopes of eventually releasing oryx and addax into the wild.  AR 2388 (19-20, 23).  Zoos from Europe, Niger, and Chad provided the founder animals.  Id. (19-20, 23); AR 2448.

20.     Mount Bou-Hedma National Park in Tunisia includes two fenced areas where the government has improved the habitat and reintroduced all three North African antelope.  AR 2388 (31-32, 35-36, 38, 39, 43).  The founder animals came from zoos in the United Kingdom, Germany, and the United States.  Id. (38, 39); AR 2448.  Because the government's original plans to expand these areas to accommodate increasing antelope populations had not materialized as of 2001, there were plans to translocate all of the addax and some of the scimitar-horned oryx to Sidi Toui or Djebil National Park, both also in Tunisia.  AR 2388 (37).  The proposal was dependent on technical and financial support from outside organizations, and the record does not reveal whether it ever took place.  Id.  The record does reveal that 10 oryx were released into the Sidi Toui National Park in Tunisia in 1999.  AR 2419.  However, the animals

came from six different zoos in France, Germany, Italy, Czech Republic, and Slovakia, and not the Bou-Hedma National Park.  Id.

21.     There are several international organizations dedicated to protecting and restoring the antelope.  Nationally, the American Zoo and Aquarium Association ("AZA") is actively involved in outreach and education programs, conservation of species in the wild, national and international policy making, and education about animal care and welfare.  AR 305.  The AZA has 213 accredited institutional members.  Id.  The AZA establishes Species Survival Plans ("SSPs"), which seek to ensure the survival of endangered species by planning for genetically diverse breeding, habitat preservation, public education, and field conservation and research.  AR 305, 1151.  SSPs focus on ensuring these populations are genetically diverse and demographically stable.  AR 1151.

22.     The AZA has established SSPs for each of the three antelope.  AR 305; 70 Fed. Reg. 52314.  There are around 350 oryx and 200 addax in the SSP populations.  AR 2451; 2448. These SSPs have been "sustainably managed both genetically and demographically . . . for over a decade."  AR 306.  The AZA recently formed the dama gazelle SSP and anticipates the same success in this program as it has had with the addax and scimitar-horned oryx.  Id.

23.     The scimitar-horned oryx SSP is the only SSP with a private ranch component, the Bamberger Ranch.  AR 2452.  The Bamberger Ranch maintains over thirty founder bloodlines of oryx, but does not allow canned hunting.  Id.; FOA's MSJ, Exhibit 1 ¶ 23.  FWS recognized that "[n]o other ranches are involved with the U.S. zoo community for the [antelope] at the present time and no future collaboration is under discussion."  AR 2596.  In fact, the AZA's policies prohibit members from supplying animals to canned hunting ranches.  AR 1968, 1990.  When FWS made a statement in the proposed rule indicating that canned hunting ranches

can serve as a repository for surplus animals, the AZA pointed out that their policies prohibit this activity. AR 1990. However, FWS did not remove the statement from the final rule. 70 Fed. Reg. 52314.

24. The Sahelo-Saharan Interest Group ("SSIG") formed in 2000 as an international affiliation of individuals and organizations dedicated to protecting species in the Sahelo-Saharan area. AR 315. The 75 members of the SSIG seek to share information about genetics, captive breeding, reintroductions, and establishment of protected areas for endangered species. Id. SSIG members are involved in conservation efforts throughout the Sahelo-Saharan region. Id. The organization seeks to ensure that antelope species exist in self-supporting numbers across their historical range, that habitats are conserved or restored, and that proper incentives are provided to ensure support for conservation in the antelope's range country states. AR 2391-92. FOA has participated in numerous SSIG conventions to discuss its recovery efforts in Senegal. Exhibit 1 ¶ 8. There is no evidence in the record that any canned hunting ranches are members of the SSIG.

25. The CITES Secretariat, a permanent office administered by the UN Environment Programme, implements the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), an international treaty aimed at preventing international trade from threatening the survival of wild species. This office has developed a plan for recovery of the North African antelope that includes eventual reintroduction when it is possible. AR 2405. The Secretariat has described the goal as establishing "a world pool of each of the species and/or sub-species . . . on the basis of animals taken from European and North American zoos or captured in the wild [to be used as] a source of animals for the restoration activities throughout [the Sahelo-

Saharan] area." Id. Notably, the plan does not include use of antelope from canned hunting ranches.

26.    The World Conservation Union Species Survival Commission ("IUCN/SSC") created the Antelope Specialist Group ("ASG") in 1978. AR 2388 (2). The ASG currently has more than 100 members in over 40 countries. Id. There is no evidence in the record showing that any canned hunting ranches are members of the ASG. In 2001, the ASG completed a "Global Survey and Regional Action Plans" for the North African antelope. AR 2388. The document summarizes the current knowledge about the species and develops action plans for their conservation. The ASG recommended release of captive bred oryx, dama gazelle, and addax into protected areas in Tunisia and Algeria. Id. (241). The ASG recognized that "action cannot be implemented without adequate human and financial resources. . . . There seems little doubt that an international contribution to the costs of programmes to conserve antelopes in many countries will be essential to ensure their effectiveness." Id. (234).

27.    There is no evidence in the record that any canned hunting operations in the United States have participated in any recovery efforts in the native range of the antelope. FWS states that a canned hunting rancher indicated he sent a number of antelope to the United Arab Emirates, and they will eventually be used for reintroduction efforts within the native range. 70 Fed. Reg. 52315; AR 1949, 1993, 2466-78. However, there is no evidence in the record showing that the animals were ever used for that purpose or ever will be.

28.    FWS found that some ranches have provided research opportunities to study the species. 70 Fed. Reg. 52315. However, there is no evidence in the record showing these studies involved the three antelope in question or that they contributed to conservation.

II.    **FWS's History of Delay in Listing the North African Antelope.**

    A.    **FWS's Decision to Protect the Antelope, But Exclude Canned Hunting Ranches.**

28.    FWS recognized the imperiled status of the North African antelope and the need for listing as early as 1991.  AR 2-25 (first draft listing proposal for the antelope).  Throughout the listing process, no FWS personnel or members of the public ever argued the wild antelope do not qualify for listing under the ESA.  See, e.g., AR 170.  Rather, the primary concern of both FWS and the public was the impact of listing on captive populations within the United States. See, e.g., AR 1, 64-115, 170, 264.  FWS's inability to determine how to prevent the ESA from applying fully to the captive populations led to fourteen years of delay in listing the species.

29.    On November 5, 1991, FWS published in the Federal Register a proposed rule to list the scimitar-horned oryx, addax, and dama gazelle as endangered species under Section 4 of the ESA.  AR 59.  The proposed rule indicated that FWS might treat captive antelope differently than wild antelope and requested information about the status of captive populations.  AR 59, 62. FWS was concerned that listing captive-bred antelope "would create infinitely more work than to omit" them and would "upset[] people."  AR 2484; see also AR 170 (commenting on the "unpopularity" of a decision to list captive populations in the U.S.), 264 ("The complicating consideration is the legitimate desire to avoid imposing unnecessary restrictions on U.S. ranchers . . . and at the same time not creating unnecessary permit issuance work.").

30.    FWS considered numerous possibilities for exempting U.S. captive-bred populations from the impacts of listing.  In September 1992, FWS considered listing both captive and wild populations as endangered, but only within their native ranges.  AR 116-40, 170.  FWS recognized that listing the captive bred populations outside of the native range would require canned hunting ranches to get permits "and thus create unnecessary delays . . . unless there was a

special rule that exempted the need for permits." AR 163 (emphasis in original). The agency never finalized this proposed rule.

31.     When FWS failed to take action for more than a year, FWS zoologist Ron Nowak drafted a memo listing the possibilities that would allow canned hunting to continue. AR 176. He included: (1) publishing the current draft of the final rule, which would classify only wild populations as endangered; (2) classifying the entire species as endangered and "developing a more flexible permitting policy" to cover captive bred animals; (3) "drop[ping] the matter" until challenged for illegally missing the ESA deadline; (4) listing wild populations as endangered but captive antelope as threatened, so the agency could issue a Section 4(d) rule allowing canned hunting to continue; (5) and not listing the antelope at all by reasoning either they are already extinct in the wild or they are numerous in captivity. AR 176-78.

32.     In January 1994, FWS chose option #4 and prepared a draft rule proposing to list the antelope within their native ranges as endangered and those in captivity outside their native ranges as threatened, with a special rule allowing canned hunting. AR 179-205. FWS never finalized this draft.

33.     FWS later recognized that the ESA requires the agency to determine a species' listing status based on its numbers in the wild. AR 212. Accordingly, FWS changed tactics again and prepared a draft final rule proposing to list all antelope, whether wild or in captivity, as endangered. AR 207-231 (This draft is not dated). However, FWS planned to allow canned hunting to continue under existing and anticipated regulations. FWS argued it could allow "normal practices of animal husbandry" at canned hunting ranches through its captive-bred wildlife ("CBW") regulation. 50 C.F.R. §§ 17.3, 17.21(g); AR 213. In addition, FWS

anticipated the agency's Office of Management Authority ("OMA") would prepare a policy that would allow canned hunting and transport of sport-hunted trophies in the U.S. AR 206, 213.

34.     However, FWS recognized the difficulty of this approach because the "primary purpose of the Act is the conservation and continued existence of wild populations of endangered and threatened species and the ecosystems on which they depend." AR at 172 (citing ESA Section 2). Accordingly, the mere "existence" of captive wildlife does not necessarily "enhance[] the survival of the species." AR 268. Similarly, OMA had previously refused to grant permits for transport or trade of sport-hunted trophies because it could not find that these activities "per se" promoted the survival and enhancement of the species. AR 173, 274-75. In fact, OMA recognized that authorizing these activities might put wild populations at risk "by encouraging the propagation of endangered and threatened wildlife for consumptive markets rather than for direct benefit to the species in the wild." AR 173, 274.

35.     In February 1995, FWS apparently drafted a proposal to list the entire species as endangered, and OMA drafted a new policy that defined "enhancement so as to allow take and interstate commerce/export." AR 278. The draft rule is not in the record. In fact, at this point the record goes completely silent until June 2002.

36.     On June 9, 2002, the Center for Biological Diversity ("Center") sent FWS a notice of violation of Section 4 of the ESA for the agency's failure to list the antelope. AR 2487; Complaint ¶ 69; Answer ¶ 69. After receiving the notice, FWS once again began work on the proposed rule. AR 2487, 2489. The agency continued to concentrate on how to allow canned hunting of the antelope regardless of listing. AR 2489, 2495-2501, 2502. When FWS had still failed to finalize the rule by April 26, 2004, the Center and Friends of Animals sent another notice of intent to sue. Complaint ¶ 70; Answer ¶ 70.

37.    After reopening the comment period on the draft rule numerous times, FWS drafted a new proposed rule in June 2004.  AR 2529-43, 2544-52.  Changing tactics once again, this time FWS proposed adding a new section to its captive bred wildlife regulations that addressed the three antelope.  Under this draft, canned hunting operations could allow sport-hunting and transport of sport-hunted trophies for personal use, but not trade or commercial activity in sport-hunted trophies.  AR 2535; see also 50 C.F.R. § 17.21(g)(1)(iii) (prohibiting commercial activity in dead wildlife).

38.    When FWS still had not issued a final rule, the Center and Friends of Animals filed this lawsuit on September 27, 2004.  Complaint ¶ 70; Answer ¶ 70.  On September 28, 2004, FWS prepared a draft proposed rule to add a new ESA regulation at 50 C.F.R. § 17.21(h) to govern captive bred populations of North African antelope.  AR 387-410.  The rule contained a requirement that canned hunting ranches demonstrate the purpose of their activities was to "enhance the propagation or survival of the species" under ESA Section 10(a)(1)(A).  AR 399.  FWS also specifically requested public comments on the "contributions of captive-bred populations to the recovery of these species in their range countries."  AR 400.  FWS did not plan to list the antelope as endangered until the exclusion rule was also complete.  AR 386.

39.    When FWS finally published the final proposed rule in the Federal Register, it eliminated the requirement to show that the purpose of the activity was to enhance the propagation or survival of the species.  Instead, the ranches had to show only that the "purpose of the activity is associated with . . . sport hunting in a manner that contributes to increasing or sustaining captive population numbers or to potential reintroduction to range countries."  AR 655 (emphasis added).

40.     On September 2, 2005, almost 14 years after FWS first determined the antelope needed protection, FWS listed the antelope.  AR 2308-13.  On the same day, FWS finalized the proposed rule ("canned hunting rule").  AR 2314-24.

**B.     The Canned Hunting Rule**

41.     Under the canned hunting rule, any person may:

> Take; export or re-import; deliver, receive, carry, transport or ship in interstate or foreign commerce, in the course of a commercial activity; or sell or offer for sale in interstate or foreign commerce live wildlife . . . and sport-hunted trophies of scimitar-horned oryx (Oryx dammah), addax (Addax nasomaculatus), and dama gazelle (Gazella dama).

50 C.F.R. § 17.21(h).  To qualify under the rule, the activity must be "associated with the management or transfer of live wildlife . . . or sport hunting in a manner that contributes to increasing or sustaining captive numbers or to potential reintroduction to range countries."  Id. § 17.21(h)(1).  Therefore, a canned hunting facility must demonstrate only that it is "sustaining" numbers of any of the antelope to allow sport hunting and commerce in trophies.  The rule does not require any current or future plans to assist in conservation or reintroduction efforts or engage in scientific study.

42.     The rule requires canned hunting ranches to "maintain[] genetic diversity" and "prevent hybridization," but contains no standards to define these terms.  Id. § (h)(3), (4).  Although the rule requires the canned hunting facilities to maintain written records of its activities, there is no permitting or registration process.  The facilities do not have to submit the records to FWS; instead, they must simply make them available for inspection if and when FWS determines it is necessary.  Id. § 17.21(h)(7).  The rule does not allow FWS to inspect the facilities.

43.    FWS justified the rule based on section 10(a)(1)(A) of the ESA, which allows FWS to permit ESA prohibited activities for "scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). FWS concludes that allowing canned-hunting and trade in the parts of the North African antelope promotes their survival and enhancement. 70 Fed. Reg. 52312.

44.    After FWS issued the rule, canned hunting proponents stated that they intend to push FWS to expand the illegal policy to other endangered species. Exhibit 1 ¶ 20. During consideration of the rule, FWS employees expressed concern about the "precedent this could set for native captive-bred endangered species." AR 2131.

45.    The canned hunting rule represents a departure from FWS's past practices in many ways. First, FWS previously analyzed permits to take endangered species on a case-by-case basis. 70 Fed. Reg. 52313. FWS has authorized canned hunting and trade in trophies under two sets of existing regulations that both require a case-by-case analysis.

46.    The CBW regulation authorize "normal practices of animal husbandry" that would otherwise be illegal under Section 9, such as confining or transporting animals. 50 C.F.R. §§ 17.3, 17.21(g). This regulation was intended to promote conservation of endangered species in the wild by preserving their genetic make up and making them available for reintroduction efforts. 58 Fed. Reg. 68323, 68324 (Dec. 27, 1993); see also 44 Fed. Reg. 30044, 30047 (May 23, 1979); 43 Fed. Reg. 16144 (Apr. 14, 1978); AR 173, 213-14. However, FWS has acted contrary to this intent by authorizing sport-hunting as a normal practice of animal husbandry under the regulation. See, e.g., AR 173, 1774, 1825; see also 50 C.F.R. § 17.3 (defining "culling," but not sport-hunting, as a normal practice of animal husbandry).

47.     However, the CBW regulation requires ranches to "register" with FWS so that the agency can maintain a "necessary minimum level of control."  44 Fed. Reg. 30044 (emphasis added).  As part of registration, the ranch must fill out an application form and provide information showing that they have the capacity to care for the animals.  50 C.F.R. § 17.21(g)(2).

48.     The CBW regulation also prohibits any interstate transport of dead animals or their parts.  Id. § 17.21(g)(1)(iii).  FWS included this prohibition because "authorizing interstate or foreign commerce in dead wildlife or its products (including sport-hunted trophies) might present a risk to the survival of both captive and wild populations, by encouraging the propagation of endangered and threatened wildlife for consumptive markets, rather than for direct benefit to the species in the wild."  AR 173, 214, 274.

49.     Although it is not clear exactly when, FWS eventually reversed its position and allowed both sport-hunting and trade in sport-hunted trophies of endangered species, including the barasingha, red lechwe, and Eld's deer, under its Section 10(a)(1)(A) regulation.  See, e.g., AR 1760, 1776, 1782, 1830, 1835.  This regulation authorizes activities to "enhance the propagation and survival" of endangered species.  50 C.F.R. § 17.22(a).  Individuals must submit a two-page, pre-printed application for a permit and show that they have adequate facilities and are willing to participate in cooperative breeding programs.  Id.; see, e.g., AR 1779-80, 1783-84.  FWS must publish notice in the Federal Register of "each" application and allow the public to comment.  50 C.F.R. § 17.22.

50.     Under both the CBW and Section 10(a)(1)(A) regulation, FWS required canned hunting ranches to contribute money (typically 10% of the sale of the hunt) to conservation organizations engaged in recovery efforts for the relevant species.  See, e.g., AR 1825-26, 1833, 1839-40, 1841, 1843, 1849-50, 1857, 1862-63, 1864, AR 2241 (stating that FWS only grants

permits for trade in sport-hunted trophies if "the permit holder provides money towards conservation efforts for the species in the wild"). FWS required these donations because the agency recognized that the captive endangered species themselves were unable to contribute to conservation in the wild because they were not "needed for organized breeding programs" and were of "unknown origin." See, e.g., 1825-26, 1839-40, 1843, 1849-50, 1862-63; see also AR 1807, 1833, 1841, 1857, 1864 (all finding animals from canned hunting ranches are not needed for "established captive breeding programs" because of a lack of information about "genetic history").

51.    FWS biologists and staff have commented repeatedly that these problems also exist for the antelope. AR 1 ("[T]he problem with the oryx, as I understand it, is that there are lots of them in captivity, but relatively few whose bloodlines are charted for optimum breeding."); AR 185-86 ("[T]he survival of the [captive antelope populations] is tenuous and there is no assurance that they can be maintained in keeping with the evolutionary potential and the morphological and ecological characteristics of the natural species. Only some of the captives are currently part of programs with such an objective."); AR 212-213 (same); AR 2497.

52.    FWS has been more than accommodating to ranchers during the permitting process. FWS issued a permit to a canned hunting ranch raising endangered barasingha despite finding that "significant issues were raised about the effectiveness of the previous permit in enhancing the conservation and survival of wild populations." AR 174. The agency granted the permit only "to be consistent with previous practices." AR 174. FWS also granted multiple permits authorizing the Prior Brothers' ranch to kill endangered species even after they failed to meet the terms of their permit, which required donations to conservation organizations. AR 1793, 1801. There are multiple other examples in the record where FWS granted permits despite

finding ranches had not made the requisite showing that sport-hunting would enhance endangered species populations.  AR 1825-26, 1839-40.

53.    Even more alarming, FWS counseled canned hunting ranches to lie about donations because conservation organizations did not want to accept money from facilities that engage in canned hunting.  AR 1860.  Specifically, when the World Wildlife Fund refused to accept funds generated from sport-hunting, FWS advised hunting ranches to "[s]end only a simple note saying the donation is for species conservation. . . .  If you indicate [the real reason for the donation] the contribution will not be accepted."  AR 1860.

### C.    Canned Hunting Rule Environmental Assessment

54.    On February 1, 2005, FWS issued a draft environmental assessment ("EA") for the canned hunting rule under the National Environmental Policy Act ("NEPA").  AR 643-656.  FWS solicited public comments, AR 651, and issued the final EA in July 2005.  AR 2230-48.

55.    In a section labeled "Purpose of the Action," FWS stated:  "We are amending the regulations implementing the [ESA] by adding new regulations that would govern U.S. captive-bred antelopes."  AR 2233.  The EA's stated "need" was to enact a rule that differed from existing regulations by allowing the transport of dead antelope and their parts.  AR 2233.  FWS wanted to include commerce in trophies because "trophy hunting on private ranches that breed these species may be necessary for wildlife management purposes and provides an economic incentive for ranchers to continue breeding and maintaining these species."  AR 2233.

56.    Although FWS considered three alternatives, not one of these alternatives prohibited sport-hunting or commerce in sport-hunted trophies.  Alternative 1, the proposed action, allows both sport-hunting and trade in trophies and include no requirements to register, get a permit, or contribute money towards recovery.  AR 2234-35.  Alternative 2 would allow

canned hunting with no registration, but would have required an individual permit for commerce in trophies. AR 2240. Alternative 3—the "no action" alternative, would have allowed sport-hunting with registration only, and commerce in trophies with an individual permit. AR 2241. Both Alternatives 2 and 3 would have required contributions to conservation organizations working on wild recovery efforts. AR 2241. There was no alternative with recovery of the antelope as a goal such as funding reintroduction efforts, habitat restoration, or anti-poaching programs.

57.    In a draft EA dated November 2004, FWS had included a fourth alternative that would "specifically prohibit exemptions for captive-bred specimens" of the antelope. AR 512. This alternative disappeared in the following drafts of the EA and was not in the draft released to the public. AR 2559-67, 565-66, 2065-66, 2084-85.

58.    In the EA, FWS finds that canned hunting "provides an economic incentive for private landowners such as ranchers to continue to breed these species and maintain them as a genetic reservoir for future reintroduction or research." AR 2239. The EA also concludes: "There is no evidence that the availability of captive-bred animals has contributed in any way to hunting pressure on these species in the wild." AR 2240.

59.    Conservation organizations commenting on the rule provided hundreds of pages of scientific evidence to the contrary. AR 1256-1758. This information includes a letter from 358 professional scientists, including E.O. Wilson and Jane Goodall, finding there is a "growing body of evidence, accumulated across many countries and taxa, indicat[ing] that legal harvest and trade can lead to increased poaching and illegal trade." AR 1924-25.

60.    The record also includes much scientific support for this conclusion. For example:

David M. Lavigne, et al., Sustainable Utilization:  the Lessons of History, in The Exploitation of Mammal Populations 251, 258-60 (Victoria J. Taylor et al. eds., 1996)) ("Generally putting a price on dead wildlife almost invariably leads to over-exploitation and increases the 'extinction potential' of target species."), AR 1298;

Hunter et al., International Environmental Law & Policy 1035 (Foundation Press 1998)) ("Ironically, market forces can exacerbate the threats from illegal trade, for as species become rarer their value on the market increases to reflect this scarcity, increasing the incentive for further poaching.") AR 1303;

Valerius Geist, North American Policies of Wildlife Conservation, in Wildlife Conservation Policy (Geist and McTaggart-Cowan eds., 1995)), AR 1324-45.

61.    The record documents specific instances where a partially legal market (or grey market) has led to increased killing of species in the wild.  See, e.g., AR 1469 ("[L]egal ivory' in trade . . . is inevitably used as a cover for illegal sources of ivory to make their way into the market.").  The record also demonstrates that illegal wildlife trade is a huge business throughout the world.  AR 1303 ("[W]ildlife trade is big business.  A conservative estimate places the value worldwide at more than $10 billion a year with at least $2-3 billion of that illegal"); AR 1346 ("According to Interpol, the international police agency, wildlife trafficking is now the second largest form of black-market commerce, behind drug smuggling and ahead of arms dealing."); AR 1352-55, 1405-08.

62.    FWS does not discuss or cite to this information when it concludes that there is no evidence that the rule will impact wild populations.  AR 2240.  At the same time, without providing a single citation, FWS makes the statement that "[s]port hunting of U.S. captive-bred specimens may also reduce the threat of extinction of wild populations by providing an alternative to legal and illegal hunting of wild specimens in range countries."  AR 2239-40.  However, according to FWS's Chief of the Office of Scientific Authority:  "One might speculate that the existence of these stocks removes some pressure on wild populations, but this cannot be

substantiated to the point of making a finding that the harvest and export of these specimens enhances the survival of the species."  AR 268.

63.     While FWS ignored the evidence presented by conservation groups, the agency cites repeatedly to the comments of the Exotic Wildlife Association and even includes these comments in the reference section of the EA.  See, e.g., AR 2236, 2238, 2242.

64.     In the EA, FWS states, "by restricting the interstate transport of sport-hunted trophies by requiring a permit or authorization, there is less incentive for captive breeders of privately owned herds to continue breeding these species."  AR 2241.  In fact, FWS argues permitting requirements will cause canned hunting ranches to stop breeding the antelope because the activities would be "no longer profitable."  AR 2241.  The EA does not support this conclusion.

65.     Ultimately, FWS issued a Finding of No Significant Impact ("FONSI"), concluding that the agency's preferred alternative, the canned hunting rule, would "have no discernible adverse effects" on the antelope.  AR 2229.


Dated:  February 21, 2007                          Respectfully submitted,


                                                  /s/  Robin Cooley
                                                  Robin Cooley
                                                  D.C. Bar No. CO0040
                                                  Environmental Law Clinic
                                                  University of Denver Sturm College of Law
                                                  2255 E. Evans Ave., Room 365G
                                                  Denver, CO 80208
                                                  Phone:  303-871-6039
                                                  Fax:  303-871-6991

                                                  Attorney for Plaintiff Friends of Animals