# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF ANIMALS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, ) | |
| ) | Civ. No. 04-1660 (HHK-DAR) |
| ) | Civ. No. 06-2120 |
| Defendant, ) | (Consolidated Cases) |
| ) | |
| and ) | |
| ) | |
| SAFARI CLUB INTERNATIONAL, <u>et al.</u>, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |
| REBECCA ANN CARY, <u>et al.</u>, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DALE HALL, Director, Fish and Wildlife Service, ) | |
| <u>et al.</u>, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| SAFARI CLUB INTERNATIONAL, <u>et al.</u>, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

## NOTICE OF ADDITIONAL ATTACHMENTS

The documents attached are hereby filed as Exhibits 1-5 of Plaintiff Friend of Animals'

Motion for Summary Judgment and Memorandum in Support filed on February 21, 2007.

Dated:   February 21, 2007                    Respectfully submitted,


                                              /s/  Robin Cooley
                                              Robin Cooley
                                              D.C. Bar No. CO0040
                                              Environmental Law Clinic
                                              University of Denver Sturm College of Law
                                              2255 E. Evans Ave., Room 365G
                                              Denver, CO 80208
                                              Phone:  303-871-6039
                                              Fax:  303-871-6991

                                              Attorney for Plaintiff Friends of Animals

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF ANIMALS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DIRK KEMPTHORNE, Secretary of the Interior, | ) |
| | ) Civ. No. 04-1660 (HHK-DAR) |
| | ) Civ. No. 06-2120 |
| Defendant, | ) (Consolidated Cases) |
| | ) |
| and | ) |
| | ) |
| SAFARI CLUB INTERNATIONAL, et al., | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |
| REBECCA ANN CARY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DALE HALL, Director, Fish and Wildlife Service, | ) |
| et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| SAFARI CLUB INTERNATIONAL, et al., | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

## DECLARATION OF PRISCILLA FERAL

I, Priscilla Feral, declare as follows:

1

1.    The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify to these facts. As to those matters which reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.    I am president of Friends of Animals ("FoA"). In my capacity as President of FoA, I have led recovery efforts for African antelopes as described below. Mindful of the interconnections between and among animals and their habitat, I also educate the public about the need to preserve the health of biocommunities in which these antelopes live. FoA recognizes the importance of this goal and work to support the recovery of the antelopes' native habitat.

3.    FoA is a non-profit animal advocacy organization which maintains offices in Connecticut, New York, and Washington, D.C. and regularly consults and communicates with experts, scientists, and government agencies worldwide. FoA has approximately 200,000 journal subscribers and members in the United States and internationally. FoA and its members and staff value the ways that humans and nonhuman species benefit from protecting native biological diversity. FoA's mission is to cultivate a respectful view of nonhuman animals, free-living and domestic. Our goal is to free animals from cruelty and institutionalized exploitation around the world. FoA uses the best available science to forward its mission through active participation in international and national policy and law formation, including law and policy involving the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), ratified by the United States in September 1973 and implemented through the Endangered Species Act ("ESA"); and through national administrative processes, legal action, public outreach, and education. FoA often participates in public processes involving endangered species and seeks to influence legislation regarding endangered and other protected species. FoA

has a limited number of resources, both in terms of staff and financial resources, to use furthering its mission.

4.    FoA and its staff have conducted extensive research on the status of the Addax, Scimitar-horned Oryx, and Dama Gazelle. All three species are imperiled due to the misuse of land through ranching and other threats, including hunting. The Scimitar-horned Oryx, for example, once inhabited more than one million square miles of the Sahel from Senegal in West Africa to Egypt and Sudan; but recent biological surveys showed that, notwithstanding the survival of a few Oryx in semi-confinement as discussed below, all truly free-living populations have been wiped out. The last free Oryx was chased to exhaustion by hunters and died in 1973. At one point, the survival of the species rested on 7 captive animals. After learning this information, I decided that FoA should become instrumental in re-introduction efforts for these species.

5.    To this end, FoA has been instrumental in establishing and maintaining a recovery program for the Scimitar-horned Oryx and Dama Gazelle in Senegal. FoA has worked with the *Direction des Parcs Nationaux* (Senegal's National Park Agency) to restore the Scimitar-horned Oryx and Dama Gazelle to two reserves managed by the Agency. In 1999, FoA funded and assisted in the delivery of eight Scimitar-horned Oryxes to the Guembeul Fauna Reserve in northwestern Senegal. In 2002, FoA funded and facilitated the delivery of two more Scimitar-horned Oryxes from Paris to the Guembeul Fauna Reserve in Senegal. In January 2003, FoA funded and facilitated efforts to move Scimitar-horned Oryxes and Dama Gazelles from the Guembeul Fanua Reserve to a fenced area within Ferlo National Park in northeastern Senegal. In 1993, *Direction des Parcs Nationaux* established this protected habitat of approximately 1,250 acres within 1,500 square mile Ferlo National Park, which is a range

located in the heart of the Sahel and covering much of the northern quarter of Senegal. FoA and the *Direction des Parcs Nationaux* are working to improve the habitat conditions within Ferlo National Park so that the Scimitar-horned Oryxes and Dama Gazelles can eventually be released from the fenced area into the entire National Park. Due to successful breeding efforts, there are currently approximately 50 Scimitar-horned Oryxes and 34 Dama Gazelles in semi-captivity within the two reserves.

      6.      As a consequence of our efforts to stabilize the soil and to provide natural food for the antelopes, Ferlo National Park is being restored from and area damaged by animal agriculture into a biosphere reserve, able to support the needs of the Scimitar-horned Oryx and the Dama Gazelle. As part of these efforts, FoA has raised and donated substantial sums of money to recovery efforts in Senegal. As President, I've had access to financial records which I've reviewed, and depended on FoA's accountant to identify our contributions toward the rehabilitation project in Senegal. For example, in November 2000, FoA donated $25,000 to *Direction Des Parcs Nationaux* for habitat rehabilitation efforts in the Ferlo National Park. In June 2001, FoA contributed $1,250 for recovery efforts in the Ferlo. In August 2001, FoA provided more than $18,000 to *Direction Des Parcs Nationaux* for fencing in the Ferlo, construction of a ranger post, and supplementary feed and assistance to the Scimitar-horned Oryxes and Dama Gazelles. In February 2002, FoA provided $6,200 for rehabilitation of a pond area within the Ferlo. In July 2002, FoA sent *Direction Des Parcs Nationaux* $11,250 for restoration of vegetation with the Ferlo and to build a cistern. Also in 2002, FoA provided a directional radio receiver, transmitters, and veterinary supplies for the Scimitar-horned Oryx recovery project. In February 2003, FoA provided $1,236.50 to help maintain Scimitar-horned Oryxes moved from the Guembuel Reserve to Ferlo. In 2007, FoA is considering a funding

request from Senegal's Department of Parks to provide monies for food for antelopes in both

Guembeul and Ferlo Reserves for a total of $25,000 annually, and for replacing fencing in

Guembeul, as the cost quoted is $222,000.

7.      FoA has also provided substantial personal effort as well.  As part of our recovery

efforts, I ensure that a member of the FoA staff regularly travels to Africa to see the species,

including those in the recovery areas, and their historic habitat.  Then FoA employee, Bill Clark,

visited Senegal and participated in recovery efforts multiple times between 1999 and 2002.  Mr.

Clark was instrumental in organizing both the initial and subsequent deliveries of Scimitar-

horned Oryxes to Senegal, as well as the transfer of Scimitar-horned Oryxes and Dama Gazelles

from the Guembuel Reserve to Ferlo National Park.  He also visited the historic habitat of the

Scimitar-horned Oryx and Dama Gazelle.

8.      FoA also funded trips for both Bill Clark and the Director of the *Direction Des*

*Parcs Nationaux* to attend the Second Annual Meeting of the Sahelo-Saharan Interest Group

("SSIG") in Almeria, Spain in May 2001.  FoA also funded Bill Clark's trip to the Third Meeting

of the SSIG in Slovakia in May of 2002.  At both meetings, the participants discussed FoA's

recovery efforts for the Scimitar Horned Oryx and Dama Gazelle in Senegal.

9.      In 2005, I personally went to Senegal to monitor FoA's recovery efforts.  On

December 26, 2005, I flew to Dakar, Senegal where we were met at the airport by Souleye

Ndiaye, who in February 1999, worked as the Director of National Parks in Senegal when FoA

delivered the first eight Scimitar-horned Oryxes to Senegal.  Souleye now works for the Minister

of the Environment as Inspector of Financial and Administrative Issues.  On December 27, 2005,

I had lunch with Col. Mame Balla Gueye, Director of Senegal National Parks to discuss FoA's

recovery efforts for Scimitar-horned Oryx and Dama Gazelle and our field assistance for

Niokolo-Koba National Park's rangers.  I also had an introductory meeting with Thierno Lo,

Minist`ere de l'Environment et de la Protection de la Nature in Dakar, to assure the Minister that

FoA's cooperative work would continue in Senegal under my direction.  Souleye Ndiaye

arranged and accompanied me to both meetings.

10.    On December 27, 2005, after meeting Souleye in Dakar, Souleye drove us north

about five hours to St. Louis where we stayed overnight, and drove the next day to the 2,000-acre

Guembeul Fauna Reserve in the northwest part of Senegal.  On foot we joined several Park

rangers and traveled through the Reserve.  We saw about 20 Oryxes grazing and a dozen or more

Dama Gazelles within this closely protected, fenced habitat.  See photographs attached as

Exhibit 1.  As we drove through the Ferlo region, I viewed the land outside the fenced Guembeul

Reserve and saw the erosion and serious damage from cattle grazing  -- land that the Oryx once

occupied.  Not only did the sight fill me with a sense of urgency regarding the continued need to

supply materials for fencing and protection, but it also impressed upon me the importance of

thinking and working holistically, to ensure our investments in these animals' future really do

last. So during my stay I put emphasis on the importance of cultivating and eating crops directly,

in order to circumvent this reliance on grazing that devastates the land. People I met were happy

to treat me to vegetarian meals; they understood that I as a westerner was not going to expect

them to present me with dishes that contributed to the problems we're working together to solve.

And together we talked, whenever the opportunity arose, of the essential links between

preserving habitat in its natural state and respect for interconnected life in the continent's

biocommunity. With the big picture always in mind, and the seriousness of the work ahead

influencing our everyday interactions, FoA's work restores these critically endangered antelopes

to their native landscape, and works with the Senegalese parks people to restore a large part of that degraded habitat to its natural conditions.

11.     On my trip to Senegal, I was able to observe the positive impact on the Scimitar-horned Oryx and Dama Gazelle as result of FoA's efforts and programs.  While currently, there are no Scimitar-horned Oryx alive outside in the wild, FoA has ensured at least they are beginning to thrive in captivity.  I intend to ensure that a member of the FoA staff or myself continues our regular travels to Africa to see all species our members support and protect, including the antelopes at Ferlo National Park.  I am currently planning a trip to Senegal to see the antelopes in the Ferlo Reserve in December 2007.

12.     The U.S. Fish and Wildlife Service's ("FWS") decision to allow canned hunting and transport of sport-hunted trophies of Scimitar-horned Oryx, Dama Gazelle, and Addax has an impact on FoA's financial resources, which are limited.  FWS is allowing activities that are prohibited under the ESA without any showing that canned hunting ranches are working towards recovery of species in the wild, like the work FoA is doing in Senegal. Although FoA is opposed to any canned hunting and does not believe that canned hunting ranches are necessary for these efforts, if FWS is going to illegally allow these activities, it should at least require concrete steps to promote the recovery of the antelope where they should live, in the wild.  While this would alleviate some of FoA's financial burden by providing greater resources for recovery, it does not resolve FoA's concern that the U.S. government should never condone the take of endangered wildlife purely for pleasure, and by doing so, the government's stance hypocritically signals to those with less means in North Africa that it is not acceptable to kill these animals while at the same time allowing wealthy people within our own country to kill them at will. Furthermore, such allowances show a lack of respect for the animals themselves.

7

13.    FoA and its members and staff, including myself, have a long-standing institutional, informational, personal, and philosophical interest in the future of the Scimitar-horned Oryx, Addax, and Dama Gazelle anywhere they live. Our public education and outreach efforts have pointed out that, although it is now possible that rare specimens can be collected from all over the world to satisfy the human yearning for novelty, the rarity of a species should not be exploited for profit and amusement. Yet people have started capturing and flying these animals around the world as collectors' items, exploiting their rarity for commercial gain. This they do to the animals' severe detriment. Collectors who breed them in captivity are exploiting them for profit, and the propagation of these animals for trophy hunting, while self-serving to entrepreneurs, does not confer a benefit on the antelopes. Nor does the practice further the protection and rehabilitation of these animals in their native range. Moreover, long-distance travel, whether it be to and from hunting ranges in the U.S. or between Africa and other countries, presents grave dangers to these animals. It can and does kill individual animals. Claims by those who purport to rehabilitate these rare species outside of Africa should be treated with the most exacting scrutiny, and should never be accepted from those who also use the animals in commerce. Life outside of their native territory can mean loss of ability to cope with predators, genetic aberration, loss of immunity to the pathogens and nuisances that naturally exist in Africa, and a complex loss for the biocommunity of which the antelopes are a natural part. In short, if the antelopes are not interacting in their natural habitat, they become functionally extinct. If critically endangered antelopes have a serious chance of thriving again in freedom, it will be within their natural habitat. Thus, FoA works to educate the public about the reasons why the theory put forth by some, that captivity for profit helps, is simply not true. It works to the animals' direct detriment by shifting the focus away from the urgent need to protect

8

the natural habitat of the species. In short, FoA firmly opposes the commercial exploitation of these species in any form. No incentive should be extended to those who hold the Addax, Scimitar-horned Oryx, or Dama Gazelle in captivity for profit.

14.    FoA regularly publicizes our efforts to recover Scimitar-horned Oryxes and Dama Gazelles to our members and subscribers as well as other members of the public. FoA publishes articles and on-the-spot photography in our quarterly journal *Act·ionLine* (e.g., "To Rescue the Unicorns," Winter 1993, pp. 28-29; "Milestones in Senegal," Fall 2001; "Rescuing the Endangered Oryxes," Spring 2001, pp.19-23; "The Destruction of the Sahel," Spring 2001). See, e.g., Exhibits 2, 3. FoA also ran public service ad in Business 2.0 in December 2005 urging support for protection of the Scimitar-horned Oryx. Attached as Exhibit 4. I also wrote an editorial in the Spring 2006 detailing my visit to see the Scimitar-horned Oryx and Dama Gazelle recovery efforts in Senegal, the work and progress being made, as well as the significant impact the visit had on me. Attached as Exhibit 5. FoA's members understand the importance of biodiversity and have financially supported FoA's efforts over the years to protect and preserve the natural habitats of the Scimitar-horned Oryx and the Dama Gazelle.

15.    FoA has extensively researched the issue of the connection between zoos and canned hunting facilities. FoA published articles about this connection in the November/December 1991 ("Exposing the Zoo-Hunting Ranch Connection," pp. 5-9) and April/May 1992 ("On the Trail of the 'Ranch Connection'," pp. 15-17) editions of *Act·ionLine*. Attached as Exhibits 6, 7. In New York City, on July 9 and 10, 2005, FoA hosted an animal rights conference with participants that discussed the connection between zoos and canned hunting ranches in Texas. FoA published a summary of the conference on their website.

16.     In 1991, I learned that the San Diego Zoo had sold two Dybowski's Sika deer to Priour Brother's Ranch in Ingraham, Texas, as breeding stock for the ranch's canned hunting operations. In the fall of 1991, I flew to Texas to investigate the Priour Ranch. While driving through West Kerr County and Ingram, Texas, I spoke with taxidermists, hunting guides and "Buck Corn" feed store operators about Priour. Although it was too late in the day to find the Priour Ranch after learning where the Priour Ranch was located, I saw other canned hunting ranches in West Kerr County, and took a photo of the entrance of one that appears in the *Act·ionLine* article. I viewed antelope and deer from outside the fence, but am unsure what species the captive animals were. What I noticed was that antelopes and deer stared at me when I approached the iron fence, rather than fleeing. I also watched ranch operators drive up in pick-up trucks to ring a bell for these animals to come to feed on buckcorn. I was deeply saddened; these animals were utterly dependent and trusting, and it was obvious to me that this kind of activity is completely disconnected from the ideal of antelopes experiencing free and independent lives as part of a thriving biocommunity. I found it disheartening that animals who exhibited no fear of humans were incapable of fleeing successfully from the fenced estates to escape from a hunter, and their trust in humans allowed them to be easily killed in canned hunts.

17.     FoA has also invested substantial time and resources in opposing trophy hunting of the critically endangered African antelopes and other species, as well any trade or transport of sport-hunted trophies. In the Fall of 2005, I assigned two employees to research Texas hunting ranches to determine the acreage involved, numbers and species of animals traded, and to identify what activities make an exotic ranch operation profitable. Such research came from the Texas Agricultural Statistics Service, the Texas Parks and Wildlife Department, and a canned hunt trade publication, the Ingram, Texas-based Exotic Wildlife Association--whose 2005 Game

10

Ranch Directory, Volume 14, lists many hundreds of the 8,274 canned hunting operations in Texas who hold hunting lease licenses. The directory listed EWA members who responded to a survey, and included a full page ad on the Y.O. Ranch in Mountain Home, Texas, along with Y.O. Ranch Exotic Game Sales & Game Ranching Seminars. There was also an ad to promote the Exotic Wildlife Association's Annual Membership Meeting on March 3 -5, 2006, and the Trophy Game Records of the World Awards Weekend on July 7-8, 2006, both at the Y.O. Ranch Resort Hotel & Conference Center, in Kerrville, Texas. FoA's research revealed 2,437 ranches with more than 1,000 acres who qualified for a 2005 Texas Hunting Lease License.

18.     In the Spring 2005 edition of *Act·ionLine*, based on this research, I wrote an editorial about canned-hunting ranches in Texas. Attached as Exhibit 8. The article documents canned hunts at the Y.O. Ranch, including Scimitar-horned Oryx for $3,750, Dama Gazelle for $5,250, and Addax for about $500 more. An *Act·ionLine* article from November/December 1989 titled "Hunting 'Tony the Tiger' on the Texas Prairie" included a caption describing Barbary sheep on a canned hunting ranch in Texas, stating, "Many of the prey are so tame a hunter can pet his target before killing it." Attached as Exhibit 9. FoA used its resources to urge people to oppose the Sportsmanship in Hunting Act of 2005 because it would allow canned hunting. That is, the proposed legislation would allow hunting of captive animals such as the endangered antelopes, even though it would, perhaps, rule out some of the smallest enterprises. It is important to us that we model in North America the same respect for antelopes that we expect to see in North Africa. FoA regularly urges its members and the public to take positions on legislative proposals that support or harm our animal protection goals. FWS's exemption of canned hunting ranches from the ESA requires FoA to spend more of its time and resources

educating the public about canned hunting of the endangered antelope and trying to encourage people not to hunt the antelope in captivity as well as efforts to influence legislation to prohibit canned hunting. Without the exemption, canned hunting of the antelope would be illegal, and there would be no need to expend these resources with respect to those species.

19.    On April 1, 2005, FoA provided comments on the regulation exempting the three antelope from ESA protections and allowing canned-hunting and the draft Environmental Assessment ("EA"). Attached as Exhibit 10. We objected to the regulation based on violations of the ESA and National Environmental Policy Act ("NEPA"). On November 17, 1992, FoA and the Committee for Humane Legislation, the latter being FoA's legislative arm and for which I acted as Executive Director, submitted a letter "in vehement opposition" to a proposal to allow trophy hunters to hunt and kill Oryxes, Dama Gazelles, which were not listed at the time, and other ESA listed animals at a privately-owned ranch, contrary to the provision for humane and healthful treatment at 50 C.F.R. § 13.41 and in violation of the ESA and its legislative history. Attached as Exhibit 11. Since the Scimitar-horned Oryx was listed in September 2005, FoA has monitored the Federal Register for actions regarding these species. FoA has commented on four separate requests to import Oryx trophies that were sport-hunting in South Africa to the United States. Attached as Exhibits 12, 13, 14. FoA has requested that FWS deny these permits because they do nothing to enhance the survival or propagation of the Oryx as required by the ESA. Because the Service's rule challenged in this case eliminates the individual permitting process for canned hunting ranches, FoA cannot participate in the process. However, if the process were available, FoA would participate as it has consistently for other issues involving the three antelope. FoA is using and will continue to use all legal means at its disposal to further and

protect its interests in preserving these species and inculcating the international respect for these species that is necessary to do so.

20.    After the U.S. Fish and Wildlife Service exempted captive Scimitar-horned Oryxes, Addax, and Dama Gazelles from the ESA, I received a brochure from the Exotic Wildlife Association containing a message from its Executive Director.  That message stated: "This association, with its allied groups such as SCI and the AZA, has been successful obtaining a new policy, which basically exempts U.S. captive bred Scimitar-horned Oryx, Dama Gazelle, and Addax Antelope from the Endangered Species Act.  Hopefully in the near future, we will be able to report that all U.S. captive bred species currently listed as endangered will fall under this same policy." Attached as Exhibit 15.  I was alarmed by the fact that this Association hopes to extend the Service's bad decision to other species.  Because of the trend set by the regulation for the three antelope, FoA will need to expend resources fighting efforts to exempt other captive bred species from the ESA.

21.    Because the Service based its decision on the fact that canned hunting ranches were helping with recovery of the species, I decided to investigate further whether this was true. My previous research on canned hunting ranches had not reveal any efforts by these facilities to recover species, unlike the efforts of FoA.  I chose the Y. O. Ranch to visit because it's one of the oldest and largest hunting ranches with 40,000 acres, in addition to having Scimitar-horned Oryxes, Dama Gazelles, and Addax available to hunters.  I also wanted to visit the Bamberger Ranch because I had heard that they had a large number of the antelope.

22.    On May 17, 2006, I went on a 90-minute truck tour of the 5,500 acre Selah Bamberger Ranch Preserve in Johnson City, Texas with Ranch Operations Manager Scott Grote. According to Mr. Grote, the ranch houses 50 female Oryxes and 11 males.  We went to a field

and viewed a grouping of 3 dozen or so female Oryxes.  Pictures attached as Exhibit 16.  One female was crippled, but still used for breeding.  We viewed a male Oryx outside the fenced area trying to find an opening in the gate to get inside.  We drove into another pasture with female Oryxes, grouped together, who appeared unafraid of the truck.

23.    Mr. Grote told me he organized hunting programs for native deer on the Bamberger Ranch, but not exotics.  Scott said, "We don't hunt any Oryxes here," and added, "but I don't necessarily think it's a bad thing."  I learned that the Ranch sells both male and female Oryxes from $650.00 to $1250.00 depending on the sex and age.  Mr. Grote admitted to me that while the Ranch doesn't sell to hunting ranches, it does knowingly sell to brokers who then sell them to hunting ranches.  Clearly, hunting ranches depend on Bamberger's to supply their hunter-customers with easy living targets -- a thought I found most discouraging.  He also told me that individuals with broken horns are not commercially profitable because hunters only want individuals with decorative horns.

24.    Mr. Grote further informed me that the Ranch had provided some Scimitar-horned Oryxes to the Smithsonian, and there were plans for a reintroduction program in Tunisia.  Finally, he told me that the Ranch had provided Scimitar-horned Oryx DNA to an unnamed zoo.  My impression is that this ranch sees antelopes as commodities that must be subject to quality control, not as individuals with an interest in being in place in a natural biocommunity.  Indeed, the rarity of these animals is something from which this ranch benefits financially.

25.    On May 18, 2006, I toured the Y.O. Ranch, a 40,000 acre sport-hunting ranch near Mountain Home, Texas.  The Y.O. maintains Scimitar-horned Oryxes and before I was taken on the "Africa in Texas" exotic game tour, I observed pictures of hunters posing with animals they had killed at the Y.O.  The pictures contained not only dead Scimitar-horned

14

Oryxes, but a dead Addax and Dama Gazelle as well. On the tour, I was informed that hunting was the main source of income for the Y.O. and that it allows sport-hunting year-round. Hunters purchase the right to hunt Scimitar-horned Oryxes for $3,750.00, while Dama Gazelles can be hunted for $5,250.00. The tour guide informed me that the Y.O. auctions its own animals and buys others at auction as well. The property includes an auction building and a trophy room.

26.    As part of the tour, I was taken to "Deer Park" where I observed several different species inside a high fenced park. The park included fallow deer, a blackbuck antelope, axis deer, waterbuck, an eland with a calf, white-tailed deer, bison, and an ostrich, among others. "Deer Park" also contained more than 20 Scimitar-horned Oryxes, including a calf. Pictures attached as Exhibit 17. The deer and exotic animals I viewed along the bus tour were unafraid of the vehicle and passengers, and remained close to the dirt road among trees and other vegetation as we drove slowly through the breeding park. A brochure that advertised the tour called the breeding park "an exotic game pasture."

27.    The tour guide told us that exotics are not hunted in the Deer Park, but that they use a helicopter and have a net gunner capture them and put them in a trailer for transfer to other areas of the park where they are hunted. I found it disgusting to imagine these unsuspecting animals shot with arrows or bullets after they were netted, transported from their breeding area, and dropped on the land provided to hunters on the other side of the fence. I was also offended by the notion that these essentially tame animals would be subject to an unfair chase.

28.    At no time did the tour operator discuss any efforts by the Y.O. Ranch to engage in scientific studies or provide endangered species for recovery efforts in the wild. Several times the tour operator described the animals in comical terms, as if it were humorous to know that the

animals we were seeing would soon be killed in an inhumane fashion.  The entire display was deeply offensive, both in knowing the manner in which these animals were to be hunted as well as knowing that these practices are apparently condoned by the FWS, despite the fact that no scientific study or enhancement of the species activities were going on.  I will certainly continue to monitor the Y.O. Ranch and other sport-hunting facilities as well as those that breed Scimitar-horned Oryxes, Dama Gazelles, and Addax to determine and assess whether these ranches are promoting the survival and enhancement of the species.

29.    Based on scientific research on the status and threats to the Addax, Scimitar-horned Oryx, and Dama Gazelle, the government agreed that the species need the fullest protection under the Endangered Species Act to avoid extinction. The government's regulation exempting captive-bred antelope from the ESA has harmed and continues to harm FoA's and its supporters' interests as well as my own personal interest for these animals addressed.  The regulation harms and continues to harm our work to protect the antelopes wherever they may be found.  Lack of the fullest protection for all members of the endangered species under the ESA imperils them in Africa, undermines their protection under CITES, and allows them to be treated as a commodity, all of which has adversely affected and continues to adversely affect FoA's and its members' interests in these species as it facilitates their decline.  I and FoA, its staff, and its members have serious and long-term educational, scientific, and moral interest in the antelopes discussed herein, which would incur future harm by the continued lack of full protection for all members of the endangered species under the ESA.

In accordance with 28 U.S.C. § 1746 and under penalty of perjury, I swear that the foregoing is true and correct.

_Priscilla Feral_

Priscilla Feral

Executed on ___2-14-07___

at 777 Post Road, Darien, Connecticut

Subscribed and sworn to before me
this _14_ day of _February_ 2007,

_Robert Orabona_
Notary Public

Date commission Expires:  10-31-10











# TO RESCUE THE UNICORNS

The entire tragedy was caused by hunters. They pursued the elegant antelopes across a half-million square miles of wilderness until none of the animals survived.

The antelopes were white oryxes, a species known to science as Oryx leucoryx. Until earlier this century, white oryx antelopes ranged across most of the Middle East, from the Mediterranean shores of Israel, clear across to the Sultanate of Oman, on the Arabian Sea. And throughout the great range, this magnificent antelope was an important element in the fragile ecology of its desert home.

White oryx antelopes were also important elements of human civilization. You can still see some of humanity's first artistic efforts in the Timna Valley of southern Israel – the ancient site of King Solomon's (copper) Mines – where thousands of years ago unknown people carved the images of these impressive animals into the remote stone cliffs.

In the Bible's original Hebrew text, this animal was known as "re'em." When the scholars of King James' Court translated the first English version of the Bible, they agreed the animal could be none other than the magnificent "unicorn." And thus we today have many enchantingly poetic verses in the Psalms and books of the Prophets.

But the hunters didn't care.

The last wild oryx was simply run to death in 1973. Tire tracks in the desert of Oman told the horrible story. Joy-riding hunters apparently discovered the footprints of the last wild oryx, and they followed its trail until they caught up with the animal. Then, the hunters gave chase. They pursued and harried and tormented the animal, mile after mile. They didn't bother to shoot. Instead, they simply kept up the relentless chase until the exhausted antelope collapsed in its tracks and died. And then there were none.

Fortunately for the species (if not for the individuals enduring the captivity), there existed a tiny zoo population of white oryxes. At one point, the survival of the species rested on only seven animals. Yet, they bred well in captivity, and only a few years after the last wild populations were wiped out, conservationists were working on projects to reintroduce the species to a few of its former habitats.

By good fortune, FoA's been involved from the start with Israel's efforts to restore the species to its rightful place in nature. We purchased three very expensive pairs of white oryx antelopes from the Los Angeles Zoo in May 1978, and airlifted them halfway across the globe to the Hai-Bar Reserve deep in the Negev Desert. Hai-Bar is a Hebrew term which simply means "Wild-Life."

Through the early 1980s, I managed the reserve, and focused on two priorities: (1) we had to increase their populations and encourage reproduction, and (2) we had to "de-zoofy" them and teach them to be wild once again.

Reproduction was encouraged in several ways. First, we put up twenty kilometers of special fencing around the reserve to exclude the many natural predators living in the region - desert wolves, hyenas, leopards and others. Time would come when the white oryx would have to face these predators on their own terms, but at the start, at least, good protection would reduce the risk of predator-caused fatalities, and therefore assist with increasing the population. We also provided wholesome supplementary feeds, and especially protein-rich alfalfa hays. Mineral and anthelminth impregnated salt licks helped assure health. So did a daily monitor of the herd – visual checks for the slightest abnormality: a limp, ticks, diarrhea – all of which were immediately tended. Good nutrition and careful protection are basic management techniques which create a situation that enhances reproduction.

At the same time, we "taught" the antelopes to be wild again. After a few generations in zoos, they had become as docile as dairy cows and could be led around simply by grabbing hold of a horn and giving a tug.

Not today. Those horns are nearly a yard long, straight as ramrods and sharp as rapiers. Anyone trying to grab hold of one risks being skewered.

Many techniques were used to "de-zoofy" the animals, to reestablish the natural behavior, environmental sensitivity, and wild temperament vital for their survival in nature.

It is not an easy process. It has taken 14 years and four managers. But today there are nearly 50

white oryx antelopes in the Hai-Bar reserve. And everyone of them is a tough customer.

They have reproduced to a healthy population. And they have been rehabilitated to the point where we believe the local wolves will think twice before challenging them. The time has come to release these elegant antelopes into the desert wilderness home of their ancestors.

We've found a place to do it. The region is called Shezaf, and it's located in the northeastern Negev – just about 40 miles southwest of the southern end of the Dead Sea.

But one does not simply open the door and shoo the antelopes out. There is a system to help assure the success of the reintroduction. An enclosure must be built at the release site, and a group of about a dozen white oryxes brought there to be habituated to the area. The social cohesiveness of this group must be confirmed. Very light radio collars, which do not annoy the animals which wear them, must be affixed so the herd can be followed and its progress monitored by professional field biologists.

Israel's Nature Reserves Authority (NRA) has invited Friends of Animals to lend a hand with this project (indeed, we have been involved with this, and other efforts, for years). We are providing both technical assistance and funding to build the Shezaf enclosure, purchase tracking and monitoring equipment, and acquire other items necessary for the project. And, as has often been the case in the past, FoA appeals to its membership for special contributions to help with the projects.

The hunters tried their best to exterminate this species. They pursued white oryx antelopes for more than a half-century across a half-million square miles. They tried to force the species into extinction. And they nearly succeeded.

A frightfully small population survived. FoA has helped to nurse this bitterly exploited animal back to the point where it can be released into a protected nature reserve in its ancestral natural habitat.

We are helping to rescue the unicorns.

## AN APPEAL FOR THE UNICORNS

Friends of Animals would like to help acquire:

| | | |
|---|---|---|
| 1. | Release site enclosure fencing and related hardware | $14,500 |
| 2. | Pre-release genetic fingerprinting of herd | $10,000 |
| 3. | Radiotelemetry radio collars, receivers and antennas | $14,200 |
| 4. | Fuel and maintenance of 4x4 vehicle* for one year | $ 4,000 |
| 5. | Field station equipment (field kitchen, tents, etc.) | $ 7,000 |
| | Total | $49,700 |

(*A special note of appreciation to Ms. Sandy Lerner and the Bosack & Kruger Foundation, which is providing a 4x4 vehicle being used in this project.)

Members of FoA who are interested in helping us to support this project are invited to send contributions to FoA, with a note attached explaining that the contribution is for the white oryx antelope project. Contributions will be acknowledged by both Friends of Animals and the Israel Nature Reserves Authority.

Persons, school classes, social groups and others who choose to make major contributions ($1,000 or more) to the project will have a standing invitation to visit the "unicorns" at any time of their choosing. They will also receive periodic reports on the progress of the project, and will be invited, from time to time, to make suggestions – such as providing names for newborn calves.

All animals in the project are fully protected, not only by Israeli law, but also by the full-time presence of a cooperative staff of NRA and FoA professionals.

The white oryx antelope is acknowledged as "endangered" by the U.S. Endangered Species Act, the Israel Wildlife Protection Law, and by CITES, the international treaty on endangered species.

– *Bill Clark*

Photo: Bill Clark



feature

# MILESTONES IN SENEGAL

**By Bill Clark**



Friends of Animals is celebrating the birth of yet another infant in our oryx antelope herd at Senegal's Guembeul Fau Reserve. But this birth is very special. It's a double mileston

The birth of the female scimitar-horned oryx (Oryx dammah) now brings our herd's population up to 16 animals—precisely double the original eight that we delivered to Senegal less than three years ago. Doubling the original population is an important milestone when breeding a species that is widely defined as "critically endangered."

Even more important, the little calf is our first "F-2" animal. F-2 is biologists' shorthand for "second filial generation," and it is accepted as one of the most important achievements for any endangered species breeding project.

Some months after delivering the herd to Senegal, in February 1999, one of the cows gave birth to a female calf who was promptly named "Formosa" as a gesture o tude to Taiwan's Council of Agriculture, provided important financial support for t ject. Little Formosa's birth was widely put in the Senegalese media because she was t calf of this extremely rare antelope specie born on Senegalese soil in about 150 year mosa was the first F-1 (first filial generation) the first generation born of the "founder" p tion delivered to Senegal. Since then, we'v brated another half-dozen F-1 births.

But now, Formosa has grown up, a become a mother herself. Her new calf, Judith by the Senegalese rangers, is the fir calf born of F-1 generation parents.

People involved with endangered s breeding programs, such as with the Cali condor or the black-footed ferret, cou achievement of an F-2 birth as an event tha firms the project's viability. Until that F-2 arrives, there can be a great measure of skep and reluctance to accept that the project bright future. But in the hard-ball science o servation biology, the birth of an F-2 infant

**People involved with endangered species breeding programs... count the achievement of an F-2 birth as an event that confirms the project's viability...the birth of an F-2 infant is heralded as the first solid evidence that the population is "self-sustaining"...**



FoA

he first solid evidence that the population
staining"—that it is being managed in a
hat promises a successful future. This is
important because all wild populations of
es have been exterminated by hunters.
ot one wild-born oryx left alive in Africa.
only hope for the future of this beautiful
s a very carefully planned and conducted
and reintroduction program.

animals are presently kept in a 25 acre
of natural habitat at Guembeul Fauna
ear the Atlantic coast of northwest Sene-
Senegalese rangers, who have been pro-
essional animal care training by FoA, are
doing a good job. The antelopes are
laxed and adjusting very well after being
o their ancestral homeland.

: takes more than mere breeding to res-
langered species. Once the numbers are
need a place to live—natural habitat that
l the resources they require, a place that
om hunters.

ls of Animals, and our partners in Sene-
:tion des Parcs Nationaux, are busy
such a place in the country's savanna
where we are creating Ferlo National
iosphere Reserve. This is a 1,500 square
f open grasslands—an African prairie—
oryxes once lived naturally. But the Fer-
degraded through recent decades, espe-
use of over-grazing linked to a cattle
at we very much want to discourage.
has started in the Ferlo, and our first
it has been the fencing of a 1,500 acre
a as Vendou Katane—the Pond of
e Disney Conservation Fund has been
helping us purchase the fencing mate-
that the site is fully enclosed, we have
k on habitat rehabilitation—restoring
its natural ecology. This means exca-
ed pond to its natural contours, so it
nking water through the year. This also
ects that will stop erosion, replant
:as, stabilize the landscape and help it
FoA is grateful to the Maree Noble /
umpf Memorial Foundation for pro-
iitial funding for this habitat rehabili-

Our timetable anticipates that the Vendou
Katane site will be far enough advanced in its reha-
bilitation to be able to transfer some oryxes there
from the Guembeul reserve sometime this coming
winter. When they are released into that large
enclosure, they will be the only scimitar-horned
oryxes living on the African Sahel.

Full reintroduction is still years ahead. There
is much work to do. And we are doing it. All
Friends of Animals' members can take special pride
in this very careful and methodical project that is
rescuing an endangered species nearly forced into
extinction by hunters. In the process, we are set-
ting up a habitat rehabilitation program which we
hope will serve as a model for similarly degraded
habitats across Africa. Just as important, we are
starting to achieve the acknowledgment, and even
the encouragements, of much larger conservation
organizations. FoA is in the field, doing the hands-
on animal work and accomplishing important
milestones along the way.



WITHOUT A FRIEND
THEY'RE DOUBLE TROPHIES.



BECAUSE OF THEIR UNIQUE HORNS, SCIMITAR-HORNED ORYXES
WERE HUNTED TO EXTINCTION. IF FRIENDS DON'T SPEAK UP
TO PROTECT THE FEW REMAINING IN NATURE, THE ONLY PLACE WE'LL
SEE THE ORYX IS ON A HUNTER'S WALL OR BEHIND BARS IN A ZOO. HELP US
KEEP THESE AND OTHER ANIMALS IN FREEDOM ON THEIR NATIVE LANDS.
PLEASE CALL 203.656.1522 OR VISIT FRIENDSOFANIMALS.ORG.
BE A FRIEND FOR LIFE.

Friends of Animals

# FRIENDS OF ANIMALS
# ACT·IONLINE

## In My View

By Priscilla Feral | Spring 2006



Hunting, an expanding human presence, and climatic and topographical changes have all drastically reduced West Africa's populations of antelopes, birds, chimpanzees, hippopotamuses, lions, monkeys and other wildlife — more than 450 different species in all. Yet a network of national parks, reserves, and areas of carefully treated forests have saved many of Senegal's free-living animals from extinction.

On a trip to the Gambia and Senegal in late December, we visited the Guembeul Fauna Reserve, near the Atlantic coast of northwest Senegal, and observed the progress of Dama gazelles and Scimitar-horned oryx — endangered desert antelopes living in protected Sahel habitat. Friends of Animals coordinated the reintroduction of eight oryxes to the arid northwestern section of Senegal in 1999, and today Senegal's oryxes number 43. Our efforts to assist oryxes have also benefited the Dama gazelles.

The Senegal National Parks agency is restoring land degraded from cattle and goat grazing, and developing Ferlo National Park, to which all of the oryxes are expected to be released. This is a 1,500 square mile tract of open grasslands where oryxes once lived. The 20 or so oryxes living in a 1,500 acre fenced section of the Ferlo are the only Scimitar-horned oryxes living on the African Sahel.

Senegal's Niokolo Koba National Park is roughly the size of Yellowstone. It's the largest national park in West Africa, and one of the continent's most diverse. Hunting is prohibited in Niokolo Koba, but, as in the rest of Africa, poaching has intensified because of bush meat trafficking. Niokolo Koba National Park is a target for gangs of poachers from Senegal and the neighboring countries of Guinea, Mali and Mauritania. Poachers slaughter animals and dry their flesh over hot coals while in the park, then transport it to markets for sale. To discourage poaching, Friends of Animals has contributed motor vehicles, radios and field supplies to park rangers so that their presence in the park is bolstered. We met with Park officials to discuss the contribution of another vehicle to transport rangers, along with spare parts for other trucks.

While traveling with primatologist Janis Carter on the edge of Niokolo Koba en route to Ethiolo, we watched groups of vervet monkeys and baboons in the forest. Janis directs a chimpanzee project for Friends of Animals to survey their populations in Senegal, and map their migration patterns with the goal of resolving conflicts between humans and chimpanzees. Carter was named in Smithsonians's November 2005 Special Anniversary Issue as one of 35 people "Who Made A Difference" in the magazine's 35 years.

We visited the village of Ethiolo in the southeastern corner of Senegal to see the Bassari people actively using the well that Friends of Animals recently financed in an effort to reduce competition over water between villagers and approximately 20 chimpanzees who consider the region their dry season refuge area. The Bassari live in traditional stone and thatched hut dwellings, and their animist worldview is reflected in their respect for chimpanzees, and their interest in the champanzees' survival.

Case 1:06-cv-02120-HHK    Document 9-7    Filed 02/21/2007    Page 2 of 2

Janis Carter recently completed a nationwide survey of the distribution of chimpanzees in Senegal, aiming to help identify the problems between humans and chimpanzees, and the best locations for digging wells. In speaking about the next phase of the project, Carter says, "Our work acknowledges the interests that both humans and chimpanzees have in water, food, and other vital resources."

Friends of Animals expresses our profound thanks to the Arcus Foundation for their 2006 grant of $50,000 to protect the remaining populations of chimpanzees in Senegal by constructing another well to allow chimpanzees water access, by monitoring well use, improving living conditions for chimpanzees and people, and developing educational materials with and for local people.

- Read more about our efforts in Senegal.

table of contents | Act·ionLine spring 2006 | flip the page 🔲

# EXPOSING THE ZOO-HUNTING RANCH CONNECTION

*By Lisa A. Landres*



Photo: Lisa A. Landres

*The head of a Gemsbok from an Oregon hunting ranch with zoo ear-notched identification.*

I n January of last year, a *60 Minutes* piece touched upon a well-kept secret...the selling of surplus zoo animals to hunting ranches. The segment generated heated denial from the zoo community, who claimed there is no concrete evidence to support such allegations.

The AAZPA (The American Association of Zoological Parks and Aquariums), a supposedly self-regulating membership organization, spewed forth their Code of Professional Ethics as testimony to their purity: "We do not sanction the selling of zoo animals at auction, nor to hunting ranches. It is a violation of our ethics code for any AAZPA accredited facility to do so."

So much for the high ideals and passionate denials. Friends of Animals now has paperwork documenting the selling of surplus zoo animals to hunt clubs, as well as to other inappropriate parties.

After FoA made the evidence public at a press conference in September, a chagrined San Diego Zoo acknowledged its dirty dealings and immediately suspended business with two breeders that sell animals to game ranches.

That a world renowned institution like the San Diego Zoo should be caught red-handed, after repeated denials in the past, received widespread news coverage and sent shock waves through the zoo community.

"We should have known," San Diego Zoo spokesman Jeff Jouett told the Los Angeles Times. "We don't condone hunting ranches and we don't deal with people who do. I'm shocked. I'm disappointed. And I'm glad it was pointed out to us."

To focus the blame on any one zoo is missing the point. The disposal of unwanted zoo animals is a national problem, and is not limited to one or two bad institutions. Almost every major zoo in the country is either contributing to the problem, or turning their back on it.

Zoos that are not guilty of allowing their surplus animals to fall into unsuitable hands are few and far between. Most zoos sell (or give) their unwanted surplus animals to animal dealers, who can, despite any agreements they may sign, resell the animals anywhere they please. That includes selling them at exotic animal auctions, where the animals literally go to the highest bidder, no questions asked.

So long as the animals are not endangered, there is nothing illegal about this. Some zoos sell or give animals to dealers who actually resell them directly to hunting ranches. To lay the blame on the dealers would be like killing the bearer of bad news. Animal dealers did not create this problem nor are they responsible for it, they are merely cashing in on it.

The problem was created by, and is knowingly perpetuated by, the zoo community.

## HEART OF TEXAS

Believe it or not, there are actually some zoos that are so brazen, so reckless, that *they* themselves have sold animals directly to the owners of hunting ranches. What zoo could be so callous as to betray the animals, and flagrantly violate the public's trust as well as their own AAZPA code of professional ethics?

For starters, the Zoological Society of San Diego.

Following last year's *60 Minutes* broadcast and after the denials from San Diego died down, it appears that the curator's office at the Zoological Society went back into action, unloading more unwanted animals to anyone who would take them.

Documents obtained by FoA, for example, show that on Sept. 6, 1990, the curator of mammals at San Diego was issued a permit by the California Department of Fish and Game to export two male Dybowski's Sika deer to Dale Priour of Ingram, Texas.

Priour just happens to be the owner and operator of Priour Ranch in Ingram, Texas, a hunting ranch that offers exotic game trophy hunting. For $1,500.00, anyone can come to the ranch to hunt and kill a Dybowski Sika, or any number of a variety of exotic wildlife.

They can even use a bow and arrow, and they only pay for what they kill or wound.

In this particular case, an export permit was issued only because this species of hoof stock is considered to be "nuisance" wildlife. In California, nuisance wildlife require a permit to enter to leave the state. Otherwise, as is most commonly the case, there would be no paper work required, no permit issued, and therefore no way of tracing the animals.

Every state has different regulations concerning the import and export of exotic wildlife, and very few states require any kind of paper work at all if the animal is not an endangered species. That means there is literally no way for anyone, including the zoos themselves, to track these animals.

## PERMISSIVE PERMITS

This particular permit is standard, stating that the animals may not be possessed for hunting, but that the animals will be used for captive breeding purposes. This is the conventional wording used on every permit, and unfortunately, it means absolutely nothing.

There is no way to determine whether or not hunting is or will be involved, and the state utilizes no method of follow-up or enforcement of permit policy.

What makes this particular case even more disturbing is the fact the San Diego Zoological Society sold animals to Priour AFTER passionate public denials stating that their animals NEVER go to hunting ranches. San Diego Zoo officials even went so far as to pretend to disassociate themselves from any person who would sell animals at auctions.

We know that the dealers most zoos utilize to dump their surplus animals regularly sell them either directly or indirectly (through the auctions) to hunting ranches, but most of the time there is simply no paper work to prove it. In the case of the San Diego Zoo, however, the documentation confirms it.

Another case involving the San Diego Zoo goes back a few years. Again, they were selling off unwanted hoof stock from the Wild Animal Park. Back in 1985, California issued them an export permit to transport a shipment of hoof stock, including 6 Gemsbok, 12 Eland and 4 Addax to Bill York, in Oregon.

Records indicate that at that time York was a partner with Bill Connolly, who was just getting a hunt club started on his ranch. His neighbors claim he not only killed the animals for trophies, but also sold the meat. FoA has obtained several documents showing that a variety of surplus animals from San Diego were sold to the Connolly ranch.

Additionally, FoA recently saw at the ranch (which is no longer operational) a mounted trophy head of a Gemsbok with standard zoo ear-notch identification. Ear-notching is a method of permanent identification that some large zoos utilize to quickly identify individuals within large herds. San Diego is one of the few zoos that use this form of identification, although not all animals are notched.

Ear-notching is usually done when the animal is only a few days old, still easy to capture and handle. Once grown, it would be an extremely difficult and dangerous procedure. Ear-notching, then, is a reliable sign that an animal was born in captivity.

Along with the permits showing that zoo animals from San Diego were sold to this ranch, this notched trophy head represents the most damaging piece of evidence yet that zoo-born animals are in fact being killed for sport.

## OTHER ABUSES

FoA has further documentation revealing that surplus animals from the Zoological Society of San Diego have gone to a wide variety of inappropriate places. Because California has unique import/export requirements, it was possible to uncover this small bit of documentation. Animals from San Diego have not only gone directly and indirectly (via the auctions) to hunting ranches, they are also routinely sold to an Arizona animal dealer, Larry Johnson.

When we went to the address stated on the permits, we found a small quarter horse ranch, surrounded by housing developments. There were no exotic wildlife to be seen, and no room for them to be free-roaming, as there were small stalls and corrals only. This suggests that when San Diego gives animals to Johnson, he is reselling them, probably immediately. (The permit states the animals will be exported out

**1990 THRU MARCH 1991 BROCHURE**
TROPHY FOREIGN GAME HUNTING
# PRIOUR RANCH

P.O. BOX 401                                    PH: DAY OR NIGHT
INGRAM, TEXAS 78025                             521-367-5944

| Game | | Price |
|---|---|---|
| **DYBOUSKI SIKA DEER** From China. Can be hunted Sept. 1 to Mar. 15 | | $1,500.00 |
| **BLACKBUCK ANTELOPE** From India. Can be hunted every day of the year. | | $850.00 |
| **FALLOW DEER** From Europe. Four Colors: black, brown, white and spotted. Can be hunted Sept. 1 to Mar. 15 | | $1,000.00 |
| **AXIS DEER** From India. Can be hunted every day of the year. | | $1,200.00 |
| **WHITETAIL DEER** Texas native. Can be hunted the Sat. nearest to the 15th of Nov. through Dec. 31 | | $1,000.00 |
| **AOUDAD RAMS** From North Africa. Can be hunted every day of the year. | | $850.00 |
| **PURE MOUFLON RAMS** From Sardinia. Can be hunted every day of the year. | | $850.00 |
| **FOUR HORNED RAMS** Ancient Asian origin. Can be hunted every day of the year. | | $850.00 |
| **AMERICAN ELK (PURE)** From North America. Can be hunted Sept. 1 to Mar. 15 | | $4,500.00 |
| **EUROPEAN RED STAG (PURE)** The most striking of European big game. Can be hunted Sept. 1 to Mar. 15 | | $3,500.00 |
| **CORSICAN RAM** From Corsica. Can be hunted every day of the year. | | $500.00 |
| **CATALINA BUCKS** Can be hunted every day of the year. | | $400.00 |
| **WILD TURKEY** Texas native. Can be hunted the Sat. nearest to the 15th of Nov. through Dec. 31 | | $200.00 |

OTHER GAME:
Semitar Oryx – 2500
Gemsbok – 3000
American Buffalo – 2500
Barasigha Deer – 3000
Nilgai – 2000
Red Lechwe – 3500

**NO KILL
NO PAY GUARANTEE**



*Photo: John L. Tveten*

*Blackbuck Antelopes.*

of California directly to the address shown.)

It is doubtful whether any zoo animals actually go-to this small "backyard" facility at all. The Arizona Department of Game and Fish believes that Johnson deals in wildlife across the border to New Mexico. We have documentation showing that the San Diego Zoo sells (or gives) animals directly to small zoos in Mexico.

The San Diego Zoo also sold animals to Pat Hoctor, a private animal breeder and owner and editor of the Animal Finders Guide, a classified advertisement guide to the exotic animal trade. Hoctor, by the way, advertises all the exotic animal auctions, and was recently quoted in the LA Times as stating that he saw nothing wrong with hunting captive bred exotic animals on large ranches.

Yet, until September, San Diego said they would never sell to anyone who had anything to do with the auctions or hunting ranches...

Animals from San Diego have even found their way into the pet trade. Further documentation revealed a kangaroo born at the San Diego facility was sold through Catskill Game Farm to a private individual as a pet. The animal died a hideous death after being torn apart by a pack of neighborhood dogs while tied up in his new owner's garage.

## SEE NO EVIL

Where was the AAZPA when these animal transactions were taking place?

All AAZPA institutions have animal dealers sign an agreement stating that they will not resell zoo animals at auction or to hunting ranches. But once in their possession, a dealer can do anything he wants to with the animals, and there is nothing the zoo community can do about it.

As Earl Tatum, a well-known animal dealer, stated last year, "No man can tell me what I can or cannot do once an animal becomes my property."

Animal activists can no longer tolerate the see-no-evil policy of the zoo community, or the assurances of the AAZPA and their promise of self-regulation. They simply are not in a position to deal with the magnitude of this problem. The AAZPA survives solely on contributions from member organizations, so why would they bite the hand that feeds them?

It is time for outside parties to step in and take responsibility for the welfare of wild animals in

captivity. We must now turn to our members of Congress and Senators and urge them to introduce and sponsor legislation that will regulate the zoo "industry" in the best interests of the animals.

The legislation needed is two-fold. First, we must regulate the selling of all non-domestic species, so that a permit is required every time an animals changes hands. We must create a paper trail so that zoo animals can be tracked, instead of getting lost through the cracks.

Second, we must regulate the sale and transfer of zoo animals to non-exploitative facilities only. Zoo animals must not be sold to circuses, laboratories, hunting ranches, or to private individuals as pets.

The issuance of these permits must not hinge upon whether the animal has reached the inevitable status of being an endangered species. We must enact federal regulations that will give all captive wildlife the protection that is inherently theirs by virtue of the simple fact that we are holding them captive, they are at our mercy.

## WIDESPREAD PROBLEM

Unfortunately the selling of zoo animals to hunt clubs and other inappropriate places is a tragedy that is going on *all* over the country. San Diego is not the only zoo involved in this dirty business. For example, many zoos, including the San Francisco Zoo, sell surplus animals to the Catskill Game Farm, owned by Jurgen Schultz, the very place that sold the San Diego kangaroo to a private individual.

Our documentation includes paper work tracing the sale of animals from the Catskill Game Farm directly to hunting ranches. Zoos across the country routinely sell unwanted animals to Schultz, with no follow-up of any kind.

What would happen to all the unwanted animals if zoos could no longer dump them on animal dealers and such? Hopefully, zoos would stop producing them. The zoo community might actually be forced to take the steps necessary to stop captive breeding, except in very specific controlled situations where it is known in *advance* that all offspring will have a suitable home for life.

To breed any animal without prior arrangements for all of the offspring is flagrantly irresponsible, yet most zoos are guilty of this type of negligence. Once a zoo acquires an animal, whether it is from a purchase, loan, gift, or as a result of captive breeding, that zoo has an

obligation to care for and provide for each and every animal, for their entire life.

If a zoo cannot or will not make that commitment, then they most certainly must never breed a single animal. Because today's babies are tomorrow's trophies. ⬛

## WHAT YOU CAN DO

The zoo community has demonstrated the inability to behave responsibly to regulate themselves. The tragedy has occurred, but it must not be allowed to continue.

1. Write or call your congressional representatives, urging them to introduce, sponsor and support federal legislation that will regulate the selling of zoo animals. Send them this article, and tell them to contract FoA for further information.

2. Write or call the AAZPA and insist that strong disciplinary action be taken against all zoos irresponsibly breeding and disposing of animals.

American Association of
Zoological Parks and Aquariums
Robert O. Wagner
Executive Director
Oglebay Park, Wheeling, WV
26003-1698
(304) 242-2160

3. Write or call your local TV and newspaper, and urge an investigative journalist to trace the movement of animals from zoos within your state. Follow this up, putting pressure on your local zoo...demand to see the records of all animal movements out of the zoo. If your zoo receives any tax money, put pressure on the City Council or local government officials.



*Photo: Denning Chambers/FoA*

*Outside the gate of a Texas hunting ranch.*

# ON THE TRAIL OF THE "RANCH CONNECTION"

As a result of our September 1991 press conference in San Diego, which for the first time ever provided the public with documentation confirming the connection between surplus zoo animals and hunting ranches, the ball was set in motion.

Reporters across the country began following up on the documentation we provided. For example, in Texas, reporters in several major cities are currently tracing the sale of zoo animals to hunting ranches. In San Antonio, it was recently discovered that several of the zoo's board members are in fact hunting ranch owners! FoA is aiding the follow-up investigations involving zoos in San Antonio, Houston and Dallas, with the indication now that many of these animals have indeed ended their lives as trophies.

In San Diego, several intensive investigations have been pursued by the local media. One reporter followed up leads provided by FoA, only to find that one animal dealer, Larry Johnson, who buys hundreds of surplus animals from San Diego every year, is taking many of the animals to the ranch of Red McCombs in Johnson City, TX. At one time this was a commercial hunting ranch, complete with a brochure which boasts, "Red McCombs Ranch...is a trophy hunter's paradise!" McCombs admits that hunting does still occur on his ranch, although he claims no zoo animals are hunted. Still, he breeds the zoo animals, and sells their offspring at the exotic animal auctions, where the animals go to the highest bidder, no questions asked.

Selling the offspring of zoo animals at these auctions, which frequently supply the hunting ranches, is a violation of the AAZPA Code of Professional Ethics. The San Diego Zoo has attempted to relinquish itself of any responsibility for these animals, claiming there is no proof that the animals Red McCombs is selling are the offspring of its animals.

Clearly, the San Diego Zoo is not willing to insure the safety of its animals or their progeny. Its method of dealing with the issue is to deny, deny, deny, regardless of what appears to be happening to the animals.

## NO NEWS IS ZOONOOZ

Also in San Diego, a local newspaper reporter decided to follow up on the saga of the two Sika deer the San Diego Zoo sold to the Priour Ranch in Texas. Following our disclosure of the unethical sale of these animals to the hunting ranch, San Diego officials immediately responded with claims of ignorance, stating they didn't know Priour Ranch was a hunting ranch.

Once FoA brought it to public attention, they admitted the sale, and then stated that the two deer "were immediately retrieved, unharmed." San Diego Zoo Executive Director Doug Myers made that statement in his column in the November issue of "Zoonooz" magazine. Zoological Society President Albert Anderson made the exact same statement in his letters to the editor, printed in both the Los Angeles Times and the San Diego Union.

Following up on the story, the San Diego reporter went to Texas to visit the Priour Ranch, only to find the two San Diego deer still at the ranch! Obviously the deer had not been "immediately retrieved" three months earlier as zoo officials repeatedly claimed. Not only had the deer not been returned to San Diego, but they were continuing to breed on the ranch, fathering and supplying the ranch with several hundred potential trophy animals for the years to come. Caught with their pants down, San



*Photo: Denning Chambers/FoA*

*Texas hunting ranch agency, Ingram, TX.*

Diego Zoo officials then claimed that Priour had refused to return the deer, while Priour maintained he had told the zoo on several occasions that they could retrieve the deer at any time.

Publicly confronted with their bald-faced lie, San Diego Zoo officials scrambled to come up with an excuse, any excuse. They stated that a three-week printing delay in the publication of Zoonooz was the reason for their false statements regarding the return of the deer. Doug Myers claimed he thought the deer would have been returned to the zoo before the Zoonooz print date. They offered no explanation for the false statements made by Society President Albert Anderson in his letters to the newspapers, which clearly did not have a three-week printing delay. Perhaps they hoped no one would remember those…

Meanwhile, in response to our zoo-hunting ranch article in Act'ionLine (Nov/Dec), concerned readers wrote letters of outrage to the AAZPA. Robert Wagner, Executive Director of the AAZPA, responded by giving out the exact same lies regarding the return of the San Diego Sika deer. Aside from the sorry fact that the AAZPA could be so easily manipulated by San Diego, their collusion with the San Diego Zoo

in the cover-up of this situation represents something far more serious – the inability of the so-called "professional" zoo community to police or regulate itself.

## DRUNKEN HUNTERS

Last December the San Diego Union did a follow-up piece, delving into the Texas hunting ranch scene. After visiting a number of Texas game ranches, the images the reporter depicted in this article were loathsome and offensive. Tame animals, trained to come toward a truck spilling cracked corn while ringing a cow bell, are shot by so-called hunters from the back of the pick-up. One day the animals get corn when they come toward the ringing bell, the next day they get blown away.

More hideous still, the reporter witnessed the fact that many of these hunters are drunk or unskilled marksmen, and instead of making a clean kill, they wound and injure the animals who then retreat and suffer in agony, only to bleed to death hours later. The reporter found some of the animals on the ranches so used to people that they didn't even get up when the hunters approached. This prompted one hunter to remark to his guide, "Man, I can't

shoot 'em unless they're standing up," to which the guide responded by throwing a rock at the resting animals, who then got up and walked away.

The article continued with comments from some of the men hunting on the various ranches. "We came down here to get drunk, chase women and kill something," one of the men said. Another hunter informed the reporter, "This is the place you come after spending two weeks in Mexico with whores. You stop here and kill something. Then, when you get home you can tell your wife, 'Look honey, I spent two weeks tracking this.'"

Shortly after being publicly caught in their lie, San Diego Zoo officials retrieved the Sika deer from the Priour Ranch, finally admitting their options for the deer are minimal. Because (like the thousands of other surplus animals) no other legitimate institution wants these animals, the zoo feels they have just three options: the deer may be euthanized, forced to live their lives in a small isolated holding pen, or sold to yet another "breeder" to produce even more deer. As if any more deer would be wanted!

Since the San Diego Zoo can't find safe and humane homes for these two deer, it seems inconceivable that it would even consider placing these deer into a situation that would actually promote the production of more animals. With this kind of logic, it is no wonder there are thousands of surplus zoo animals across the country.

Friends of Animals finds their solution to this problem both unsatisfactory and myopic. In a letter to the editor of the San Diego Union, FoA President Priscilla Feral suggested to the zoo that it keep the two male deer in a normal herd situation by vasectomizing them, thereby allowing the animals to maintain their natural behaviors without the ability to reproduce. At the time of this printing, the zoo has yet to make a decision on the fate of these two animals.

It is important to remember these are only two out of more than a thousand animals. The return of these two deer to the San Diego Zoo is only a smoke screen to avoid the real issue, the problem of unwanted surplus zoo animals. Zoos (like San Diego) continue to purposely breed animals, without thought or regard as to where the animals will go once they mature. The incident in San Diego illustrates only too clearly the complete lack of control zoos have over the fate of their animals once they leave the back gate.

And because there is practically no paper trail documenting where and how zoo animals are changing hands, the zoo community continues to claim that its animals NEVER end up in hunting situations. Sadly, the facts continue to demonstrate that zoos are not providing any real protection for their surplus animals, despite all claims to the contrary.

By its own admission, the Zoological Society of San Diego alone is producing in excess of 1,200 surplus animals every year. Considering that there are only so many facilities which will take exotic species, and those have only so much room, surplus zoo animals must be going somewhere. Thousands every year. So where are they? This is a question that the zoo community has refused to respond to. While zoos like San Diego continue to make claims that their animals only go to the best of homes, they have yet to provide any evidence of precisely which homes.

Of those thousand or more surplus animals that went out the back gates of the Zoo and Wild Animal Park in San Diego last year, it is FoA's feeling that the majority of them ended their lives as trophies, or as breeding stock to help supply future trophy hunting. And what about the countless unwanted animals from the rest of our nation's zoos? With San Diego involved in the hunting ranch connection, it isn't hard to envision what is going on elsewhere.

FoA's investigation continues. FoA is working with reporters across the country to continue to bring this issue to the forefront, and is also proceeding with efforts to bring legislation before Congress that will regulate the commercial trafficking of exotic wildlife, as well as ban canned hunts.

Please keep writing letters. It is vitally important to continue to put pressure on your local zoo, as well as on the San Diego Zoo, and your state and federal legislators. Continue to blast the AAZPA, this time for its unethical involvement in the San Diego Zoo cover up. Look for further updates in upcoming issues of Act'ionLine.

*– Lisa A. Landres*



MEMORIAL

Friends of Animals has received kind donations in memory of Eleanor Dortmann, Laura Brooks, Diane Allen, Marion Driscoll Sweeny, and Laurette Jaina. FoA extends sympathies to family members and friends.

# FRIENDS OF ANIMALS
# ACT·IONLINE

## In My View
Priscilla Feral | Spring 2005

The Y.O. Ranch is a Texas legend. It began with a young immigrant from Alsace–Lorraine named Charles Schreiner, who single-handedly "fought outlaws, Indians, and Mother Nature."1 Schreiner's descendants still run the cattle ranch, talking up their role in what they call the conservation of Texas Longhorn cattle.

The ranch's Web site — which visitors navigate by moving crosshairs over the screen — says the family's interest in conservation led the ranch to start "providing a home to exotic wildlife." Home is a strange word for it.

Through a connection forged in the early 1960s with Fred Stark, curator of the San Antonio Zoo, the Y.O. Ranch released some of the zoo's surplus antelopes and Aoudad sheep as "an experiment in adaptation." Thus began the Schreiner family's start in the exotic wildlife business, a business that other Texas ranchers later entered.

Today, the Y.O. boasts more than 60 exotic species, and advertises many of them to hunters. Confinement makes these animals especially easy to shoot and gives this tourist attraction its popular name: the canned hunt.

For this purpose, the Y.O. offers zoo-bred Scimitar-horned oryx antelopes, yours for the taking for $3,750. For $5,250, you can go home with the head of a Dama gazelle; for about $500 more, you can shoot an Addax antelope. Free-living oryx have been hunted to extinction in Africa. Indeed, all three of these North African antelope species have an "endangered" classification pending with the U.S. government. But that just makes them all the more attractive to Texas tourists.

Through the years, these animals have lived and died at the whim of the Schreiners. The family's string of money-making schemes has included photo safaris, a Y.O. Adventure Camp for children, corporate retreats, and the Y.O. Ranch Restaurant in Dallas. In 1986, the Schreiner family set aside 11,000 acres to sell as home sites.

One couple, seeking a retirement home, ran across an advertisement for the Y.O. Ranchlands and called on a whim. "It was a fun adventure just driving through the countryside to get there, but when I pulled up to the main entrance of the Y.O. Ranch, I knew this place was something special," recalls buyer Claudia Leon. "[T]here was a herd of zebra in the meadow."

"In addition to owning a ranch," exclaim the Y.O. Ranchlands promotional materials, residents also have "exotic and native wildlife literally in their backyards" — animals whom owners can kill to their hearts' content.2

Many people have asked me how such things could be allowed. Does the federal Fish and Wildlife Service have anything to say about ranchers who push holiday packages and land sales through the use of exotic animals?

In fact, the federal government knows what is going on, but is willing to allow it under the guise of conservation. The Fish and Wildlife Service has dragged its feet for years over the publication of a final rule to list the three antelope species as "endangered" under the Endangered Species Act. That listing would prevent zoos from selling these antelopes to hunting ranches — a practice the Service euphemistically calls "absorbing the surplus specimens produced in zoos," and "reducing [the] threat of extinction."3

By failing to take the legally mandated actions to list the three antelopes under the federal law, Gale Norton, as Secretary of the Interior, is responsible for the deaths of thousands of zoo-bred animals each year in canned hunts.

Friends of Animals' first exposé on the zoo-hunting connection followed a 60 Minutes Television broadcast in January 1990 about the sale of surplus zoo animals to hunting ranches. Our segment infuriated the zoo people, who claimed we lacked evidence to support our allegations. Of course, we have ample documentation of the commerce in zoo-bred animals to animal dealers, exotic animal auctions, and hunting ranches.

The curator of mammals at San Diego's Zoo obtained a permit from California's Department of Fish and Game to export two male Dybowski's Sika deer to Dale Priour's Hunting Ranch in Ingram, Texas, where a Sika deer hunt was priced at $1,500. Today, the ranch charges $1,250 to shoot a Sika deer. When I visited the Priour Ranch near San Antonio, 15 species of 2,000 animals were fenced within 6,000 acres. Antelopes and deer stared at me when I approached the iron fence. I watched ranch operators drive up in pick-up trucks to ring a bell for these docile animals to come and eat buck corn.

More than 40 states allow canned hunts. Hunting ranches in Texas now operate as a profitable extension of zoos looking to dispose of last year's exotic animal babies. Each new zoo baby sends a surplus adult animal out the back door, often to a hunting ranch. And of course, the zoos are also fond of trumpeting their conservation work — especially where rare animals are concerned. They have reason to agree, then, that businesses such as the Schreiner family ranch are supporting conservation of rare antelopes and other animals.

Six years ago, Friends of Animals coordinated a reintroduction for oryx to enable their survival on their native lands. Although they are not yet able to live in complete freedom, their numbers are on the rise in Senegal. Our efforts to assist them have also helped the Dama gazelles in the same region.

And in September 2004, Friends of Animals and The Center for Biological Diversity filed a lawsuit in the federal courts to compel the Secretary of the Interior to list the three North African antelope species as endangered — with no exceptions, and no relaxed rules, for antelopes who are captive-bred. We're represented in the case by a team of lawyers who refuse to settle or compromise with ranchers, as the government would like to do.4 These fine professionals are Jay Tutchton, of the Center for Biological Diversity's Environmental Clinical Partnership with the University of Denver, and Matt Kenna, of the firm Kenna and Hickcox in Durango, Colorado.

Footnotes

1. These bizarre pieces of information are available on the company's Web site. The Y.O. cattle brand was first used on the Texas Gulf Coast in the 1840s, by Youngs O. Coleman of the Fulton family ranching empire. In 1880, Charles — who by then was called "Captain Schreiner," bought the ranch, its brand and cattle with profits made from driving more than 300,000 Texas Longhorn cattle "up the trail" to Dodge City. The ranch continues to be owned by the Schreiner family, who promote it as a Texas legend.

Case 1:06-cv-01025-HHK   Document 9-1   Filed 02/01/2007   Page 3 of

2. Animals including white-tailed deer, wild hogs, wild turkey, blackbuck antelope, Sika deer and fallow deer, are managed by the Y.O. Landowners Association; thus residents have legal control over these animals. Home buyers also acquire special privileges that include free or discounted use of the airstrip, the chuck wagon restaurant, swimming pool, Africana game viewing pasture, horse arena, and hunting on the main ranch. The Y.O. has a full-time security marshal patrolling the property.

3. This language appears in the Service's proposed rule regarding the three North African antelope species and the related draft Environmental Assessment.

4. We declined an offer from the Service to settle our suit by covering captive-bred antelopes with the relaxed standards applied to "threatened" species. This "split-listing" scheme was written up as an ostensible benefit to the species, but actually provides an incentive to canned hunts and legitimizes what ranchers call the exotic livestock industry. The trade in exotic, or non-native, wildlife has become a booming sub-industry in Texas. Embracing hunting, tourism, feed, fencing and taxidermy, it's worth at least $100 million to the state economy. Oryx are among "the most popular exotics in Texas" — and that, hunters contend, is "crucial for its survival." See Asher Price, "Strange Breeds in a Strange Land"-American-Statesman (16 Mar. 2004) at A1.

N   E   W   S

*Photo: John L. Tveten*



*For a fee, hunters can stalk all kinds of exotic animals on private game preserves, like these Barbary sheep on a ranch in Texas. Many of the "prey" are so tame a hunter can pet his target before killing it.*

# HUNTING "TONY THE TIGER" ON THE TEXAS PRAIRIE

"NO KILL–NO PAY: MASTERCARD AND VISA ACCEPTED."

Thus reads the heading of an advertisement which appeared in the fall issue of North American Hunter magazine. Similar advertisements can be found in the classified section of all the major shooting/hunting-oriented periodicals: "SPECIAL–THREE ANIMALS FOR $999.00."

Such ad copy is typical of the promotional campaigns sponsored by the explosively popular and lucrative business of exotic animal shooting preserves. Although each region of the United States hosts these enterprises, none approaches the magnitude of the exotic animal hunting empire in Texas, which encompasses 2.4 million acres of plains, prairies and plateaus.

The inventory of exotics inhabiting the shooting preserves of Texas includes the six most hunted animals: Axis deer, nilgai antelope, black buck antelope, aoudad sheep, fallow deer, sika deer and more than sixty other exotic species. On some ranches the hunter may fill his game bag with a camel, giraffe or zebra. Although some are preserves in the strict sense of this word (i.e., the stocks of exotics may either be maintained as a private zoo or bred for conventional zoo operations) most exotic animal ranches are in the business of furnishing living, soon-to-be-mounted, trophies for their clientele.



*Photo: John L. Tveten*

*Blackbuck antelope on a Texas game reserve.*

## EUROPEAN BWANAS

The majority of individuals who pay thousands of dollars to take part in these "McHunts" are from Europe; most are from Great Britain, while Germany, Austria, Africa, France and Australia send lesser number of trophy hunters to the killing fields.

Texas' 486 big game ranches represent a total exotic animal population of approximately 164,500, of which approximately 90,500 animals are behind fences and approximately 74,000 are free-roaming. The Texas climate affords these exotic species the ideal habitat conditions for vigorous population growth. Statistics reveal the growth trend of the exotic animal hunting preserve enterprise, and no waning is predicted as increasing numbers of livestock ranchers abandon their traditional pursuits and make the transition to exotics.

The economic ripple effect of these preserves has invigorated motels, sporting goods shops, taxidermists and restaurants. Seasonal resort areas now have a year-round clientele. As one preserve owner stated, "Exotic game hunting has once again put Texas on the world map."

A typical exotic animal hunt lacks the elements one usually associates with, for example, white-tailed deer hunting. Tracking, stalking or waiting hours in a ground blind or tree stand to ambush the victim is alien to the exotic headhunter. Such hunters are chauffeured to within shooting distance of the desired target in specially outfitted pickup trucks or jeeps, where they merely slip out of the vehicle and slay the unsuspecting animal.

As one ranch owner stated, "Don't worry about getting dirty on a hunt." The guide and field dressers do the remainder of the "dirty work" after the kill: The carcass is tagged and transported directly to the packing house, the taxidermist is called and the client leaves in short order with the desired body part mounted and ready to hang.

## CANNED LION

As offensive as the typical exotic animal hunt may be, some ranchers sponsor an activity which is denounced by even the most ardent trophy hunters – the so-called "canned hunt." Canned hunts, specifically canned lion hunting, affords the hunters the unique opportunity to virtually pat their prospective quarry while the animal sits passively in a cage purring, then shoot it. The results of one such sham safari were detailed by a reporter with the Dallas Morning News:

"On a secluded island in the marshlands of Trinity Bay, an African lion, *raised in captivity*, was released from his cage and given an hour's head start. Before long, the ranch owner and a hunter who had paid $3,500 for the kill, caught up with their prey, which was crouched in the thicket. They circled, unable to get a clear shot. The ranch owner said, 'We threw rocks in to spook him out, and he charged at us at that point. We killed him at ten feet away.'"

Lynn Cuny, Director of Wildlife Rescue and Rehabilitation in San Antonio, Texas, secretly visited one of these canned lion ranches for the purpose of gathering information vital to her campaign against the hunts. As Lynn approached the lions' compound, they romped to the fence to greet her, some purring and rubbing up and down the fence like house cats. She noted that the lions were confined to an area no more than three acres, manicured and wide open, with no refuge for the pursued animals.

Some of the lions Lynn saw were former pets and "retired" circus performers. The operators of canned lion hunt ranches also procure some of their stock from reputable zoos, which dispose of their surplus lions with full knowledge of the fate which awaits them.

Recently, again in Texas, a husband and wife discovered that the lions they had been hand-raising for rancher friends were being used for canned hunts. The husband, by chance, picked up the current issue of a hunting magazine and saw the photo of a smiling hunter standing over a dead lion – the couple immediately recognized the lion as Paul, one of their hand-raised cubs.

P.C. Hanes, director of the animal protection group, Central Texas Wildlife, said, "Those lions have been hand-raised as pets and are being taken out to be shot for so-called sport.



What kind of sport is it if you go out and shoot your dog then mount his head?" Steven Christenson, past president of the Dallas Safari Club, basically concurs with Hanes: "That's about the most revolting, disgusting thing I've heard in a long time."

## UNEXOTIC OHIO?

Ohio State Senator Eugene Branstool (D-Utica), outraged over similar canned hunts occurring within his district, introduced landmark legislation (bill S. 212) which is designed to prohibit the killing of a non-indigenous species on animal hunting preserves in Ohio. Senator Branstool's bill prohibits the importation, ownership or harboring of non-native wildlife for the purpose of hunting; prohibits the operation of an enclosed area of land as a preserve for the purpose of hunting non-native species and provides a penalty for anyone who attends such hunts or witnesses the hunting of a non-indigenous animal.

This bill has been criticized for being overly broad, in that some believe it would prohibit game bird shooting preserves. Such preserves release pen-reared non-native birds like pheasants for paying bird-shooting customers. Senator Branstool's legislation would exempt these preserves, however distasteful they are in themselves, from the prohibitory provisions.

The Ohio Department of Natural Resources has voiced its disapproval of the bill and has offered a counter proposal to regulate rather than abolish exotic animal preserves. The Ohio DNR's regulations would: Require all preserves stocking exotic animals be a minimum of 160 acres; regulate weapons to be used; stipulate the species to be hunted (bears and big cats would not be permitted); and establish standards for the housing and treatment of exotics.

But Senator Branstool sees no room to compromise on the exotic animal issue. "It doesn't make it any more right just because they'd have to pay a license fee, and the game warden has to inspect the property," he said. "There's something unethical about bringing in an exotic game animal from Texas and hunting it."

## "PERSONAL PROPERTY"

New Mexico, Arizona, California and New York have enacted laws which prohibit canned hunts. Anyone who purchases a dangerous cat in those states must have a permit. In other states, however, most notably Texas, exotic animal shooting preserves do not fall under the jurisciction of any state agency. The operations are limited only by the greed and imagination of the owners.

Since, for example, the African lion is not a game animal pursuant to Texas game laws, it has the same status as a rabbit. Phil Evans, regulatory coordinator for the Texas Parks and Wildlife Department said, "They can be hunted at any time, in any number (in any manner). They could be considered personal property."

Exotic species share the same status as livestock and can be denied even minimal protection under humane or wildlife laws and regulations.

Concern expressed by the U.S. Fish and Wildlife Service may offer grounds for optimism. K.C. Frederick, regional director of the Fish and Wildlife Service, said the agency is investigating who is involved in hunting lions and other exotic game. Since hunters are taking African lions, the Fish and Wildlife Service fears they may be taking other species as well.

Lynn Cuny was told by the owner of a ranch that he could acquire any wild animal no matter how rare or endangered for anyone who can pay him as much as $15,000 for any given animal. U.S. wildlife authorities are of the opinion that Texas must impose some measure of statutory restrictions.

"Those lions belong to private owners and nothing good is ever going to happen to those cats," said Fish and Wildlife agent Jim Stinebough. "It's a danger to the public and sad for the cat."

*– Steven Ruggeri*

## Act'ion

FoA urges our Ohio members to call or write their state senator (the League of Women Voters or your local city/town hall will provide you with their names, addresses and telephone numbers) and request they support Senator Branstool's bill, S. 212. You may also wish to take the time to send a brief thank you note to Senator Branstool.

Our Texas membership is encouraged to call or write Senator Cyndi Krier, 301 South Frio, Suite 123, San Antonio, TX 78206, and Congressman Henry B. Gonzalez, 727 East Durango, San Antonio, TX 78206, and urge them to introduce legislation designed to prohibit "canned lion hunts."

We ask of all our members that they contact FoA with any information relative to the operation of exotic animal shooting preserves in their region.

881

# ENVIRONMENTAL LAW CLINICAL PARTNERSHIP
## University of Denver College of Law
### 2255 E. Evans Ave., Rm. 365M
### Denver, CO 80208
### Phone: (303) 871-6034
### Fax: (303) 871-6991
### E-mail: jtutchton@law.du.edu



Chief, Division of Scientific Authority                              April 1, 2005
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, Room 750
Arlington, VA 22203
Fax: 703-358-2276
E-mail: ScientificAuthority@fws.gov

Re:    Comments on Proposed Rule to Exclude U.S. Captive-Bred Scimitar-
       Horned Oryx, Addax, and Dama Gazelle From Protection Under the
       Endangered Species Act. 70 Fed. Reg. 5117 (Feb. 1, 2005).

Dear Chief:

On behalf of the Center for Biological Diversity, Friends of Animals, and the members of both organizations we submit the following comments on the Proposed Rule to exclude U.S. captive-bred Scimitar-Horned Oryx, Addax, and Dama Gazelle from Protection Under the Endangered Species Act. 70 Fed. Reg. 5117 (Feb. 1, 2005) (hereinafter the "Proposed Rule"). These comments also address the draft Environmental Assessment ("EA") prepared in connection with the Proposed Rule pursuant to the National Environmental Policy Act ("NEPA").

## I.    The Proposed Rule Is a Bad Idea.

The Proposed Rule is a bad idea. Indeed, it would not be an overstatement to suggest the Proposed Rule is a profoundly destructive idea – not only to the three species specifically concerned, but also to the overall structure and integrity of the Endangered Species Act ("ESA"). 16 U.S.C. §§ 1531-1544.

### A.    The Proposed Rule Would Deny ESA Protection to Most Individual Members of the Three Species.

By its own admission, the Proposed Rule amounts to a blanket exclusion of the majority of individual animals of each of the three antelope species from the protection of the ESA. See 70 Fed. Reg. 5117 (Scimitar-horned Oryx is extinct in the wild; fewer than 250 Addax remain in the wild; fewer than 700 Dama Gazelle remain in the wild); 70 Fed. Reg. 5117, 5119 (estimating 4,000 to 5,000 Scimitar-horned Oryx, 1,500 Addax, and 750

Dama Gazelle in captivity worldwide, many in the U.S.) and 70 Fed. Reg. 5117, 5119 (discussing 2,145 Scimitar-horned Oryx, 1,824 Addax, and 369 Dama Gazelle in captivity in Texas alone). By excluding captive animals in the U.S. from the potential protections of the ESA, the Proposed Rule will dramatically reduce the number of individual animals that might be legally protected should the three species be listed under the ESA. The effect of the Proposed Rule would be to limit the reach of the ESA to the few antelope remaining in Africa and those in captivity in foreign nations. The ironic result would be to convey ESA protection for these species in only those areas of the world where the ESA has less impact than it does on American soil. Given that each of the three species is direly threatened with extinction it makes no sense to exclude most of the population of each species from the ESA's legal protection. Each individual animal of these three species should be protected regardless of its geographic location. Each individual animal is also entitled to respect as a member of an endangered species. The refusal to apply the ESA in America, where it is most effective, harms the antelope and undercuts the Congressional purpose behind this nation's premier wildlife protection law.

**B.**    **A Global Nationwide Permit Equates Legitimate Conservation Efforts With Exploitation of These Animals for Profit.**

The U.S. Fish and Wildlife Service ("FWS") rationale for excluding captive bred individuals of each species in the U.S. from ESA protection is specious. FWS asserts "this proposed rule would authorize certain otherwise prohibited activities that enhance the propagation or survival of the species." 70 Fed. Reg. 5117. However, rather than submitting these "certain otherwise prohibited activities" to the ESA's permitting system by listing the species in the U.S., the Proposed Rule represents a "global nationwide permit" finding that all activities taking place in the U.S. with respect to these species are somehow enhancing their propagation or survival. In short, FWS is attempting to avoid applying the litmus test of the ESA permitting system to specific activities in the U.S. to determine if they specifically enhance the propagation or survival of these species or not. The principal purpose of this "global nationwide permit" is undoubtedly to allow U.S. trophy or "sport" hunting operations featuring these animals to continue unhindered by ESA regulation. See Declaration of Matthew Sandler ¶ 13 (The Declaration of Matthew Sandler with attached Exhibits accompanies these comments and is incorporated herein by reference).

FWS opines that "[c]aptive breeding in the United States has enhanced the propagation and survival of the scimitar-horned oryx, addax, and dama gazelle worldwide by rescuing these species from near extinction and providing the founder stock necessary for reintroduction." 70 Fed. Reg. 5117, 5118. However, FWS offers little evidence to support this assertion. FWS offers no factual support to establish that legitimate conservation efforts would be hampered by application of the ESA. FWS asserts "[t]he need to quickly move U.S. captive-bred specimens among breeding facilities is reflected in this proposed rule by allowing such movement without requiring a separate ESA permit." 70 Fed. Reg. 5117, 5119. However, FWS makes no attempt, nor could it, to establish that application of the ESA's permitting system actually hinders legitimate captive breeding. Any such claim would be demonstrably false as countless

2

endangered species have been, and are captive bred in the U.S. successfully, while still enjoying full ESA protection. For example, California Condors, Black-footed Ferrets, and the Mexican Wolf have all been successfully captive bred in the U.S. and re-introduced to the wild in full compliance with the ESA's permit system designed to protect endangered species.

Additionally, FWS has made no distinction between legitimate captive breeding efforts in the U.S. that might arguably be designed to rescue these species from extinction and provide founder stock necessary for reintroduction -- and canned hunting operations that breed these species solely to provide trophy animals for hunters. FWS cites two U.S. operations, The Wilds and Fossil Rim Wildlife Center, as examples of captive breeding operations that might help conserve these animal species and provide founder stock necessary for reintroduction. Neither of these two operations apparently allows or involves any hunting of these animals. Sandler Dec. ¶¶ 2, 3. On the other hand, the apparent majority of U.S. ranch style operations that currently breed these animals do so in order to offer trophy hunting for profit and involve no apparent conservation efforts. Sandler Dec. ¶¶ 5-13. The animals on these trophy hunting ranches are not bred to preserve genetic diversity, enhance survival of the species, or for other conservation purposes. They are bred for characteristics desired by trophy hunters, weight and size of horns. Sandler Dec. ¶¶ 8, 12. This selective breeding for trophy values likely will harm the genetic fitness of the species for life in the wild.

Moreover, by allowing commercial hunting of these animals and trade in their body parts for profit, the Proposed Rule will continue a market in these animals that will create incentives for illegal hunting and trade. Commercial trade in endangered wildlife is contrary to the ESA. It is also contrary to positions FWS has taken in the past. For example, in Cayman Turtle Farm, Ltd. v. Andrus, 478 F. Supp. 125 (D.D.C. 1979), FWS effectively argued that allowing trade in captive raised sea turtles would be detrimental to the prospects for the survival of wild sea turtles. This was because increased demand would provide a strong economic incentive for the illegal marketing of wild sea turtles. The present case is no different. Allowing the trade and hunting of captive bred animals will create market incentives for illegal hunting of wild animals.

Finally, even if one were to accept FWS' argument in the Proposed Rule that allowing the hunting of captive antelope would somehow benefit the species, FWS has not established that listing the antelope under the ESA would stop the canned hunting enterprises. While, the Center and FoA wish it were otherwise, the simple fact is that some of the same trophy hunting ranches that presently allow hunting of the three antelope species also provide hunting opportunities of animals already listed under the ESA. Sandler Dec. ¶¶ 8, 9, 10, and 11. Accordingly, even if under the perverse logic of FWS we must allow the hunting of captive bred endangered species in order to save them, there is no evidence that an ESA listing would stop the hunting. Rather, an ESA listing would require specific permits establishing that the hunting was actually furthering the propagation or survival of these species. FWS' Proposed Rule is inappropriately attempting to avoid putting its opinion about the utility of canned hunting operations as a conservation tool to this test. The Center and FoA maintain this attempted "end run" of

3

the ESA permitting system in the Proposed Rule is being considered precisely because canned hunting would flunk the ESA's test limiting "take" of endangered species to activities that actually enhance survival or propagation of the species. It is abundantly clear that canned hunting of these animals for profit offers no true conservation benefits. If FWS believes otherwise, it should embrace, rather than avoid, ESA regulation. FWS and the canned hunting operations it is supporting through the Proposed Rule should prove their conservation claims – case specifically – through the ESA permitting system.

## II.    The Proposed Rule Violates the Endangered Species Act.

In 1978 the U.S. Supreme Court declared that:

[T]he Endangered Species Act of 1973 represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.

T.V.A. v. Hill, 437 U.S. 153, 180 (1978). Accordingly, at the outset, it is unfathomable for FWS to assert, as it does in the Proposed Rule, that an ESA listing would not contribute to the preservation of the three antelope species inside or outside of U.S. territory.

The ESA provided for the listing and legal protection of species and individual members of the species regardless of whether or not specific animals are captive. Section 9(b) of the ESA exempts from the ESA's prohibitions only those individuals of a listed species which were "held in captivity or in a controlled environment on December 28, 1973," but not species of fish or wildlife "held in the course of a commercial activity." "[T]his language clearly evinces a legislative intent to include specimens reared in captivity and in controlled environments with the ambit of the Act." Cayman Turtle Farm, Ltd. v. Andrus, 478 F. Supp. 125 (D.D.C. 1979).

The ESA expressly prohibits the killing or importation of "endangered" species. 16 U.S.C. § 1538. The ESA only authorizes such activities for "threatened" species where such activities are "for the conservation of such species." 16 U.S.C. § 1533(d). "Conservation" is defined as "the use of all methods and procedures which are necessary to bring any endangered or threatened species to the point at which the measures provided" by the ESA "are no longer necessary" and may only include the direct killing of a listed species "in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." 16 U.S.C. § 1532(3). This is not the case with the three antelope species at issue. Most importantly, the three species are proposed to be listed as endangered, not threatened, and they certainly satisfy the definition of endangered. Accordingly, direct killing of these animals is simply not allowed under the ESA. Hunting is categorically not allowed as a conservation tool for endangered species. Moreover, even if the three species were proposed to be listed as threatened rather than endangered, there is no evidence that this is an "extraordinary case" where population pressures within a given ecosystem cannot otherwise be relieved. Were population pressures to exist somewhere, those animals should be relocated or made available for re-introduction to their native range, rather than killed. FWS' Proposed Rule would allow

trophy hunting on an ongoing basis. This is fundamentally inconsistent with the structure of the ESA and violates the law.

## III.    The Draft Environmental Assessment Violates NEPA.

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, is our nation's basic charter for the protection of our environment. It "contains 'action forcing' provisions to ensure that federal agencies act according to the letter and spirit of the Act." 40 C.F.R. § 1500.1. The fundamental purpose of NEPA is to improve the decision making of federal agencies by requiring an analysis of the environmental impacts of a proposed action and an exploration of alternatives to that action that would reduce or eliminate such impacts.

### A.    The Proposed Action Requires an EIS.

The primary vehicle for such an analysis is an Environmental Impact Statement ("EIS") prepared by the acting agency. 42 U.S.C. § 4332(2)(c). An EIS is required for all federal actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(c). An EIS must be prepared and circulated for public review and comment prior to any major federal action that may have a significant effect on the environment. Id. 40 C.F.R. §§ 1502.5, 1508.3. Federal actions include the adoption of "formal documents establishing an agency's policies which will result in or substantially alter agency programs," the adoption of "formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources," and the adoption "of programs, such as a group or concerted actions to implement a specific policy or plan." 40 C.F.R. §§ 1508.18(b)(1), (2), (3) (emphasis added). There are several indicators of a significant action; one such indicator is whether the action "may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b)(9).

Accordingly, the Proposed Rule should require an EIS and not merely an EA. The Proposed Rule marks a substantial alteration of FWS' behavior. With extremely rare exceptions the hundreds of foreign listed species under the ESA are listed both inside and outside of the U.S. Moreover, FWS has never before recognized canned trophy hunting as a legitimate conservation tool for endangered species inside the U.S. Thus, the Proposed Rule is a dramatic break with past agency programs. It will adversely affect an endangered species. It requires an EIS.

### B.    FWS Has Failed to Honestly Disclose the Purpose and Need for the Proposed Action.

Another key requirement of NEPA is that the underlying purpose and need for the proposed action must be disclosed. 40 C.F.R. §§ 1502.10(d); 1502.13. Here FWS has been less than honest with the public. The Proposed Rule is not needed to conserve the antelope. The antelope could be conserved with ESA protection. The Proposed Rule is only necessary to facilitate canned hunting operations – and other activities that could not

survive the scrutiny of ESA regulation. FWS must honestly disclose and discuss the need for the proposed action.

FWS states: "We are including trophy specimens because trophy hunting on private ranches that breed these species may be necessary for wildlife management purposes, provides revenue for the continued operation of captive-breeding operations, and provides an economic incentive for ranchers to continue breeding and maintaining these species." EA at 4. This statement is grossly misleading. First, the only two examples that FWS provides of captive breeding operations in the U.S. that are contributing to the propagation or survival of the antelope species, The Wilds and Fossil Rim, do not allow hunting. Second, FWS has identified no "wildlife management purposes" that support trophy hunting. Indeed, because human hunters select animals for their "trophy" value they tend to remove the most viable animals from a population rather than the less viable animals removed by non-human predators. Additionally, FWS has not identified any population pressures that would support culling animals. Most importantly, FWS has not identified a single instance in which a ranch allowing hunting has contributed animals for re-introduction. Rather, the ranches apparently do nothing more than provide a steady stream of animals for hunting and thus for their own profit. This has nothing to do with conservation of the species in the wild. Finally, even considering FWS' assertion that an economic incentive is necessary to ensure ranchers continue breeding these species, the evidence is to the contrary. FWS' argument is that an ESA listing will provide an economic dis-incentive to the ranches. However, as pointed out above, some of the same ranches that allow hunting of the three antelope species also allow hunting of ESA listed species. Accordingly, an ESA listing does not seem to create the economic dis-incentive FWS believes exists. If anything, ESA listing seems to increase the price these ranches charge for their canned hunts. Sandler Dec. ¶¶ 8, 9, 10, and 11.

Accordingly, FWS has not identified any rational purpose and need for the Proposed Rule. The only rational purpose and need for the proposed rule is to allow for trophy hunting of the antelope in the U.S. absent ESA scrutiny. This actual purpose and need for the Proposed Rule must be disclosed to comply with NEPA.

## C.    The EA is Not Based on High Quality Information.

Additionally, NEPA's implementing regulations recognize that intelligent decision-making can only derive from high quality information. EAs must provide "evidence and analysis" to support a conclusion that a Finding of No Significant Impact ("FONSI") is appropriate or whether a full EIS is required. 40 C.F.R. § 1508.9. Information included in NEPA documents "must be of high quality. Accurate scientific analysis …[is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b). Where an agency has outdated, insufficient, or no information on potential impacts, it must develop the information as part of the NEPA process.

FWS' NEPA analysis relies almost entirely on unsupported assertions. It is not based on high quality information. Again, as discussed above, FWS has not provided any

887

evidence that trophy hunting or the ranches that offer trophy hunting of the antelope have any relationship to the conservation of the antelope in the wild. Despite the existence of thousands of the antelope on trophy hunting ranches in Texas, there is no evidence a single antelope from any of these ranches has ever been re-introduced into the wild. See 70 Fed. Reg. 5117, 5119 (discussing 2,145 Scimitar-horned Oryx, 1,824 Addax, and 369 Dama Gazelle in captivity in Texas alone). Rather, these antelope are maintained by these ranches to provide trophy hunting opportunities, nothing more.

Additionally, FWS admits "[w]e have no information [...] on the health status of the herds of these species held in captivity in the U.S.. Similarly, we have no information on whether specimens of these species have escaped or served as a vector for disease to livestock or native wildlife." EA at 8. Such information is necessary for intelligent decision-making and to support FWS' FONSI conclusion. For example, without any information about the health status of the herds of these species held in captivity in the U.S., FWS can not conclude, as it does, that the hunting ranches help to conserve the genetic diversity of these animals. Additionally, animals held in confinement are at higher risk for disease. For example, the spread of Chronic Wasting Disease in native deer and elk in Colorado and Wisconsin has been closely linked to game ranch operations that traded and transported infected animals. See e.g. An overview of Chronic Wasting Disease – A Threat to Wildlife: www.iafawa.org. The potential for disease transmission from exotic wildlife to both native wildlife and livestock is a significant problem. FWS should not proceed absent any information. Its FONSI determination is unsupported by the record before the Agency.

> ### D.    The EA Does Not Adequately Describe Or Require Mitigation Measures.

NEPA and its implementing regulations require that federal agencies take a "hard look" at measures to mitigate environmental impacts. Agencies are required to develop, discuss in detail, and identify the likely environmental consequences of proposed mitigation measures. 40 C.F.R. §§ 1508.25(b); 1502.14(f); 1502.16(h); and 1502.2(c). Furthermore, a decision to proceed with an action must not be based on arbitrary assumptions about the success of mitigation measures or promises of future action. Federal case law has made abundantly clear that a perfunctory description or mere listing of mitigation measures is insufficient to support a FONSI. Rather mitigation measures must be sufficiently evaluated in order to enable the agency and the public to properly evaluate the severity of the adverse effects of a proposed action before making a final decision.

FWS' asserts that the Proposed Rule "contains provisions that will allow the Service to monitor the activities being carried out by captive-breeding operations within the United States to ensure that these activities continue to provide a benefit to the three antelope species. It is, in part, due to the fact that we [FWS] can require recordkeeping and access to records that distinguishes U.S. captive-breeding operations from foreign captive-breeding operations." 70 Fed. Reg. 5117, 5120. This is a mitigation measure under NEPA. However, this alleged "monitoring" is not described in the Proposed Rule

or EA and FWS only states it "can require recordkeeping and access to records," but fails to say that it actually will require recordkeeping or describe this recordkeeping. FWS' reliance on these potential future actions as mitigation is illegal under NEPA.

Similarly, the Proposed Rule and EA contain no explanation or evaluation of the effectiveness of any mitigation measures designed to ensure that the trade in antelope body parts to be allowed will be regulated to allow the distinction between antelope hunted on U.S. ranches and antelope illegally taken from the wild. A description of such mitigation measures and their effectiveness is essential to support the Proposed Rule and EA's conclusion that allowing hunting in the U.S. will not harm wild antelope populations, or increase poaching or illegal trade. FWS' failure to provide this information violates NEPA.

### E.    The EA Does Not Adequately Analyze Cumulative Impacts.

NEPA requires that federal agencies must consider cumulative impacts in determining the scope of an environmental impact statement. 40 C.F.R. § 1508.25(c)(3). Cumulative impacts are impacts on the environment which result from a combination of the incremental impact of the proposed action, and other past, present, and reasonably foreseeable future actions whether taken by the federal government or others. 40 C.F.R. § 1508.7. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. Id.

The EA contains no analysis of the potential cumulative impacts of the proposed action. This violates NEPA. For example, the EA contains no discussion of how the proposed action to allow trophy hunting of the antelope in the U.S. might impact conservation efforts for the antelope in other countries which might foreseeable face future demands to allow trophy hunting by their own citizens. Similarly, the EA contains no analysis of the potential cumulative impact on the conservation of other species in the U.S. in light of foreseeable demands that FWS allow trophy hunting of other species in the U.S. given the apparent "new trend" in FWS policy towards trophy hunting exemplified by the Proposed Rule.

## IV.    Conclusion.

The Proposed Rule is a bad idea. It is also illegal. It violates both the ESA and NEPA. But even more fundamentally, it is simply wrong. The Proposed Rule is nothing more than political appeasement masquerading as science. While FWS has illegally delayed for over a decade in extending the protection of the ESA to these antelope species, a trophy hunting industry has sprouted in Texas and elsewhere in the United States based on the easy exploitation of these animals. An ESA listing of these animals in the U.S. would subject this trophy hunting industry to uncomfortable scrutiny and regulation under the ESA's permitting system. The Proposed Rule has nothing to do with conservation of these antelope and everything to do with allowing unregulated trophy hunting to pacify this powerful political interest. FWS would do well to remember the words of St. Francis of Assisi in its final consideration of this Proposed Rule: "If you

889

have men who will exclude any creatures from the shelter of compassion and pity, you will have men who will deal likewise with their fellow men." Trophy hunting has no place in endangered species conservation. It is bad for the antelope species at issue, under cuts the ESA by setting a dangerous precedent, and is at base inconsistent with an ethical approach to endangered species conservation. The Center for Biological Diversity, Friends of Animals and their members urge you to reject the Proposed Rule and afford the Scimitar-horned Oryx, Addax, and Dama Gazelle the full protection of the Endangered Species Act throughout the world.

Respectfully Submitted,

Matthew Sandler
Jay Tutchton, Esq.
Counsel for the Center for Biological Diversity and
Friends of Animals

01/05/06  THU 14:27  FAX 203 656 0267        FRIENDS OF ANIMALS
COMMITTEE FOR HUMANE                    FRIENDS OF ANIMALS ...15 '92 15:01 P 02

**Committee
for
Humane
Legislation**

*The Committee is the
legislative arm of
Friends of Animals
conducting public
action to protect
animals.*







Priscilla Feral
Executive Director

1623 Connecticut Avenue, N.W.
Washington, D.C. 20009

National Headquarters
Friends of Animals
P.O. Box 1244
Norwalk, Connecticut 06856

(202) 483-8998
(202) 483-8997 FAX

November 17, 1992

Director, Office of Management Authority
U.S. Fish and Wildlife Service
4401 North Fairfax Drive, Room 432
Arlington, Virginia 22203

RE:  (PRT 767310) Application by Hunter Schuehle for
     CBW permit authorizing canned hunt of endangered
     hoofstock

To Whom It May Concern:

Please note the vehement opposition of Friends of
Animals, a 150,000-member non-profit animal protection
organization, and its legislative arm, Committee for
Humane Legislation, to the recent application of Texan
Hunter Schuehle for a captive-bred wildlife (CBW)
permit (PRT 767310) authorizing him to invite out-of-
state sport hunters to kill surplus red lechwe, dama
gazelle, barasingha, Eld's brow-antlered deer, and
Arabian oryx currently held captive on Mr. Schuehle's
"exotic wildlife ranch."

The basis for our opposition is not only that the
permit sought by Mr. Schuehle would reduce the Fish and
Wildlife Service (FWS) to the role of broker for a
canned hunt, and that issuance of such a permit would
make a mockery of the purposes of the Endangered
Species Act, but that issuance of such a permit would
be illegal.

Under current law, a CBW permit cannot be issued
to one person, such as Mr. Schuehle, for the use of
others, such as the sport hunters who wish to hunt his
surplus animals.  According to 50 C.F.R. 17.22(a)(1),
application for a CBW permit must be made by the person
wishing to engage in the activity for which the CBW
permit is required.  Similarly, 50 C.F.R. 13.25
prohibits the transfer of any FWS permit for the use of
any party other than the agent of the permit holder.
The hunters who plan to kill Mr. Schuehle's animals
would be Mr. Schuehle's customers, but they would
surely not be his agents in the enterprise of a captive
breeding program.  Accordingly, the individual hunters
would themselves have to acquire CBW permits before
they could lawfully participate in Mr. Schuehle's

Comment on Schuehle CBW Permit
     Application
U.S. Fish and Wildlife Service
November 17, 1992
Page - 2

canned hunt.  In order to meet permitting requirements, moreover,
these hunters would have to demonstrate the experience and
capacity necessary for operating a successful breeding program.

     Even if, however, FWS had the authority to transfer to sport
hunters the privileges of a permit issued to Mr. Schuehle for the
conduct of a canned hunt, issuance of any such permit to Mr.
Schuehle would, itself, contravene the Endangered Species Act.

     In particular, we sharply disagree with the assertion made
by former OMA Branch of Permits Chief Robinson, in a February 24,
1989 letter to Mr. Schuehle, that the culling of populations
propagated under the authority of the Endangered Species Act may
take the form of sport hunting.  Perhaps Mr. Robinson has
forgotten that 50 C.F.R. 13.41 requires the humane and healthful
treatment of all animals possessed under a CBW permit.  Whereas
FWS may not yet be willing to acknowledge that the sport hunting
of endangered species, as a general matter, may be inimical to
the purposes of the Endangered Species Act, surely it cannot
legitimately take the position that the hunting of confined
endangered animals, whose natural defenses against predation and
other similar forces have been eroded through disuse, is humane.

     Even if it could be argued that the hunting of confined
animals can be humane, Mr. Schuehle's particular proposal belies
this possibility.  In his May 12, 1992 letter to FWS Biologist
Matthew Vandenberg, Mr. Schuehle describes the "excess" animals
he wishes culled as "old and broken down," and "standing around
like they were dead."  The stalking and hunting of such animals
would be inhumane in the extreme, and therefore violative of the
humane treatment requirement of 50 C.F.R. 13.41.

     On January 7, 1992, FWS announced its intent to revamp the
CBW registration scheme in order to stem the problem of
overbreeding of captive endangered animals by permit holders.
The impetus for addressing the problem of overbreeding comes
directly from the Endangered Species Act, the paramount purpose
of which is to conserve wild populations of endangered and
threatened species, in part through propagation programs that
enhance these species' survival.  Acknowledging that uncontrolled
captive breeding does not serve this purpose, FWS resolved, in
its January 7 announcement, to begin to factor considerations
relating to the sizes of captive populations into its CBW
regulatory scheme.

     If Mr. Schuehle is permitted to orchestrate a commercial
canned hunt of his excess hoofstock under a CBW permit, FWS will
be perpetuating the very problem that it purports it wishes to

Comment on Schuehle CBW Permit
    Application
U.S. Fish and Wildlife Service
November 17, 1992
Page - 3

resolve through a new regulatory scheme. A permit authorizing
culling by canned hunt will eliminate for Mr. Schuehle, and for
others like him, any incentive to avoid overstocking and
overbreeding. It will also eliminate economic incentives for
breeders to participate in reputable and successful species
survival plans, under which they would identify appropriate
placements for animals prior to acquiring and breeding them, and
breed only to the extent that breeding contributes to
conservation of species in the wild. If FWS grants the permit
Mr. Schuehle now requests, on the basis of an application that is
a virtual testament to Mr. Schuehle's inability to modulate
acquisitions and breeding in accordance with the goals of the
Endangered Species Act, FWS will effectively become party to
activities that run afoul of the Act.

    For these reasons, we urge you to deny Mr. Schuehle's
pending application. Alternatively, if FWS does not have
sufficient determination to render a denial at this time, we urge
you to defer any decision on the pending application until such
time as new CBW regulations addressing the problems of
overstocking and overbreeding are made final.

    Thank you.

Sincerely yours,



Lucille R. Kaplan
Legislative Director





UNIVERSITY OF
DENVER
STURM COLLEGE OF LAW

Environmental Law Clinical Partnership
2255 E. Evans Ave., Rm. 365H
Denver, CO 80208
303.871.6034
Fax 303.871.6991
http://www.law.du.edu/envclinic/

August 30, 2006

U.S. Fish and Wildlife Service
Division of Management Authority
4401 North Fairfax Drive, Room 700
Arlington, Virginia 22203
Fax: (703) 358-2281

To whom it may concern:

On behalf of Friends of Animals, I write to request that the Fish and Wildlife Service ("FWS") deny the following application for a Section 10 permit allowing the import of sport-hunted trophy scimitar-horned oryx from South Africa:

1.        Applicant: George W. Adrian, New Milton, WV, PRT - 127075

Authorizing the import of this endangered species would violate the Endangered Species Act ("ESA").

The applicant has requested a permit to import oryx trophies "for the purpose of enhancement of the survival of the species" under Section 10 of the ESA. 16 U.S.C. § 1539(a)(1)(A). Section 10 allows FWS to grant very limited exceptions to the ESA's prohibition against the "take" of endangered species, which includes both killing and importing. In order to grant a permit under Section 10, however, FWS must find the permit (1) was applied for in good faith, (2) will not operate to the disadvantage of the endangered species, and (3) will be consistent with the purposes and policy set forth in the ESA. Id. § 1539(d). Mr. Adrian's application does not support such a finding.

FWS has provided Friends of Animals with the complete file for this application, and it does not contain a single shred of evidence that the killing or importing of this oryx will enhance the survival of the species. Although the application asks the hunters to provide information to support an enhancement finding, Mr. Adrian's application says nothing. Therefore, FWS has no evidence to support a finding that the permit will enhance the survival of the species.

Indeed, allowing the applicant to kill an endangered scimitar-horned oryx in a canned hunt and then importing its parts certainly "operates to the disadvantage" of the oryx in violation of Section 10. Id. § 1539(d). Moreover, it is inconsistent with the ESA's purpose of "conserving" endangered species. Id. § 1536(a)(1).

In order to "conserve," FWS must "use all methods and procedures which are necessary to bring any endangered or threatened species to the point at which the measures provided pursuant to [the ESA] are no long necessary." Id. § 1532(3). In other words, FWS must recover the species in the wild. Canned hunting of an endangered oryx does nothing to promote its recovery in the wild. In fact, the ESA specifically states that conservation does not include "regulated taking" except "in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." Id. According to Congress, "[t]o say that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur—it is just to say that the authority exists in the unlikely event that it ever becomes needed." H.R. Conf. Rep. No. 93-740, at 2 (1973), reprinted in 1973 U.S.C.C.A.N. 3001, 3002. Therefore, sport hunting or any other regulated taking of either threatened or endangered species is allowed only if the species is exceeding the population limits of its ecosystem. Sierra Club v. Clark, 755 F.2d 608 (8th Cir. 1985) (finding sport hunting of threatened wolves is not allowed under the ESA); Fund for Animals v. Turner, 1991 WL 206232 (D.D.C. 1991). In addition, FWS must find that there is "no other feasible way" to alleviate this pressure. H.R. Conf. Rep. No. 93-740, at 2.

FWS could not support a finding that such extraordinary circumstances exist for the scimitar horned oryx. FWS's listing rule shows the oryx is either already extinct or in imminent danger of becoming extinct in the wild. 70 Fed. Reg. 52319 (Sept. 2, 2005). There have been no reported sightings of the species in the wild since the late 1980's. Thus, the oryx is not exceeding the population limits of any ecosystem in the wild. Furthermore, there is no evidence that either killing the oryx or importing its parts will facilitate recovery of the species in the wild. As such, if FWS were to grant this permit, it would violate Section 10 of the ESA. If FWS chooses to do so, Friends of Animals will consider further action against the agency.

Thank you for your attention to this matter. Please call me at (303) 871-6039 if you have any questions about Friends of Animals' comments.

Sincerely,

Robin Cooley
Supervising Attorney
Environmental Law Clinical Partnership

TRANSMISSION VERIFICATION REPORT

```
                                        TIME  : 08/31/2006 15:45
                                        NAME  : UNIV OF DENVER SLO
                                        FAX   : 3038716847
                                        TEL   : 3038716140
                                        SER.# : IIIIIIIIIIIII
```

```
DATE,TIME               08/31  15:44
FAX NO./NAME            84977517033582281
DURATION                00:00:42
PAGE(S)                 02
RESULT                  OK
MODE                    STANDARD
                        ECM
```

**ENVIRONMENTAL LAW CLINCAL PARTNERHSIP**
**University of Denver Sturm College of Law**
**2255 E. Evans Ave., Rm. 365G**
**Denver, CO 80208**

January 2, 2006

U.S. Fish and Wildlife Service
Division of Management Authority
4401 North Fairfax Drive, Room 700
Arlington, Virginia 22203
Fax: (703) 358-2281

Dear Fish and Wildlife Service:

On behalf of our client, Friends of Animals, I write to request that the Fish and Wildlife Service ("FWS") deny the following applications for Section 10 permits allowing the import of sport-hunted trophy scimitar-horned oryx from South Africa:

1.      Applicant: John C. Wirth, Jr., Dubois, WY, PRT-111987
2.      Applicant: Michael E. Willard, Hailey, ID, PRT-110509

Authorizing the import of these endangered species would violate the Endangered Species Act ("ESA").

The applicants have requested permits to import oryx trophies "for the purpose of enhancement of the survival of the species" under Section 10 of the ESA. 16 U.S.C. § 1539(a)(1)(A). Section 10 allows FWS to grant strictly limited exceptions to the ESA's prohibition against the "take" of endangered species, which includes both killing and importing. In order to grant a permit under Section 10, FWS must find the permit (1) was applied for in good faith, (2) will not operate to the disadvantage of the endangered species, and (3) will be consistent with the purposes and policy set forth in the ESA. Id. § 1539(d). Mr. Wirth's and Mr. Willard's applications do not support such a finding.

FWS has provided Friends of Animals with the complete files for these applications, and they do not contain a single shred of evidence that the killing or importing of these species will enhance the survival of the species. Although the application asks the hunters to provide information to support an enhancement finding, Mr. Wirth's application says nothing, and Mr. Willard's application states only that the "animal was taken on private land/preserve." The fact that Mr. Willard killed the oryx on private land is irrelevant with respect to Section 10. Therefore, FWS has no evidence to support a finding that granting either permit will enhance the survival of the species.

Indeed, allowing an applicant to kill an endangered scimitar-horned oryx in a canned hunt and then importing the individua'ls parts "operates to the disadvantage" of

the oryx in violation of Section 10. Id. § 1539(d). Moreover, it is inconsistent with the ESA's purpose of "conserving" endangered species. Id. § 1536(a)(1).

In order to "conserve," FWS must "use all methods and procedures which are necessary to bring any endangered or threatened species to the point at which the measures provided pursuant to [the ESA] are no long necessary." Id. § 1532(3). In other words, FWS must recover the species in the wild. Canned hunting of an endangered oryx does nothing to promote its recovery in the wild. In fact, the ESA specifically states that conservation does not include "regulated taking" except "in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." Id. According to Congress, "[t]o say that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur— it is just to say that the authority exists in the unlikely event that it ever becomes needed." H.R. Conf. Rep. No. 93-740, at 2 (1973), reprinted in 1973 U.S.C.C.A.N. 3001, 3002. Therefore, sport hunting or any other regulated taking of either threatened or endangered species is allowed only if the species is exceeding the population limits of its ecosystem. Sierra Club v. Clark, 755 F.2d 608 (8th Cir. 1985) (finding sport hunting of threatened wolves is not allowed under the ESA); Fund for Animals v. Turner, 1991 WL 206232 (D.D.C. 1991). In addition, FWS must find that there is "no other feasible way" to alleviate this pressure. H.R. Conf. Rep. No. 93-740, at 2.

FWS cannot support a finding that such extraordinary circumstances exist for the scimitar horned oryx. FWS's listing rule shows the oryx is either already extinct or in imminent danger of becoming extinct in the wild. 70 Fed. Reg. 52319 (Sept. 2, 2005). There have been no reported sightings of the species in the wild since the late 1980's. Thus, the oryx is not exceeding the population limits of any ecosystem in the wild. Furthermore, there is no evidence that either the killing of the two oryx concerned or importation of their body-parts will facilitate recovery of this species in the wild. Accordingly, if FWS grants these permits, it will violate Section 10 of the ESA. If FWS continues on this course of action, Friends of Animals will consider legal action against the Agency.

Thank you for your attention to this matter. Please call me at (303) 871-6039 if you have any questions about Friends of Animals' comments.

Sincerely,

Robin Cooley

Robin Cooley
Supervising Attorney
Environmental Law Clinical Partnership

2

**ENVIRONMENTAL LAW CLINCAL PARTNERHSIP**
**University of Denver, Sturm College of Law**
**2255 E. Evans Ave., Rm. 365H**
**Denver, CO 80208**

July 5, 2006

U.S. Fish and Wildlife Service
Division of Management Authority
4401 North Fairfax Drive, Room 700
Arlington, Virginia 22203
Fax: 703.358.2281
Phone: 803.358.2104

Dear Fish and Wildlife Service:

On behalf of our client Friends of Animals, I request the Fish and Wildlife Service ("FWS") deny the following application for a Section 10 permit allowing importation of one sport-hunted trophy scimitar-horned oryx from South Africa:

1.       Applicant: George T. Markou, Mt. Arlington, NJ, PRT-124778

Authorizing the importation of this endangered species trophy would violate the Endangered Species Act ("ESA").

The applicant has requested a permit to import an oryx trophy "for the purpose of enhancement of the survival of the species" under Section 10 of the ESA. 16 U.S.C. § 1539(a)(1)(A). Section 10 allows FWS to grant very limited exceptions to the ESA's prohibition against the "take" of endangered species, which includes both killing and importing. In order to grant a permit under Section 10, however, FWS must find the permit (1) was applied for in good faith, (2) will not operate to the disadvantage of the endangered species, and (3) will be consistent with the purposes and policy set forth in the ESA. Id. § 1539(d). Mr. Markou's application does not support such a finding.

FWS has provided Friends of Animals with the complete file for this application and it does not contain a single shred of evidence that the killing or importing of this species will enhance the survival of the species. Although the application asks hunters to provide information supporting an enhancement finding, Mr. Markou's application only provides a form letter from the Klipplaatfontein Farm stating trophy hunting is part of their management plan. The form letter does not support a species enhancement claim. Therefore, FWS has no evidence to support a finding that the permit will enhance the survival of the species.

Indeed, allowing the applicant to kill an endangered scimitar-horned oryx in a canned hunt and then import a trophy certainly "operates to the disadvantage" of the oryx in violation of Section 10. Id. § 1539(d). Moreover, it is inconsistent with the ESA's purpose of "conserving" endangered species. Id. § 1536(a)(1).

In order to "conserve," FWS must "use all methods and procedures which are necessary to bring any endangered or threatened species to the point at which the measures provided pursuant to [the ESA] are no long necessary." Id. § 1532(3). In other words, FWS must recover the species in the wild. Canned hunting of an endangered oryx does nothing to promote its recovery in the wild. In fact, the ESA specifically states that conservation does not include "regulated taking" except "in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." Id. According to Congress, "[t]o say that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur— it is just to say that the authority exists in the unlikely event that it ever becomes needed." H.R. Conf. Rep. No. 93-740, at 2 (1973), reprinted in 1973 U.S.C.C.A.N. 3001, 3002. Therefore, sport hunting or any other regulated taking of either threatened or endangered species is allowed only if the species is exceeding the population limits of its ecosystem. Sierra Club v. Clark, 755 F.2d 608 (8th Cir. 1985) (finding sport hunting of threatened wolves is not allowed under the ESA); Fund for Animals v. Turner, 1991 WL 206232 (D.D.C. 1991). In addition, FWS must find that there is "no other feasible way" to alleviate this pressure. H.R. Conf. Rep. No. 93-740, at 2.

FWS could not support a finding that such extraordinary circumstances exist for the scimitar horned oryx. FWS's listing rule shows the oryx is either already extinct or in imminent danger of becoming extinct in the wild. 70 Fed. Reg. 52319 (Sept. 2, 2005). There have been no reported sightings of the species in the wild since the late 1980's. Thus, the oryx is not exceeding the population limits of any ecosystem in the wild. Furthermore, there is no evidence that either killing the oryx or importing its parts will facilitate recovery of the species in the wild. As such, if FWS were to grant this permit, it would violate Section 10 of the ESA. If FWS chooses to do so, Friends of Animals will consider further action against the Agency.

Thank you for your attention to this matter. Please call me at 303-871-6034 if you have any questions about Friends of Animals' comments.

Sincerely,

Jay Tutchton
Director, Environmental Law Clinical Partnership
Attorneys for Friends of Animals

TRANSMISSION VERIFICATION REPORT

TIME : 07/05/2006 18:08

| | |
|---|---|
| DATE,TIME | 07/05 18:07 |
| FAX NO./NAME | 82048217033582281 |
| DURATION | 00:01:20 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

# Exotic Wildlife Association

Case 1:...  Document 21-7  Filed 02/27/20...  Page 1 of 1



**Address:**
105 Henderson
Branch Rd. W.
Ingram, TX 78025

❖ ❖ ❖

**Phone:**
(830) 367-7761

❖ ❖ ❖

**Fax:**
(830) 367-7762

❖ ❖ ❖

**Email:**
info@exoticwildlife
association.com

### A Message from the Executive Director

The Exotic Wildlife Association has come along way since the last Game Ranch Directory was printed five years ago. Our membership has continued to grow during that time, and the EWA name is now recognized as one of the major associations across this nation. Over the past three years, your association has had many successes fighting private property rights issues. We have also experienced tough times such as droughts, regulations, bad economy, and animal rights extremists; but, because of the strong industry we represent, we have always landed on our feet.

The passion for the animals felt by the members of the Exotic Wildlife Association is still as strong today as it was 38 years ago when the pioneers in this new industry formed this great association. This love for the land and the animals that inhabit it is the biggest reason we have been so successful.

Through its membership, this organization has been responsible for many of the repatriation efforts of animals that are extinct or near extinction in their native lands. This association, with its allied groups such as SCI and the AZA, has been successful obtaining a new policy, which basically exempts U.S. captive bred Scimitar Horned Oryx, Dama Gazelle, and Addax Antelope from the Endangered Species Act. Hopefully in the near future, we will be able to report that all U.S. captive bred species currently listed as endangered will fall under this same policy.

This directory of membership in no way reflects all our membership or their services. This is a current listing of our members who responded to our survey. The Game Ranch Directory will become a yearly publication, and any member who wishes to be a part of this directory should contact the EWA office as soon as possible. Also if you are interested in advertising your ranch or related services, please inquire about our advertising packages for this publication as well as all of EWA's publications.

As always, your staff looks forward to serving our membership.


**Charly Seale**
**Executive Director**

*"Promoting Conservation Through Commerce Since 1967"*





















UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA


FRIENDS OF ANIMALS,

Plaintiff,

Civil NO# 04-166                              Civil NO# 04-1660(HHK)


V


GALE NORTON, Secretary of the Interior,

Defendant,


DECLARATION OF TARIG OSMAN


I, Tarig Osman, declare as follows:

1.     The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify competently to these facts. As to those matter which reflect an opinion, they reflect my personal opinion and judgmental on the matter.

2.     I am a Sudanese Citizen, but now I am a German Citizen. I work in computer field. I was born and grew up in the middle of Sudan;

the capital of Sudan Khartoum is the business and government center of Sudan. I also traveled a lot around the country with my father. From 1982 to 1987 we were in the west of Sudan, an area called Elfashier, it is near the boarder of Sudan and Chad. We lived in a military camp, but the high rank employ lived in nice house, their lives ran very smoothly. On the opposite side, there are the soldiers whose lives are very hard. The area is between the Sahara and Chad board, with little grass and woodlands. It is a very open area. We used to leave camp to hunt from time to time, and we always have to have a guide that knew the area very well or otherwise we could get lost. These guides know where to find the animals for us to hunt.

3.     In the middle of the South Sahara steppe and woodlands, ecoregion extends in a narrow band from central Mauritania though Mali, Southwestern Algeria, Niger and Chad across Sudan to Red Sea, covering the southern fringes of the Sahara Desert. Rainfall occurs mainly during the summer time of July and August, but is unreliable and varies greatly from year to year.

4.     Notable animal species, which once occurred throughout the ecoregion, have now been reduced to extremely small and

scattered population, including the following: Addax, Scimitar Horned Oryx, Dama Gazelle, Cheetah and wild Dog.

5.  I used to travel a lot inside my country Sudan. My father used to work with the military. This time we were in the west of Sudan in this place called Elfashier .It is near the boarder of Sudan and Chad. We use to go on hunting trips from time to time, but we didn't go deep into the desert. One day these people arrived at our camp site. They were three whit men who spoke the English language (we called them Kohaja), this stranger arrived in tow four- wheel-drive cars, and they had rifles (not like one used in military). They left the camp site the next day in the early morning with tow guides; they came back after ten days with three gazelle and a few birds. They paid the guides tow hundred dollars each. Tow hundred dollars was a lot of money in Sudan at the tine you couldn't just turn your head away from it. This was in the winter of 86. This was not hunting season, and beside we knew this animals were protect by law. Even if the local people hunted these animals, it was just for the meat because economically the local people can't afford buying meat from the market. The stranger left us the meat but they took the gazelle

heads with them. This trophy hunting happens a lot in this area. I know that sometimes they cross the boarder between Sudan and Chad looking for these kinds of animals. The boarder is so wide and unprotected; there is much hunting of endangered species such as this.

In accordance with 28 U.S.C. sec 1746 and under penalty of perjury, I swear that the foregoing is true and correct.

April 1, 2006

Tarig Osman,

HUGEL, STR 84

NUERNBERG, GERMANY

This document was translated from Arabic language to English, by FAYHA SULEMAN. Under Mr. Tarig Osman, permission.

Fayha Suleman

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, and
FRIENDS OF ANIMALS,

        Plaintiffs,

        V.                                                 Civil NO. 04-1660(HHK)

GALE NORTON, Secretary of the Interior,

        Defendant.

## DECLARATION OF LIMIA IBRAHIM

I, Limia Ibrahim, declare as follows:

1- The facts set forth in this declaration are based upon my personal knowledge. If called as a witness I could and would testify to these facts. As to those matters which reflect an opinion, they reflect my personal opinion and judgment on the matter.

2- I am a Sudanese Citizen and live in Khartoum capital of Sudan. I work in an import and export company as an executive operator. I was born and grew up in the capital of Sudan Khartoum.

3- I have a friend whose husband goes on hunting trip from time to time, so every time I go to their house they have gazelle meat barbecues. One day I asked my friend's husband if we could join him on one of his hunting trips just for fun, so he arranged for the trip and we went in three four wheel drive cars with food, water, and hunting guns. We headed northwest to a place called Wadi Howar. It is near the boarder of Sudan and Libya at the edge of the Kordfan region. It took us five days to get there.

3- In October, 2000, we start our trip to Wadi Howar; Wadi Howar is one of the most remarkable natural features of the south Eastern Sahara. It was proclaimed on the 18th of

July 2001 as one of the largest national park in the world with its diverse flora and outstanding geological features including the volcanic and crater landscape of the Meidob Hill and Jebel Rahib complex. Numerous paleo lakes and large active barachen fields also exist in that area. Dorcas gazelle, barberg sheep, ostrich and other animals also inhabit that area. The Wadi Howar was the largest of the Nile's tributaries from between 9500 to 3000 years before the present desert,

4-  We camped there, and then the group started looking around the place to find out what kinds of animals live there. In our discovery tour, we met other people driving their cars; they were four land rovers. The drivers were Sudanese people but there were also white people who were obviously from the west. They wore funny hats that I saw before only in pictures of the period of English colonization of Sudan. On top of their cars were these four wonderful animals tied with ropes. I never saw such beautiful animals like those before. We stopped and asked where they had gotten the animals from. The white people, generally we called them (Kohaja in Sudan), didn't want to speak to us but the driver told us that they hunted the animals on the border Sudan and Libya share with Chad. We were very curious about those white westerners (kohajas) and why they were there in such hot weather. It was normal for us but for them white people I didn't think so. One of the guide, his name was Ali, told us if you want the truth guys these people are trophy hunters. All that they are looking for is the heads and the horns of dama gazelles, and because it is illegal they have to pay us to guide them inside the Sahara. We asked how much the drivers were paid and they said it was about $500 each ($1 equal 2300 Sudanese pound). For the guides that was the only way for them to make money and live a wealthy life, but they told us that the job is not like before because this kind of animals

now are extremely rare. It was harder to find them to find dama gazelles even around the area where they used to live. Ali told us that before they could always find them in groups but now they could only find them individually and even finding them individually wasn't easy. He also told us that the white westerners (kohajas) were not looking for the meat but they were going to take the meat to their family. The white westerners (kohajas) were going to have the head and leave the meat. We asked where the white westerners (kohajas) took the heads of the dama gazelles but they told us they didn't know or care; all they cared about was the money. We asked about the hunting guard but the guide told us that because the area is so wide, it is very hard to protect. So they never saw the hunting guard.

5- That shocked us; I stopped eating gazelle meat from then on. My friend's husband quit the hunting trip and became a vegetarian.

6- In accordance with 28 U. S. A. sec 1746 and under penalty of perjury, I swear that the foregoing is true and correct.

December 17, 2006

Limia Ibrahim,

ELFETEHAB, STR 117

KHARTOUM, SUDAN

This document was translated from Arabic Language to English,

BY FAYHA SULEMAN. Under Mrs. Limia Ibrahim, permission.

Fayha Suleman

سيما ـ ابراهيم

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF ANIMALS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DIRK KEMPTHORNE, Secretary of the Interior, | ) |
| | ) Civ. No. 04-1660 (HHK-DAR) |
| | ) Civ. No. 06-2120 |
| Defendant, | ) (Consolidated Cases) |
| | ) |
| and | ) |
| | ) |
| SAFARI CLUB INTERNATIONAL, et al., | ) |
| | ) |
| Defendant-Intervenors. | ) |
| REBECCA ANN CARY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DALE HALL, Director, Fish and Wildlife Service, | ) |
| et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| SAFARI CLUB INTERNATIONAL, et al., | ) |
| | ) |
| Defendant-Intervenors. | ) |

## DECLARATION OF LEE HALL

I, Lee Hall, declare as follows:

1.    The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would testify to these facts. As to those matters which reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.    I serve as the Legal Director for Friends of Animals. My office is located at 396 Poplar Avenue, Devon, Pennsylvania.

3.    In September and October 2005, I reviewed copies of several Internet pages, connected with the address of the pages, and viewed the pages live online. I viewed several Oryx mounts for sale. On Craig's List of Cleveland, for example, oryx heads were available for $750 on 18 September 2005.[1] Attached as Exhibit 1. Copies of these and other listings accompany this statement. Many offer to ship worldwide.

4.    I also viewed hunts for sale. For example, on 16 October 2005, Ebay seller "Hunting with Jeff" ( <Huntingwithjeff.com> of Crystal City, Texas) began advertising item number 7189772395, for a South Texas Scimitar-horned Oryx trophy hunt; this hunt was listed at $3500 by eBay Hunt.[2] Attached as Exhibit 2. Price was exclusive of other parts of the package such as transportation to the Double C Ranch. I watched active bidding over the course of several days (16-21 Oct.) for that item. On 24 October 2005 I observed that the highest bid was visible: $1,526.00.[3]

---

[1] I observed this at the Internet address (URL): http://cleveland.craigslist.org/spo/98370448.html

[2] I observed this at the Internet address (URL): http://cgi.ebay.com/TROPHY-SCIMITAR-ORYX-HUNT-IN-SO-TEXAS-EXOTIC-HUNTING_W0QQitemZ7189772395QQcategoryZ14110QQrdZ1QQcmdZViewItem

[3] The precise Internet address (URL), which I observed, was:

http://cgi.ebay.com/ws/eBayISAPI.dll?ViewItem&item=7189772395&ru=http%3A%2F%2Fsearch.ebay.com%3A80%2Fsearch%2Fsearch.dll%3Fcgiurl%3Dhttp%253A%252F%252Fcgi.ebay.com%252Fws%252F%26fkr%3D1%26from%3DR8%26satitle%3D7189772395%26category0%3D%26fvi%3D1

5.      From 4 October 2005 to 11 October 2005, Ebay had a seller in North Texas offering an African Oryx shoulder mount sized 36" and needing repair (NR).[4] Attached as Exhibit 3.  The winning bid was US $212.50.

6.      Lolli Brothers Livestock Market has, from autumn 2005 to spring 2006 when I observed, continuously offered exotic mounts such as "African Hoof Stock."[5] In October a cached paged showed a Scimitar-horned Oryx mount at $700.00.

7.      There are many taxidermy sites offering to mount Oryxes, Addax and Dama Gazelles and also Oryx mounts and parts. Addax were available from Moyle Mink and Tannery of Idaho for the following prices:[6] Addax Cape $ 75.00; Addax Mounts $195 - 325.00; and Addax Hide $ 36.00 - 60.00.  Attached as Exhibit 4.

8.      The Flagg Group (African Novelty & Rugs) of Dallas has, according to my observations in October 2005 and March 2006, continuously offered North African antelope (including Oryx and Addax in October 2005 and Dama Gazelle in March 2006) shoulder mounts in the price range of $475.00 to $2,000.00[7].  Attached as Exhibit 5.

9.      Advertised on Ebay by a seller from Bowie, MD, an Oryx horn, in a set of four African antelope horns, is for sale ($80 to buy now). I viewed this item on 31 March 2006. The current bidding cycle for this item ends 07 April 2006.[8]

---

[4] I observed this at the Internet address (URL):  http://cgi.ebay.ca/African-Oryx-Shoulder-Mount-36-Horns-NR_W0QQitemZ7187350288QQcategoryZ22702QQcmdZViewItem

[5] I observed this at the Internet address (URL): http://www.lollibros.com/giftshop.htm

[6] I observed this at the Internet address (URL):  http://www.moytown.com/Taxidermy-Price-List.html

[7] I observed this at the Internet address (URL):
http://www.theflagggroup.com/AShoulderMountLifesize.html

[8] The URL is: http://cgi.ebay.ca/Assortment-of-4-African-Antelope-Horns-Kudu-Oryx-etc_W0QQitemZ7230542120QQcategoryZ22702QQrdZ1QQcmdZViewItem

In accordance with 28 U.S.C § 1746 and under penalty of perjury, I swear that the foregoing is true and correct.

_____

Lee Hall

Executed on ___02-14-07_____

at 777 Post Road, Darien, Connecticut

Subscribed and sworn to before me
this _14_ day of _February_ 2007,

_____
Notary Public

Date commission Expires:  10-31-10

ORYX

http://cleveland.craigslist.org/spo/98370448.html

# AFRICAN ANIMAL HEADS + other exotic mounts >>> ORYX only this ad - $750

---

Reply to: anon-98370448@craigslist.org
Date: 2005-09-18, 4:01PM CDT


SELLING AS PART OF AN ESTATE SALE.......
ORYX MOUNT, BEAUTIFUL CONDITION.... PART OF 36 HEADS OF A 1972 HUNT MY DAD WENT ON....
32" LONG HORN [BASE TO TIP]; 12" SPREAD; 26' out from wall; 48" cape to tip
EMAIL ME TO SET UP A VIEWING TIME ***********************


ALSO HAVE THE FOLLOWING FOR SALE SEPERATELY >>>>>>>

GREATER KUDU @$750 O.B.O.
21" LONG HORN [BASE TO TIP]; 24' out from wall; 40" cape to tip

GAZELLE @ $700 O.B.O.
21" LONG HORN [BASE TO TIP]; 14" SPREAD; 21" out from wall; 41" cape to tip

PRONGHORN ANTELOPE @$100

WHITE TAIL DEER @$ 75
8point buck; 21" max horn width; 16" top width; 28" out from wall; 36" cape to tip

GREAT NORTHERN PIKE ... @$40

WILL SELL ALL AT A VERY REASONABLE PRICE ...........

http://cgi.ebay.com/TROPHY-SCIMITAR-ORYX-HUNT-IN-SO-TEXAS-EXOTIC-HUNTING_W0QQitemZ7189772395QQcategoryZ14110QQrdZ1QQcmdZViewItem

## CLICK HERE FOR MORE INFO ON HUNTINGWITHJEFF

Official Huntingwithjeff.com eBay Hunt

  



### Trophy Scimitar Oryx Hunt
#### List Price $3500

This item is for one Trophy Scimitar Oryx hunt! This will be a 3 day, 2 night hunt (2 full days of hunting) and will include transportation to and from the hunting areas on the ranch and the following:

**(1) Scimitar Oryx**
**Unlimited Varmints**
Lodging at the Double C Ranch
Great Meals
Guide Service
Maid Service



The winning bidder will be allowed to harvest one (1) Trophy Scimitar Oryx and an unlimited number of varmints (coyote, bobcat, badger and fox). There will be no additional harvest fees on this hunt. The hunt does not include: hunting license, tips or transportation to the ranch.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On every eBay hunt I will give a $50 credit for any varmint harvested on the hunt. Example: Shoot 3 coyotes and you will earn $150 in credit **towards any future hunts**. The time period to take this hunt is up to one year after the auction ends

http://cgi.ebay.ca/African-Oryx-Shoulder-Mount-36-Horns-NR_W0QQitemZ7187350288QQcategoryZ22702QQcmdZViewItem

## African Oryx Shoulder Mount 36" Horns NR



**Supersize**

**Larger Picture**

| | |
|---|---|
| Winning bid: | **US $212.50**<br>(Approximately C $251.90) |
| Ended: | 11-Oct-05 05:23:55 EDT |
| Start time: | 04-Oct-05 05:23:55 EDT |
| History: | 2 bids   (US $200.00 starting bid) |
| Winning bidder: | roxxxane6769  ( 18 ☆ ) |
| Item location: | North Texas<br>United States |
| Ships to: | Worldwide |

**ADDAX**

**http://www.moytown.com/Taxidermy-Price-List.html**

| TYPE | PRICE |
|------|-------|
| Addax: Cape | $ 75.00 |
| Addax: Half Mount | $ 195.00 |
| Addax: Full Mount | $ 325.00 |
| Addax: Hide | $ 60.00 |
| Addax: Back Hide | $ 36.00 |

**The Flagg Group**
*African Novelty & Rug Prices*

## SHOULDER MOUNT / LIFESIZE

| | | |
|---|---|---|
| Baboon | $450.00 | $2,000.00 |
| Blesbok, Bontebok | 525.00 | 2,500.00 |
| Bongo | 900.00 | 4,000.00 |
| Buffalo-Cape, Water, Banteng | 1,200.00 | 9,000.00 |
| Bushbuck | 450.00 | 2,100.00 |
| Bush - pig | 650.00 | 2,100.00 |
| Cats - Caracal, Serval | | 1,200.00 |
| Civet | | 1,300.00 |
| Genet | | 750.00 |
| Chamois | 450.00 | 2,100.00 |
| Dik-Dik | 325.00 | 1,000.00 |
| Duiker, Grysbok, Oribi | 350.00 | 1,200.00 |
| Yellow-backed Duiker | 450.00 | 2,000.00 |
| Eland - Common | 1,000.00 | 7,000.00 |
| Giant | 1,2000.00 | 8,000.00 |
| Forest Hog | 700.00 | 2,200.00 |
| Gazelle - Dama, Grant's Peters' | 450.00 | 1,900.00 |
| Dorcas, Eritrean, Thomson's | 400.00 | 1,800.00 |
| Gensbok | 700.00 | 2,700.00 |
| Gerenuk | 550.00 | 1,800.00 |
| Giraffe (Pedestal) | 3,700.00 | |
| Hartebeest | 675.00 | 3,000.00 |
| Hippo | 4,000.00 | |
| Hyena | 550.00 | 1,800.00 |
| Ibex, Tahr | 450.00 | 2,000.00 |
| Impala | 450.00 | 1,800.00 |
| Jackal | 300.00 | 750.00 |
| Klipspringer | 350.00 | 1,200.00 |
| Kudu - Greater | 875.00 | 3,500.00 |
| Lesser | 575.00 | 2,500.00 |
| Lechwe, Kob, Puku | 575.00 | 2,200.00 |
| Leopard | 500.00 | 3,000.00 |
| Lion | 850.00 | 4,000.00 |
| Monkey (small to medium) | 325.00 | 1,500.00 |
| Nyala - Common | 600.00 | 3,000.00 |
| Mountain | 800.00 | 4,000.00 |
| Lion | 650.00 | 3,000.00 |
| Oryx, Addax | 475.00 | 2,000.00 |
| Bohor, Mtn., Vaal Rhebok | 450.00 | 1,700.00 |

| | | |
|---|---|---|
| Rhino | 4000.00 | 20,000.00 |
| Roan | 800.00 | 3,500.00 |
| Roebuck | 425.00 | 1,900.00 |
| Sable | 800.00 | 3,500.00 |
| Sheep - Argali, Gharal | 800.00 | 3,000.00 |
| Red, Urial | 600.00 | 2,000.00 |
| Sitatunga | 550.00 | 3,000.00 |
| Springbok | 450.00 | 2,000.00 |
| Springhare | | 800.00 |
| Steenbok, Suni | 350.00 | 1,200.00 |
| Topi, Tiang, Tseessebe | 625.00 | 2,800.00 |
| Waterbuck | 700.00 | 3,000.00 |
| Warthog | 700.00 | 2,000.00 |
| Wildebeast | 650.00 | 3,000.00 |
| Zebra | 775.00 | 3,800.00 |

Pedestal Mounts add 25% to the above shoulder mount proces.
Additional charge for custom alterations and open mouth.

2827 Nagle St. Dallas TX 75220
(214) 350-2551

Back to Price List
close window

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>DIRK KEMPTHORNE,<br>Secretary of the Interior, *et al.*,<br><br>    Defendants. | Civil Action No. 06–1279 (CKK) |

**MEMORANDUM OPINION**
(August 9, 2006)


The gray wolf (*Canis lupus*) is classified as an endangered species in the state of

Wisconsin and throughout all but one of the remaining coterminous United States.  At issue in

the instant case is the legality of a lethal depredation control program allowing up to forty-three

*endangered* wolves to be killed in Wisconsin pursuant to a permit issued by the United States

Fish and Wildlife Service ("FWS") with the purpose of fostering greater social tolerance for

wolves.

Plaintiffs The Humane Society of the United States, Animal Protection Institute, Friends

of Animals and Their Environment ("FATE"), Help Our Wolves Live ("HOWL"), Indigenous

Environmental Network, Klamath Forest Alliance, and RESTORE: The North Woods filed a

Complaint on July 19, 2006 for injunctive and declaratory relief against Defendants Dirk

Kempthorne in his capacity as Secretary of the Interior, the United States Department of the

Interior, H. Dale Hall in his capacity as Director of FWS, and FWS.  Presently before the Court is

the [5] Motion for Preliminary Injunction filed by Plaintiffs on July 25, 2006, requesting that the Court enjoin Defendants, their employees, agents, and all others acting in concert or participation with Defendants from allowing the killing of gray wolves pursuant to the lethal depredation control provisions of Permit No. TE111360–0, and that the Court direct FWS to immediately stop the Wisconsin Department of Natural Resources, its employees, agents, and any and all others acting in concert or participation with it, from any further killing of gray wolves pursuant to the lethal depredation control provisions of the same.

The Parties participated in a conference call on the record on July 26, 2006.  Defendants filed an Opposition to Plaintiffs' Motion for Preliminary Injunction on August 1, 2006.  Additionally, Safari Club International and Safari Club International Foundation filed a Motion to Intervene, which the Court has granted as of right, and an Opposition to Plaintiffs' Motion for Preliminary Injunction.  Plaintiffs filed a Reply on August 3, 2006.  After considering all of the aforementioned filings, the relevant statutes and case law, and the administrative record, the Court shall GRANT Plaintiffs' Motion for Preliminary Injunction.  Based on the foregoing analysis, the Court concludes that Plaintiffs have demonstrated a substantial likelihood of success on the merits that a lethal depredation control program applied to an endangered species contravenes the plain meaning and clear intent of Congress as set forth in Section 10(a)(1)(A) of the Endangered Species Act.  Plaintiffs have additionally demonstrated irreparable injury, shown that the issuance of a preliminary injunction would on balance cause minimal harm to Defendants and Defendant-Intervenors, and demonstrated that the public interest supports granting preliminary injunctive relief.

## I: BACKGROUND

2

A.     The Endangered Species Act

"[T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (hereinafter "*TVA v. Hill*").  "'The plain intent of Congress in enacting this statute,' we recognized, 'was to halt and reverse the trend toward species extinction, whatever the cost.  This is reflected not only in the stated policies of the Act, but in literally every section of the statute.'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *TVA v. Hill*, 437 U.S. at 184)).  The ESA further includes a congressional mandate to federal agencies, including the statement that "[i]t is further declared to be the policy of Congress that all Federal departments and agencies shall seek to *conserve* endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."  16 U.S.C.A. § 1531(c)(1) (emphasis added).  To "conserve" is defined pursuant to 16 U.S.C. § 1532(3) as "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.  Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the *extraordinary* case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking."  16 U.S.C. § 1532(3) (emphasis added).

The ESA allows the Secretary of the Interior to designate certain species of animal life as having protected status.  16 U.S.C. § 1533(a)(1).  *See also TVA v. Hill*, 437 U.S. at 159–60;

3

*Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003). There are three different

categories of federally-protected species under the ESA–endangered species, threatened species,

and experimental populations. Endangered species are defined pursuant to 16 U.S.C. § 1532(6)

as "any species which is in danger of extinction throughout all or a significant portion of its range

other than a species of the Class Insecta determined by the Secretary to constitute a pest whose

protection under the provisions of this chapter would present an overwhelming and overriding

risk to man." 16 U.S.C. § 1532(6). Threatened species are defined pursuant to 16 U.S.C. §

1532(20) as "any species which is likely to become an endangered species within the foreseeable

future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). And

experimental populations, sometime referred to as "10(j)" populations, are defined pursuant to 16

U.S.C. § 1539(j) and are treated similarly to threatened species with some defined exceptions.

*See* 16 U.S.C. § 1539(j). Endangered species are afforded the highest level of protection of any

species classification. *See TVA v. Hill*, 437 U.S. at 174 ("[E]xamination of the language, history,

and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to

be afforded the highest of priorities.").

Section 9 of the ESA makes it unlawful to "take any [endangered] species within the

United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). To "take"

an endangered species is defined by the ESA to include "to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §

1532(19). Pursuant to Section 10(a)(1)(A) of the ESA, 16 U.S.C. § 1539(a)(1)(A), the Secretary

of the Interior "may permit, under such terms and conditions as he shall prescribe–any act

otherwise prohibited by [Section 9] of this title for scientific purposes or to enhance the

4

propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section."  Section 10(a)(1)(A) permits are generally referred to as either "scientific" or "recovery" permits.  *See Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 72 (D.D.C. 2003), *aff'd*, 415 F.3d 8 (D.C. Cir. 2005).  Regulations have been issued by the FWS which set forth the factors that the FWS "shall" consider when determining whether to issue a Section 10(a)(1)(A) permit:

> (i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

> (ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

> (iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

> (iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

> (v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

> (vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

50 C.F.R. § 17.22(a)(2).  The Court notes that these regulations are not at issue in the instant case (in other words, Plaintiffs do not contend that Defendants arbitrarily and capriciously applied such regulations in the issuance of the permit in question), but rather Plaintiffs contend that the authorization of a lethal depredation control program is contrary to Section 10(a)(1)(A) itself.

5

B.    *The Endangered Gray Wolf*

On March 9, 1978, the gray wolf was listed as an endangered species throughout the coterminous United States, with the exception of Minnesota where the gray wolf was classified as threatened.  *See* Pls.' Mem. Prelim. Inj. at 3; Defs.' Opp'n at 6 (citing 43 Fed. Reg. 9607 (March 9, 1978)); Final Rule to Reclassify and Remove the Gray Wolf from the List of Endangered and Threatened Wildlife in Portions of the Coterminous United States, 68 Fed. Reg. 15804, 15806 (April 1, 2003) ("April 2003 Final Rule").  On April 1, 2003, the FWS reclassified the gray wolf from endangered to threatened.  *See* April 2003 Final Rule.  Reclassifying the gray wolf from endangered to threatened allowed FWS to promulgate regulations with respect to the gray wolf pursuant to Section 4(d) of the ESA.  16 U.S.C. § 1533(d) ("Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.").  FWS implemented Section 4(d) regulations as part of the April 2003 Final Rule that authorized "the full spectrum of depredation control actions, from nonlethal opportunistic harassment to lethal control of depredating wolves."  April 2003 Final Rule, 68 Fed. Reg. at 15868.  *See* Pls.' Mem. Prelim. Inj. at 4; Defs.' Opp'n at 8.  However, in *Defenders of Wildlife v. Norton*, 354 F. Supp. 2d 1156 (D. Or. 2005), the court held that the April 2003 Final Rule violated the ESA such that the gray wolf regained its endangered status.  *Defenders of Wildlife v. Norton*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005).  The court also enjoined FWS from implementing the depredation abatement program that had been authorized by FWS under Section 4(d) of the ESA.  *Id.*

C.    *The 2005 Wisconsin Subpermit and 2006 Wisconsin Permit*

6

In February of 2005, in light of the gray wolf's return to endangered status and Wisconsin's continued desire to control depredations by wolves, Wisconsin submitted a permit application to FWS requesting the authority to implement a depredation control program with respect to the endangered gray wolf pursuant to Section 10(a)(1)(A) of the ESA. Pls.' Mem. Prelim. Inj. at 5, Ex. C (Memorandum from Ron Refsnider, Region 3 Listing Coordinator & Wolf Recovery Coordinator, to TJ Miller, Region 3 Endangered Species Program Manager (Mar. 17, 2005)). On April 1, 2005, the FWS issued a Section 10(a)(1)(A) permit to the Wisconsin Department of Natural Resources, authorizing the lethal take of up to 34 wolves in 2005. *See* Pls.' Mem. Prelim. Inj. at 6, Ex. D (Subpermit No. 05–03 A1, hereinafter "2005 subpermit"); Defs.' Opp'n at 9. However, the 2005 subpermit was vacated via the issuance of a permanent injunction in *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.), as Judge Ellen Huvelle determined during a hearing on plaintiffs' motion for preliminary injunction that FWS had failed to provide an opportunity for notice and comment before issuing the 2005 subpermit. Pls.' Mem. Prelim. Inj. at 6, Ex. E (*Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction, Civil Action No. 05–1573 (D.D.C. September 13, 2005)); Defs.' Opp'n at 9. At the time the permanent injunction was granted, 29 of the 34 wolves authorized to be lethally taken in Wisconsin had already been killed. *See* Pls.' Mem. Prelim. Inj. at 7, Ex. F (Tr. of Prelim. Inj. Hearing at 7, *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.)).

After the 2005 subpermit was vacated by the court, Wisconsin's resubmitted permit application was published in the Federal Register on September 14, 2005. *Id.* at 7, Ex. G (Memorandum from Field Supervisor, ES Field Office, Green Bay, WI, to Assistant Regional Director-Ecological Services, Fort Snelling, MN (ES/TE) (Apr. 20, 2006); Defs.' Opp'n at 9

(citing 70 Fed. Reg. 54401–02 (Sept. 14, 2005)).  The public comment period with respect to

Wisconsin's resubmitted permit application expired on October 14, 2005.  *Id.*  FWS prepared a

draft environmental assessment, which was made available for public comment on March 2,

2006, and thereafter issued the Final Environmental Assessment and an accompanying Decision

and Finding of No Significant Impact in April of 2006.  *See* Pls.' Mem. Prelim. Inj. at 8, Exs. B

& H; Defs.' Opp'n at 10.

On April 24, 2006, the FWS issued the permit at issue in the instant case, authorizing

Wisconsin to implement a lethal depredation control program with respect to the endangered

gray wolf.  *See* Pls.' Mem. Prelim. Inj. at 8, Ex. A (Permit Number TE111360–0, hereinafter

"permit" or "2006 permit"); Defs.' Opp'n at 10–11.  Section F of the permit allows the lethal

take of up to 43 endangered wolves for depredation control purposes.  *Id.*  Defendants state that

the rationale behind a lethal depredation control program "is that, in the absence of adequate

measures to control known depredating wolves, public support for wolf recovery and wolf

reintroduction programs will likely erode and individuals will resort to illegal killing to protect

their pets and livelihood."  Defs.' Opp'n at 8; *see also* Pls.' Mem. Prelim. Inj. at Exh. I at 2 (Set

of Findings: Wisconsin Department of Natural Rescoures Wolf Depredation Permit

(TE111360)).

On May 9, 2006, Plaintiffs sent a 60-day notice letter to FWS pursuant to 16 U.S.C. §

1540(g) requesting that FWS rescind the 2006 permit.  *See* Pls.' Mem. Prelim. Inj., Ex. J (Letter

re: Notice of Intent to Sue from Sanne H. Knudsen to Lynn Scarlett and H. Dale Hall (May 9,

2006)).  As of August 1, 2006, 17 wolves had been taken for depredation control purposes

pursuant to the permit at issue.  Defs.' Opp'n at 11 n.6.

## II: LEGAL STANDARD

*A.      Standard for Preliminary Injunctive Relief*

The decision whether to grant preliminary injunctive relief under Federal Rule of Civil

Procedure 65(a) is reserved to the sound discretion of the Court.  *See* Fed. R. Civ. P. 65(a); *Sea*

*Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989).  In assessing whether to

grant preliminary injunctive relief, which is considered an extraordinary remedy in this circuit,

*see Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969), a court must balance four

factors: (1) whether the movant is substantially likely to succeed on the merits; (2) whether the

movant would suffer irreparable injury if the injunction were not granted; (3) whether an

injunction would substantially injure other interested parties; and (4) whether the public interest

would be furthered by the injunction.  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066

(D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746

(D.C. Cir. 1995)); *Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C. Cir. 1998).

"These factors interrelate on a sliding scale and must be balanced against each other.  'If

the arguments for one factor are particularly strong, an injunction may issue even if the

arguments in the other areas are rather weak.'"  *Serono Labs*, 158 F.3d at 1318 (quoting *CityFed*

*Fin. Corp.*, 58 F.3d at 746).  Accordingly, "[a]n injunction may be justified, for example, where

there is a particularly strong likelihood of success on the merits even if there is a relatively slight

showing of irreparable injury."  *CityFed Fin. Corp.*, 58 F.3d at 747.  Notwithstanding the fluid

nature of this familiar four-part inquiry, "[i]t is particularly important for the [movant] to

demonstrate a substantial likelihood of success on the merits."  *Barton v. Dist. of Columbia*, 131

F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)).  If

9

the movant fails to do so, "it would take a very strong showing with respect to the other

preliminary injunction factors to turn the tide in plaintiffs' favor." *Davenport v. Int'l Bhd. of

Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999).

In addition, a party seeking preliminary injunctive relief must demonstrate at least some

irreparable injury because "the basis for injunctive relief in the federal courts has always been

irreparable harm." *CityFed Fin.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88

(1974)) (alterations omitted).  In order to establish irreparable injury justifying preliminary

injunctive relief, a plaintiff must establish injury that is great, certain, and actual, not merely

theoretical.  *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C.

Cir. 1985).  "'The injury complained of [must be] of such *imminence* that there is a "clear and

present" need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Ashland Oil, Inc. v.

FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)) (emphasis in

original).

> B.      *Standard for Agency Review*

Plaintiffs in this case challenge Defendants' authorization of the lethal taking of up to 43

gray wolves for depredation control pursuant to Permit No. TE111360–0 as beyond the statutory

authority conferred by and in direct violation of Section 10(a)(1)(A) of the ESA.  The standard

for the Court's review of such challenges is known as *Chevron* review, after the Supreme Court's

decision in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  The

central question for the reviewing court under *Chevron* "is whether the agency's construction of

the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the

agency's interpretation 'is based on a permissible construction of the statute.'" *Arent v. Shalala*,

70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843). Under the *Chevron*

analysis, a court first asks "whether Congress has directly spoken to the precise question at issue.

If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency,

must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at

842–43; *see also id.* at 843 n.9 ("[A]dministrative constructions which are contrary to clear

congressional intent" must be rejected by the court). "When performing this first step, [courts]

employ traditional tools of statutory construction." *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211

F.3d 638, 643 (D.C. Cir. 2000) (citing *Chevron*, 467 U.S. at 842–43; *INS v. Cardoza-Fonseca*,

480 U.S. 421, 446 (1987)). Among these tools is a statute's framework and legislative history.

*See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 172

(D.C. Cir. 2003) ("*AFL-CIO*"); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d

114, 134 (D.D.C. 1999); *see also Natural Res. Def. Council v. Browner*, 57 F.3d 1122, 1127

(D.C. Cir. 1995) ("Reference to statutory design and pertinent legislative history may often shed

new light on congressional intent, notwithstanding statutory language that appears 'superficially

clear.'") (quoting *Am. Scholastic TV Programming Found. v. Fed. Commc'ns Comm'n*, 46 F.3d

1173, 1178 (D.C. Cir. 1995)). However, canons of construction are only to be used during step

one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in

question." *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C. Cir.

1989) (emphasis in original). In conducting this stage of the *Chevron* analysis, the Court "giv[es]

no deference to the agency's interpretation." *AFL-CIO*, 333 F.3d at 173.

If the court finds that "the statute is silent or ambiguous with respect to the specific issue,

the question for the court is whether the agency's answer is based on a permissible construction

of the statute." *Chevron*, 467 U.S. at 843. "A statute is considered ambiguous if it can be read

more than one way." *AFL-CIO*, 333 F.3d at 173. "The court need not conclude that the agency

construction was the only one it permissibly could have adopted to uphold the construction, or

even the reading the court would have reached if the question initially had arisen in a judicial

proceeding." *Chevron*, 467 U.S. at 843 n.11. However, if the Agency's interpretation unduly

compromises the statute's "purposes, it is not a 'reasonable accommodation' under the Act, and

it would therefore not be entitled to deference." *Orloski v. Fed. Election Comm'n*, 795 F.2d 156,

164 (D.C. Cir. 1986) (quoting *Chevron*, 467 U.S. at 845); *see also Chevron*, 467 U.S. at 845

(providing that if the agency's "choice represents a reasonable accommodation of conflicting

policies that were committed to the agency's care by the statute, we should not disturb it unless it

appears from the statute or its legislative history that the accommodation is not one that Congress

would have sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)); *Common

Cause v. Fed. Election Comm'n*, 692 F. Supp. 1391, 1396 (D.D.C. 1987) ("[W]here the agency

interprets its statute in a way that flatly contradicts Congress's express purpose, the court may –

indeed must – intervene and correct the agency.").

     C.    *Application of* Chevron *in the Instant Case*

     The first step of *Chevron* provides a statute-based review mechanism to determine

whether the statute itself provides the agency with any discretion to act in a particular way, rather

than providing a measure of the reasonableness of agency action. The instant Circuit has

addressed the differences between *Chevron* review and "arbitrary and capricious" review under

the APA. *See Arent v. Shalala*, 70 F.3d 610, 615–16 (D.C. Cir. 1995). "[A] reviewing court's

inquiry under *Chevron* is rooted in statutory analysis and is focused on discerning the boundaries

of Congress' delegation of authority to the agency; and as long as the agency stays within that

delegation, it is free to make policy choices in interpreting the statute, and such interpretations

are entitled to deference." *Id*. at 615. However, the two issues overlap at the margins such that

judicial review can exemplify such overlap between step two of *Chevron* and "arbitrary and

capricious" analysis. *See Animal Legal Defense Fund, Inc. v. Glickman*, 204 F.3d 229, 234 (D.C.

Cir. 2000).[1]

     The Court notes that Defendants misconstrue the proper standard of review to be applied

in the instant case, largely ignoring the first step of *Chevron* analysis. Defendants state that

"[t]he Court must apply the 'arbitrary and capricious' standard of the APA, 5 U.S.C. §

706(2)(A),(C), to the FWS's decision making in assessing the likelihood of success on the

merits. 5 U.S.C. § 706." Defs.' Opp'n at 15. However, review pursuant to the APA also

requires the Court to determine if agency action is "not in accordance with law" or "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §

706(2)(A),(C). In the instant case, the Court concludes that because Defendants' authorization of

a lethal depredation control program contravenes the clear and express intent of Congress and

consequently fails under the first step of *Chevron*, the Court should not proceed to the second

step of the *Chevron* analysis nor is there a need to determine whether Defendants were arbitrary

and capricious in their actions, as the actions at issue are contrary to an unambiguous statute and

---

[1] Analysis under *Chevron* is sometimes inappropriate, particularly when neither of the
Parties contests that the statutory provision at issue is ambiguous or leaves room for ample
agency discretion. *See, e.g., Fund for Animals, Inc. v. Turner*, Civ. No. 91–2201, 1991 WL
206232 at *3 (D.D.C. Sept. 27, 1991) (applying deferential standard of review to "agency
rulemaking" resulting in the promulgation of an FWS *regulation* authorizing a sport hunt of the
threatened grizzly bear).

consequently not in accordance with law and in excess of statutory authority.

### III:  DISCUSSION

A.      *Substantial Likelihood of Success on the Merits*

Plaintiffs make two umbrella arguments on the merits of why the Court should enjoin the

lethal taking of gray wolves for depredation control purposes pursuant to Permit No.

TE111360–0.  First, Plaintiffs argue that the lethal depredation control program authorized by the

permit is "outside of the scope of the narrow take exception allowed by Section 10(a)(1)(A) of

the Endangered Species Act ("ESA"), 16 U.S.C. § 1539(a)(1)(A)" because the lethal depredation

control program–"to increase social tolerance"–contravenes the plain language, purposes, and

policy of the ESA.  Pls.' Mot. Prelim. Inj. at 1–2; Pls.' Mem. Prelim. Inj. at 10–18.  Second,

Plaintiffs argue that even if authorized killing to increase social tolerance were permissible under

the ESA, the FWS nonetheless "has failed to provide any scientifically based factual support to

show that the lethal depredation control program will affirmatively 'enhance the propagation or

survival' of the wolf.  16 U.S.C. § 1539(a)(1)(A)."  Pls.' Mot. Prelim. Inj. at 2; Pls.' Mem.

Prelim. Inj. at 21–25.  The Court shall examine fully Plaintiffs' first argument, concluding that it

need not proceed to examine Plaintiffs' second argument under the second step of the *Chevron*

analysis because it is clear from the language, framework, and legislative history of the ESA that

a depredation control program involving the lethal taking of an endangered species[2] contravenes

---

[2] The Court notes that despite Defendants' pages of arguments describing the alleged
recovery of the gray wolf, see generally Defs.' Opp'n, and Defendant-Intervenors' statement that
a Proposed Rule was published to delist gray wolves in Wisconsin, see Intervs' Opp'n at 15,
these passages are irrelevant to the Court's decision, which is predicated on the fact that the gray
wolf is currently listed as an endangered species and as such is subject to the protections afforded
to it pursuant to the ESA.

14

the clear intent of Congress as set forth in the ESA.

As noted above, under APA review, a court must first apply the "traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n*, 372 F.3d 395, 399 (D.C. Cir. 2004) (citing *Chevron*, 467 U.S. at 842–43 & n.9). Under step one of the *Chevron* analysis, if the intent of Congress is clear, the court (as well as the agency) must give effect to the unambiguously expressed intent of Congress. *Id.*; *see also Chevron*, 467 U.S. at 842–43. The court is to proceed to step two of the *Chevron* analysis – wherein it considers (1) whether the agency acted within its delegated authority, and (2) whether the agency's interpretation of the statute is reasonable – *only* if the statute is silent or ambiguous with respect to the specific issue. *Id.*; *see also Chevron*, 467 U.S. at 843–44. Defendants, who as noted above misconstrue the standard of review to be applied, are not entitled to any deference if, as in this case, the court determines that the statutory provision in question is neither silent nor ambiguous in precluding the specific action in question.

The instant Court recognizes that it is in uncharted legal waters, as the issue of whether lethal taking of endangered species for depredation control purposes violates the ESA is one of first impression. Plaintiffs' statement that "[n]o court has been asked to rule on the issue of whether the lethal taking of endangered species, supported not by science but justified solely by social policy reasons, exceeds the scope of the scientific take exception provided in Section 10(a)(1)(A)" is substantiated by the Court's own research. Pls.' Reply at 8. However, review of the existent statutory framework and case law reflective of the extremely high level of protection afforded to endangered species, coupled with the cautious approach courts have taken in

15

analyzing the lethal taking of threatened species pursuant to the ESA, leads the Court to conclude

that the lethal depredation control program authorized by the permit at issue in this case violates

Section 10(a)(1)(A) of the ESA.

　　　　　1.　　Plain Language of Section 10(a)(1)(A) of the ESA

With respect to statutory construction, the Supreme Court has emphasized that "[i]n

ascertaining the plain meaning of the statute, the court must look to the particular statutory

language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v.*

*Cartier, Inc.*, 486 U.S. 281, 291(1988) (citations omitted).  The "first step" in the canon of

statutory construction is to "begin with a 'plain language' analysis of the statutory text." *Cal.*

*Indep. Sys. Operator Corp.*, 372 F.3d at 400.  That is, the court is to assume "that the legislative

purpose is expressed by the ordinary meaning of the words used." *Sec. Indus. Ass'n v. Bd. of*

*Governors*, 468 U.S. 137, 149 (1984) (internal quotation and citations omitted).  "Where [] the

plain language of the statute is clear, the court generally will not inquire further into its

meaning." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995).

Section 9 of the ESA makes it unlawful to "take any [endangered] species within the

United States or the territorial sea of the United States."  16 U.S.C. § 1538(a)(1)(B).  To "take"

an endangered species is defined by the ESA to include "to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. §

1532(19).  Pursuant to Section 10(a)(1)(A) of the ESA, the Secretary of the Interior "may permit,

under such terms and conditions as he shall prescribe–any act otherwise prohibited by [Section 9]

of this title for scientific purposes or to enhance the propagation or survival of the affected

species, including, but not limited to, acts necessary for the establishment and maintenance of

16

experimental populations pursuant to subsection (j) of this section."  16 U.S.C. § 1539(a)(1)(A).

The permit issued by Defendants at issue in this case authorizes the lethal "take" of up to 43 gray

wolves for depredation control purposes relying on the language of "propagation or survival of

the affected species."[3]

The language "propagation or survival of the affected species," is, on its face, antithetical

to the killing of 43 members of an endangered species barring some direct and immediate danger

imposed by the individual animals killed to other members of the species.  While the Court can

contemplate one circumstance in particular where a lethal take might be permitted to enhance the

propagation or survival of the species–where an individual wolf had mange or some other

communicable disease that could ultimately result in the death of other *wolves*–it is

counterintuitive to authorize the killing of *endangered* animals rather than to authorize some

non-lethal method of "take" to enhance their propagation or survival.

Defendants argue that Plaintiffs "incorrectly attemp[t] to make a distinction between

'lethal take' and 'non-lethal take,'" and that "[t]he ESA and its implementing regulations make

no such distinction," citing to the definition of "take" included in Section 9 of the ESA.  Defs.'

Opp'n at 17.  Defendants conclude that since Section 10 authorizes the FWS to permit "any act

otherwise prohibited by [Section 9]," that "based on the plain reading of the ESA, the FWS may

permit all forms of take under Section 10(a)(1)(A) as long as it is for 'scientific purposes or to

enhance the propagation or survival of the species.'"  Defs.' Opp'n at 17.   However, the Court

_____

[3]  While the permit at issue includes provisions for the non-lethal take of wolves for
scientific purposes pursuant to Section 10(a)(1)(A), Plaintiffs do not contest these provisions in
the instant case.  *See* Pls.' Mem. Prelim. Inj., Ex. A (2006 permit).

17

notes that a plain reading of Section 10(a)(1)(A) requires at least a basic comprehension of the phrase "propagation or survival of the affected species."  Defendants' approach in the issuance of the permit at issue–that killing 43 allegedly depredating wolves will increase social tolerance for wolves and ultimately result in fewer illegal killings of wolves[4]–simply applies a labyrinthian analysis that does not comply with the text of the statute on its face.[5]

When faced with this precise issue during a hearing on a motion for preliminary injunction in *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.), Judge Ellen Huvelle also noted the contradictions in Defendants' logic (or lack thereof).  While granting injunctive relief to Plaintiffs based on Defendants' failure to provide a notice and comment period with respect to the lethal depredation program permit issued in that case, during the course of the hearing, Judge Huvelle stated with respect to the merits of Plaintiffs' position, "I am baffled by the government's position here.  I have to be perfectly frank.  I have a hard time understanding the notion you kill the wolves to save the wolves."  Pls.' Mem. Prelim. Inj., Ex. F (Tr. of Prelim. Inj. Hearing at 11, *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.)).  The instant Court is similarly confounded by Defendants' approach as applied to an *endangered* species in light of the language found in Section 10(a)(1)(A), which the Court finds

---

[4]  Defendants build their entire authorization policy around "[t]he threat [that] comes from intolerant stakeholders who–in the absence of an effective government-sanctioned wolf control program–will engage in unregulated and unsupervised takings to protect their pets and livelihood."  Defs.' Opp'n at 21–22.

[5]  Nonetheless, the Court will also address Defendants' argument in Section III(A)(2) of the instant Opinion to demonstrate that in addition to the plain language of Section 10(a)(1)(A), the statutory structure of the ESA also contradicts Defendants' assertion that Congress intended to make no distinction between lethal and non-lethal takings of endangered animals pursuant to Section 10(a)(1)(A) of the ESA.  *See infra* Section III(A)(2).

on its face would preclude a lethal depredation control program.

However, even assuming *arguendo* that the plain text of Section 10(a)(1)(A) left some room for interpretation, the first step of *Chevron* analysis requires the Court to rely on traditional methods of statutory interpretation that exceed in scope an isolated reading of the statutory provision in question.  In analyzing both the statutory framework of the ESA and its legislative history, the Court has little doubt that Plaintiffs will succeed on the merits (as they have certainly demonstrated a substantial likelihood of doing so) in proving that a lethal depredation control program is unlawful pursuant to Section 10(a)(1)(A) of the ESA.

> 2.    Statutory Framework of the ESA

A review of Section 10(a)(1)(A) *in pari materia* with the ESA as a whole supports the Court's reading of the plain language of the statute and contradicts the Agency's construction. This Circuit follows the canon of statutory construction that holds that "[s]tatutory provisions *in pari materia* normally are construed together to discern their meaning."  *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n*, 309 F.3d 796, 801 (D.C. Cir. 2002) (citing *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) ("noting that the rule that statutes *in pari materia* should be construed together 'is . . . a logical extension of the principle that individual sections of a single statute should be construed together'")); *see also Holyoke Water Power Co. v. Fed. Energy Regulatory Comm'n*, 799 F.2d 755, 766 (D.C. Cir. 1986) ("The three sections are *in pari materia* and must be read together."); *FAIC Secs., Inc. v. United States*, 768 F.2d 352, 363 (D.C. Cir. 1985) ("[T]hese two statutes are *in pari materia* and must be construed together.").  It is therefore appropriate for the Court to examine the statutory framework of the ESA in its

determination of the role that Section 10(a)(1)(A) plays therein.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation" as the "meaning–or ambiguity–of certain words or phrases may only become evident when placed in context.").  *See also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) (a "fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").  Upon the Court's consideration of the statutory framework of the ESA as a whole and the heightened protection afforded to endangered species therein, the Court cannot construe Section 10(a)(1)(A) to authorize the lethal taking of the endangered gray wolf for depredation control purposes.

The ESA allows the Secretary of the Interior to designate certain species of animal life as having protected status.  16 U.S.C. § 1533(a)(1).  *See also TVA v. Hill*, 437 U.S. at 159–60; *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003).  As the Court noted in Section I(A) of this Opinion, there are three different categories of federally-protected species under the ESA–endangered species, threatened species, and experimental populations.  Endangered species are defined pursuant to 16 U.S.C. § 1532(6) as "any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man."  16 U.S.C. § 1532(6).  Threatened species are defined pursuant to 16 U.S.C. § 1532(20) as "any species which is likely to become an endangered species within the foreseeable future throughout

all or a significant portion of its range."  16 U.S.C. § 1532(20).  And experimental populations,

sometime referred to as "10(j)" populations, are defined pursuant to 16 U.S.C. § 1539(j) and are

treated similarly to threatened species with some defined exceptions.  *See* 16 U.S.C. § 1539(j).

Endangered species are afforded the highest level of protection of any species classification.  *See*

*TVA v. Hill*, 437 U.S. at 174 ("[E]xamination of the language, history, and structure of the [ESA]

indicates beyond doubt that Congress intended endangered species to be afforded the highest of

priorities.").

A number of cases have held that *threatened* species, which as indicated in the above

framework are afforded fewer protections than endangered species under the ESA, cannot be

lethally taken with the ultimate goal of fostering fewer human-animal conflicts as a mechanism

for allegedly preserving the species.  In *Fund for Animals v. Turner*, the court enjoined FWS

from authorizing a limited hunt of threatened grizzly bears in the Northern Continental Divide

Ecosystem.  *Fund for Animals, Inc. v. Turner*, Civ. No. 91–2201, 1991 WL 206232 (D.D.C.

Sept. 27, 1991).  The court rejected defendants' rationale that "a limited hunt of the grizzly bear

creates a wariness of humans, which protects the bears by confining them to their range and

reducing bear-human conflicts, and which, in the long run, promotes the conservation and

recovery of the species[,]" *id*. at *7, instead ascertaining that

> [t]he difficulty is that the statute, as currently interpreted, does not authorize
> hunting whenever it would be a sound conservational tool.  Congress has specifically
> limited the hunting of a threatened or endangered species to extraordinary cases of
> population pressures, and the Court is constrained to enforce that legislative restriction.
> *See Sierra Club v. Clark,* 577 F. Supp. 783, 790 (D. Minn. 1984) (concluding that
> "reduc[ing] the level of wolf-human contact" is not a valid basis for authorizing a
> regulated taking under the ESA), *aff'd in part and rev'd in part on other grounds,* 755
> F.2d 608 (8th Cir. 1985).

21

*Id*.

Additionally, in *Sierra Club v. Clark*, the Eighth Circuit held that a public sport hunting season of a *threatened* species (the Eastern Timber Wolf in Minnesota) was unlawful and contrary to the plain language, statutory structure, and legislative history of the ESA. *Sierra Club v. Clark,* 755 F.2d 608 (8th Cir. 1985). The Court notes that Defendants' attention to *Sierra Club v. Clark* ignores the Eighth Circuit's actual holding while quoting dicta from the opinion very selectively. Defendants state that "[t]he only statement of law made by a United States Court of Appeals concerning the issue before this Court–whether the FWS may issue Section 10(a)(1)(A) permits for depredation control purposes–supports the FWS's position that limited depredation control actions enhance the survival of the species as a whole and are therefore properly permitted under Section 10(a)(1)(A)." Defs.' Opp'n at 18. However, the Eighth Circuit's comment to this effect is dicta (particularly as applied to endangered species, as *Sierra Club v. Clark* pertains to a threatened species), found in a footnote, and completely unaccompanied by any analysis. *See id*. at 614 n.8. Furthermore, the footnote refers to the potential for "the removal of depredating animals or the culling of diseased animals from a population" pursuant to Section 10(a)(1)(A) without distinguishing whether the provision refers to endangered or threatened species, which appears to be qualitatively and quantitatively different in its animal-focused approach from a lethal depredation control *program*. *Id*. Moreover, the footnote's mention of "removal" does not necessarily imply a lethal taking.

In light of the statutory framework set out above and the heightened level of protection given to endangered species by Congress and acknowledged by the courts, the Court will also return to Defendants' argument discussed in Section III(A)(1) that "[t]he ESA and its

implementing regulations make no such distinction" between a lethal and a non-lethal take.

Defs.' Opp'n at 17.  Defendants cite to the definition of "take" included in Section 9 of the ESA

as including to "kill" amongst a variety of other actions including to harass, harm, pursue, and so

forth.  *Id*.  As noted in Section III(A)(1), Defendants conclude that since Section 10 authorizes

the FWS to permit "any act otherwise prohibited by [Section 9]," that "based on the plain reading

of the ESA, the FWS may permit all forms of take under Section 10(a)(1)(A) as long as it is for

'scientific purposes or to enhance the propagation or survival of the species.'"  Defs.' Opp'n at

17.  However, as Plaintiffs point out, the broad definition of "take" in the ESA and prohibition

thereof in Section 9 "underscores the high level of protection that Congress intended to afford

endangered species."  Pls.' Reply at 3.  In considering the statutory framework providing the

highest level of protection to endangered species and the narrow exception provided via Section

10(a)(1)(A) to enhance species survival, the Court agrees that

> [i]n light of the context of the exception–the broad take prohibition in
> combination with a limited scientific take exception meant to further species survival–the
> FWS cannot honestly contend that its authorization of a lethal, as opposed to non-lethal,
> depredation control program is irrelevant to the issue of whether it has exceeded the
> scope of its authority under Section 10(a)(1)(A).  While it is true that Section 10(a)(1)(A)
> does not distinguish between lethal and non-lethal takes, the purpose of the exception
> makes clear that Congress would neither be indifferent to the severity nor degree of
> taking permitted by the FWS.

Pls.' Reply at 4.

In summary, the Court agrees that "[b]y using Section 10(a)(1)(A) to implement a lethal

depredation control program for endangered wolves in Wisconsin, the FWS expands the scope of

this otherwise limited exception to effectively erase any meaningful distinctions between the

management measures permitted for endangered, threatened, and experimental populations."

Pls.' Mem. Prelim. Inj. at 15.  The case law supports Plaintiffs' position, as both the Eighth

Circuit and instant District have explicitly disallowed programs involving the lethal taking of

*threatened* species, which are afforded lesser protections under the structure of the ESA than the

*endangered* gray wolf presently at stake.

### 3.    Legislative History

When the plain language of the statute in question and the reading of that provision in

relation to its related subparts contradicts the Agency's construction, the Agency may establish

the legitimacy of its construction by looking to the legislative history of the law at issue.

However, the presumption in favor of the plain language of the provision is rebuttable only in the

"rare cases [in which] the literal application of a statute will produce a result demonstrably at

odds with the intentions of its drafters."  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235,

242 (1989) (internal quotation omitted).  The Agency's burden in rebutting the clear language is

onerous:  the Agency must "show either that, as a matter of historical fact, Congress did not

mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost

surely could not have meant it."  *Engine Mfrs. Ass'n v. Envtl. Prot. Agency*, 88 F.3d 1075, 1089

(D.C. Cir. 1996); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (courts

may ignore plain language in a narrow category of cases where "the literal application of a statute

will produce a result demonstrably at odds with the intentions of its drafters . . . .").

Here, Defendants cannot meet this high standard.  Indeed, Defendants do not even make

much of an attempt in this regard.  Defendants state that "the general principle that public

opposition can frustrate wolf recovery was recognized by Congress when it stated that the FWS

'could allow for the taking of [red wolves] if depredations occur or if the release of these populations will continue to be frustrated by public opposition.'  *See* House Report No. 97–567, 34, reprinted at 1982 U.S.C.C.A.N. 2807, 2834 (1982)."  Defs.' Opp'n at 19–20.  Defendants rightfully qualify their citation with a footnote, stating that "[t]his Congressional statement was made in the context of experimental populations, but it nevertheless demonstrates clear Congressional recognition of the fact that wolf recovery can be frustrated by public intolerance due to depredations."  *Id*. at 20 n.9.  However, as Plaintiffs demonstrate, see Pls.' Reply at 8–9, Defendants' selective quotation of the House Report does not reveal the context in which the statement was made–as an example of the management flexibility provided by the inclusion of the classification of experimental populations in the 1982 amendments:

> To encourage efforts to establish such experimental populations when the conservation needs of a species would be served by doing so, this amendment relaxes certain restrictions otherwise applicable to listed species . . . .  The Committee also expects that, where appropriate, the regulations could allow for the directed taking of experimental populations.  For example, the release of experimental populations of predators, such as red wolves, could allow for the taking of these animals if depredations occur or if the release of these populations will continue to be frustrated by public opposition.

H.R. Rep. No. 97–567 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2807, 2833–34.  *See also Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) ("In order to increase the Service's flexibility in reintroducing endangered species into portions of their historic range, Congress extensively amended the ESA in 1982 . . . add[ing] section 10(j), which allows the FWS to designate as 'experimental populations' some reintroduced populations of endangered or threatened species.  Under the looser standards of section 10(j), members of an experimental population are generally to be treated as threatened rather than endangered." (internal citations omitted)).

25

Because the plain language of Section 10(a)(1)(A) and the statutory framework of the ESA are clear, the Court agrees with Plaintiffs' assessment that "The ESA is congressional recognition that the value of species trumps the social tolerance that a person or group of people may have for a particular species." Pls.' Reply at 14. The legislative history of the ESA clearly demonstrates that Congress did not intend to authorize a lethal depredation control program of an endangered species.

"[T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S.at 180. "'The plain intent of Congress in enacting this statute,' we recognized, 'was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *TVA v. Hill*, 437 U.S. at 184)). For a comprehensive review of the legislative history preceding the enactment of the ESA in 1973, the Court directs the reader to the seminal case *Tennessee Valley Authority v. Hill*. *See id.* at 174–181. The ESA further includes a congressional mandate to federal agencies, including the statement that "[i]t is further declared to be the policy of Congress that all Federal departments and agencies shall seek to *conserve* endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C.A. § 1531(c)(1) (emphasis added).

In the course of congressional debates during the enactment of the ESA with respect to how "conserve" would be interpreted, the Senate's definition of conservation included instructions to manage protected species "at the optimum carrying capacity of their habitat,"

26

through techniques including "regulation and taking necessary to these ends." S. 1983, 93rd

Cong., 1st Sess. §§ 4(e) & 3(1) (1973) (emphasis added), *cited in Sierra Club v. Clark*, 755 F.2d

at 616. The conference eliminated this language such that the final Act's definition of

conservation includes a mandate that regulated taking can take place only "in the extraordinary

case where population pressures within a given ecosystem cannot otherwise be relieved." 16

U.S.C. § 1532(3). The circumstances under which "taking" of endangered animals were to be

allowed were set forth in Section 10(a)(1)(A) and are "extremely narrow." *See TVA v. Hill*, 437

U.S. at 180. The conference report submitted with the ESA further iterates the level of caution

that Congress intended to be applied to the taking of endangered and threatened species covered

by the ESA:

> In extreme circumstances, as where a given species *exceeds the carrying capacity of its particular ecosystem* and where this pressure can be relieved in no other feasible way, this "conservation" might include authority for carefully controlled taking of surplus members of the species. To state that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur–it is just to say that the authority exists in the unlikely event that it ever becomes needed.

Conf. Rep. No. 740, 93rd Cong., 1st Sess. 23, *reprinted in* 1973 *U.S. Code Cong. & Admin.*

*News* 2989, 3001–02, *cited in Fund for Animals, Inc. v. Turner*, 1991 WL 206232 at *5

(concluding that populations pressures cannot be defined to include increased movement of

threatened bears into inhabited areas and increased human-bear conflicts in and of themselves)

(emphasis added). *Also cited in Sierra Club v. Clark,* 755 F.2d at 615–16 ("Because a

'conference report represents the final statement of terms agreed to by both houses, next to the

statute itself it is the most persuasive evidence of congressional intent.' *Demby v. Schweiker*,

671 F.2d 507, 510 (D.C. Cir. 1981). The unambiguous language of this conference report must

be given great weight.").

In summary, after analyzing the plain language, statutory framework, and legislative history of the statute, the Court concludes that congressional intent with respect to Section 10(a)(1)(A) of the ESA is remarkably clear and unambiguous in precluding the authorization of a lethal depredation program on the gray wolf where it is classified as endangered. As such, the Court will not proceed with step two of the *Chevron* analysis, as the statute is neither silent nor ambiguous in its preclusion. *See Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 399 (D.C. Cir. 2004); *Chevron*, 467 U.S. at 843–44.[6] Plaintiffs have therefore demonstrated a substantial likelihood (indeed, a *strong* likelihood) of success on the merits in demonstrating that Defendants acted contrary to law in their issuance of the permit at issue.[7]

### B.    Irreparable Injury

Plaintiffs, citing to case law, argue that the deaths of a finite number of endangered wolves constitutes irreparable injury for the purposes of issuing a preliminary injunction. *See*

---

[6] The Parties include arguments stating their positions as to whether or not the lethal depredation program at issue comports with past agency position and practice. *See* Pls.' Mem. Prelim. Inj. at 18–21; Defs.' Opp'n at 7–8. These arguments need not be addressed, as they fall outside of the interpretative boundaries of step one of the *Chevron* analysis.

[7] Defendants, in their Opposition, state that they "have no objection to the Court consolidating its ruling on Plaintiffs' motion for a preliminary injunction with a decision on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2)." Defs.' Opp'n at 1 n.1. But for Plaintiffs objection thereto in their Reply ("Plaintiffs do not think it is appropriate to consolidate this preliminary injunction motion with the merits as proposed by Defendants," Pls.' Reply at 15 n.5), the Court may have been inclined to consolidate its consideration of the instant preliminary injunction request with an ultimate determination on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2) in the Court's conclusion that Defendants' authorization of the lethal depredation control program in question was contrary to law and thus a violation of 5 U.S.C. § 706(2)(A).

28

Pls.'s Mem. Prelim. Inj. at 26–27.  Defendants argue that irreparable harm occurs only when the

take of endangered or threatened animals jeopardizes the entire species.  Defs.' Opp'n at 29–31

("[I]n order to demonstrate irreparable harm to the species for the purposes of their request for a

preliminary injunction, Plaintiffs need to demonstrate not that individual wolves will be

impacted, but that the actions at issue will jeopardize the species as a whole.").[8]  Notwithstanding

the Parties' conflicting views as to the appropriate legal basis under which the Court should

evaluate irreparable injury, it is clear to the Court that the existing case law as well as the

language, purpose, and history of the ESA as discussed in Section III(A) prohibit the Court from

adopting the standard espoused by Defendants.  The Court agrees with Plaintiffs' contention that

"[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive

relief would stand the ESA on its head.  Without the ability to enjoin illegal taking under the

ESA, courts would be without power to prevent harm to endangered species before a species was

on the brink of extinction."  Pls.' Reply at 20.

"Environmental injury, by its nature, can seldom be adequately remedied by money

---

[8]  Defendants cite to *Water Keeper Alliance v. Dep't of Defense*, 271 F.3d 21 (1st Cir. 2001) in support of their position.  However, while this First Circuit opinion suggests that something more than "the death of even a single member of an endangered species" is required to demonstrate irreparable injury, the level of injury to the species required by the First Circuit via this opinion is not as great as Defendants suggest.  *See, e.g., id*. at 34 ("In the absence of a more concrete showing of probable deaths during the interim period and of how these deaths may impact the species, the district court's conclusion that [Plaintiff] has failed to show potential for irreparable harm was not an abuse of discretion.").  In the instant case, as will be explained further in Section III(C), Plaintiffs have demonstrated a very concrete probability of death of endangered wolves (in fact, 17 endangered wolves had been killed pursuant to the lethal take depredation provision of the permit as of August 1, 2006).  Additionally, Defendants have neither refuted that the permit authorizes lethal taking of up to 10 percent of the endangered wolf population in Wisconsin, nor that such deaths will cause intra-pack hardships and stress on the species as indicated in affidavits submitted with Plaintiffs' Motion.  *See infra* § III(C).

29

damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is

sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction

to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). A

number of cases assessing irreparable injury in the context of the ESA emphasize that harm to a

small number of animals is sufficient to demonstrate irreparable harm to an endangered, or even

a threatened, species. *In Fund for Animals v. Turner,* the court rejected defendants' argument

that irreparable injury should be predicated on the possible eradication of a species, holding that

the killing of an estimated three *threatened* grizzly bears constituted irreparable injury.

> *TVA* does underscore the weight Congress has placed on the protection of
> endangered and threatened species. As the Court stated, "the [ESA] indicates beyond
> doubt that Congress intended endangered species to be afforded the highest of priorities,"
> *id.* at 174, and a threatened species is one that the Secretary believes likely to become
> endangered within the foreseeable future. In light of this Congressional mandate, the loss
> even of the relatively few grizzly bears that are likely to be taken through a sport hunt
> during the time it will take to reach a final decision in this case is a significant, and
> undoubtedly irreparable, harm.

*Turner*, 1991 WL 206232 at *8 (quoting *TVA v. Hill*, 437 U.S. at 174), *cited in Am. Rivers v.*

*U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 259 (D.D.C. 2003). *See also Defenders of*

*Wildlife v. Norton*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005) ("[t]he death or injury of

endangered wolves due to the [Section] 4(d) rules is irreparable injury."). *Compare Greater*

*Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1257 (10th Cir. 2003) ("Plaintiffs contend that a

proponent of a preliminary injunction under these circumstances, seeking to prevent harm to

members of a threatened or endangered species, need not show harm to the species as a whole.

We agree.").

The irreparable harm caused to the gray wolf absent injunctive relief is clear, as the

permit at issue authorizes the lethal take of 43 wolves–which Plaintiffs' stipulate (and Defendants do not refute) constitutes approximately 10 percent of the gray wolf population in Wisconsin. *See* Pls.' Mem. Prelim. Inj. at 9. In the FWS Biological Opinion dated April 20, 2006, with respect to the permit at issue, the FWS Field Supervisor, ES Field Office, Green Bay, WI, acknowledged that "[t]he gray wolf is expected to be adversely affected by the proposed action." Pls.' Mem. Prelim. Inj., Ex. G at 7. The Court concludes that applying the standard articulated in the above cases, which recognizes the heightened degree of protection afforded to endangered species, the lethal taking at issue in this case constitutes irreparable injury.

C.    *Balance of Harms*

"Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species." *Am. Rivers*, 271 F. Supp. 2d at 261 (internal quotation and citation omitted). As explained in Section III(B), it is clear that wolves taken pursuant to the lethal take provision of the permit at issue will suffer irreparable injury. While death is the most obvious harm inflicted upon endangered wolves in the absence of injunctive relief, Defendants do not contest the more subtle effects such takings will have on the endangered wolf population. According to the Declarations of Tom Herschelman and Karlyn Berg, taking of wolves pursuant to the permit will "lead to the deaths of individual animals, disturb and stress intra-pack relationships, and cause a decline in the area wolf population." Pls.' Mem. Prelim. Inj. at 28, Herschelman Decl. ¶ 8, Berg Decl. ¶ 7.

Defendants claim that "[t]he issuance of an injunction will harm the state of Wisconsin by eliminating its ability to effectively manage depredating wolves." Defs.' Opp'n at 32.

31

Defendants cite Wisconsin's need to control depredating wolves through the lethal depredation

program at issue "because the wolf population has grown so rapidly."  *Id*.  Defendants further

claim that "as a result of the fact that wolves occupy nearly all areas of suitable habitat . . . ,

suitable areas for translocating problem wolves are no longer available."  Defs.' Opp'n at 33.

Defendants and Defendant-Intervenors seem to miss the point–that wolves are presently

classified as *endangered* species and congressionally are viewed first and foremost as such,

rather than as a nuisance to residents or a threat to livestock or other game that residents may

choose to hunt.[9]  As the lethal take of 43 wolves allowed by the permit at issue qualifies as

irreparable environmental injury, see Section III(B), such that " injury is sufficiently likely," the

Court shall apply the principle that "the balance of harms will usually favor the issuance of an

injunction to protect the environment" in granting Plaintiffs' request for preliminary injunctive

relief.  *See Amoco Prod. Co.*, 480 U.S. at 545.  While 17 wolves had been killed as of August 1,

2006, more wolves would be lethally taken while the Parties await a final decision on the merits

in the absence of preliminary injunctive relief.

> D.     *Public Interest*

"Examination of the language, history, and structure of the [ESA] . . . indicates beyond a

doubt that Congress intended endangered species to be afforded the highest of priorities."  *TVA v.*

---

[9]  The Court notes that a number of affidavits attached to Defendant-Intervenors'
Opposition to Plaintiffs' Motion for Preliminary Injunction reflect resident complaints about
"competing" with wolves as hunters for other game when hunting for sport, a concern which, in
light of the gray wolf's endangered classification, clearly does not carry sufficient weight to be
factored into the Court's balancing of the harms in issuing a preliminary injunction.
Furthermore, the Court notes that Plaintiffs only challenge the lethal take provisions of the
Wisconsin permit such that state agencies have other methods available for dealing with
depredation concerns as authorized by the permit.  *See* Pls.' Mem. Prelim. Inj. at 29.

*Hill*, 437 U.S. at 174.  The Supreme Court in *TVA v. Hill* "underscore[d] the weight Congress has placed on the protection of endangered and threatened species."  *Fund for Animals, Inc. v. Turner*, 1991 WL 206232 at *8.  "Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species."  *Am. Rivers*, 271 F. Supp. 2d at 261 (internal quotation and citation omitted).  In enacting the ESA, Congress has "spoken in the plainest of words, making it abundantly clear that it has given the policy of conservation of endangered species the highest of priorities."  *Id*. (internal quotation marks omitted).

Defendants state that "the public interest in the long-term health and recovery of the gray wolf population in Wisconsin will be best served by permitting the states to continue their depredation control activities," and that "granting Plaintiffs' request for a preliminary injunction will not further the ESA's overarching purpose of recovering species," citing the allegedly increased public support that will accompany lethal control of "problem" wolves.  Defs.' Opp'n at 33.  The Court finds this argument disingenuous, particularly in light of Defendants focus in its Opposition just a page earlier reflecting concerns about the "rapi[d]" growth of the gray wolf population in Wisconsin.  Congressional intent behind the adoption of the ESA and iterated throughout the language of the Act itself makes crystal clear that the "public interest" lies in the protection of the endangered gray wolf–not in the lethal taking of "problem" gray wolves in the hopes of creating a selected-for gray wolf population that never interferes with livestock or hunters' kills.  Simply put, the recovery of the gray wolf is not supported by killing 43 gray wolves.

## IV:  CONCLUSION

As succinctly stated by Plaintiffs, "[t]here is no support for the idea that Congress intended the FWS to cater to criminal behavior and cotton to social intolerance as a strategy for endangered species recovery." Pls.' Reply at 14.  Based on the reasoning articulated throughout this Memorandum Opinion, the Court shall GRANT [5] Plaintiffs' Motion for Preliminary Injunction, preliminarily enjoin and restrain Defendants and their agents from authorizing the lethal take of any more gray wolves for depredation control purposes pursuant to Permit Number TE111360–0, and direct FWS to immediately stop the Wisconsin Department of Natural Resources and its agents from any further killing of gray wolves pursuant to the same.  An appropriate Order accompanies this Memorandum Opinion.

Date:   August 9, 2006

_/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge